T.C. Memo. 1996-19


UNITED STATES TAX COURT


J.J. ZAND, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


J.J. ZAND AND EVA C. ZAND, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 32434-88, 32435-88.    Filed January 23, 1996.


<u>Earl J. Silbert</u>, <u>David J. Curtin</u>, and <u>Kevin M. Dinan</u>, for petitioners.

<u>Nancy B. Herbert</u>, <u>James W. Ruger</u>, <u>John J. Boyle</u> and <u>Mathew J. Fritz</u>, for respondent.

TABLE OF CONTENTS                           Page

Determinations of Deficiencies and Additions to Tax  . .   7

Issues . . . . . . . . . . . . . . . . . . . . . . . . .   8

Findings of Fact . . . . . . . . . . . . . . . . . . . .  10


I.   Preliminary Facts . . . . . . . . . . . . . . . . .  10
     A.  Background . . . . . . . . . . . . . . . . . . .  10
     B.  Ownership of Diesel Power  . . . . . . . . . . .  12
     C.  Audits for Prior Years . . . . . . . . . . . . .  13
     D.  Preparation of Tax Returns . . . . . . . . . . .  14
     E.  Bank Accounts  . . . . . . . . . . . . . . . . .  15
     F.  Sale of Diesel Power Stock . . . . . . . . . . .  19


II.  Transactions With Manufacturers--Commission Income . . .  22
     A.  Lockheed . . . . . . . . . . . . . . . . . . . .  23
     B.  Payments by Lockheed . . . . . . . . . . . . . .  29
     C.  Ashland  . . . . . . . . . . . . . . . . . . . .  34
     D.  Payments by Ashland  . . . . . . . . . . . . . .  39
     E.  General Motors . . . . . . . . . . . . . . . . .  43
     F.  Payments Made by General Motors. . . . . . . . .  49
     G.  SEDCO/IMICO  . . . . . . . . . . . . . . . . . .  54
     H.  Payments by SEDCO, IMICO, Stewart & Stevenson  . . .  56
     I.  Ingersoll-Rand . . . . . . . . . . . . . . . . .  60
     J.  Payments by Ingersoll-Rand . . . . . . . . . . .  62
     K.  Morgan . . . . . . . . . . . . . . . . . . . . .  64
     L.  Payments by Morgan . . . . . . . . . . . . . . .  65
     M.  Harnischfeger  . . . . . . . . . . . . . . . . .  66
     N.  Payments by Harnischfeger  . . . . . . . . . . .  68
     O.  Pioneer  . . . . . . . . . . . . . . . . . . . .  70
     P.  Payments by Pioneer  . . . . . . . . . . . . . .  74
     Q.  Galion . . . . . . . . . . . . . . . . . . . . .  77
     R.  Payments by Galion . . . . . . . . . . . . . . .  81
     S.  Clark  . . . . . . . . . . . . . . . . . . . . .  85
     T.  Payments by Clark  . . . . . . . . . . . . . . .  90
     U.  Miscellaneous Commissions/Goodyear . . . . . . .  94
     V.  Payments by Miscellaneous Companies/Goodyear . . . .  95


III. Interest and Dividend Income--First National City Bank,
     London, England, and Crown Life Insurance Company. . . . 100


IV.  Interest Income--WHIP Account at Barclays Bank Bahamas . 102

V.    Character of Gain on Disposition of Diesel Power Stock . 103

VI.   Claimed Capital Losses for 1978 and 1979 . . . . . . . . 105

VII.  Asserted Claim of Right for 1979 . . . . . . . . . . . . 106

VIII. Claimed Schedule C Expense Deductions . . . . . . . . . 108
      A.   Cost of Goods Sold for 1973  . . . . . . . . . . . 108
      B.   Cost of Goods Sold for 1977  . . . . . . . . . . . 110
      C.   Cost of Goods Sold for 1978, 1979, and 1981  . . . 110
      D.   Claimed Deductions for Commission Expenses . . . . 110
      E.   Claimed Deductions for Consulting Fees . . . . . . 115
      F.   Claimed Deductions for Management Fees . . . . . . 117
      G.   Claimed Deductions for Consulting Fees or Salary . . 120
      H.   Claimed Deductions for Legal and Professional Fees . 121
      I.   Claimed Deductions for Salaries and Wages  . . . . 124
      J.   Claimed Deductions for Office Expenses . . . . . . 124
      K.   Claimed Deductions for Interest Expenses . . . . . 129
      L.   Claimed Deductions for Insurance Expenses  . . . . 132
      M.   Claimed Deductions for Dues and Publications . . . 132
      N.   Claimed Deductions for Depreciation  . . . . . . . 133
      O.   Claimed Rental Loss  . . . . . . . . . . . . . . . 135
      P.   Claimed Rent Expense--London . . . . . . . . . . . 135
      Q.   Claimed Deduction for Loan Origination Fee . . . . 135
      R.   Claimed Moving Expense Deduction . . . . . . . . . 136
      S.   Investment Tax Credits . . . . . . . . . . . . . . 136
      T.   Claimed Deductions for Travel and Entertainment
           Expenses . . . . . . . . . . . . . . . . . . . . . 136


IX.   Claimed Dependency Exemption and Charitable Contribution
      Deductions . . . . . . . . . . . . . . . . . . . . . . . 144
      A.   Dependency Exemption Deduction Claimed for
           Tara Daneshvari. . . . . . . . . . . . . . . . . . 144
      B.   Deduction for Charitable Contribution Claimed for
           Property Transferred to the City of Columbus, Ohio. .144
      C.   Deduction for Charitable Contribution Claimed for
           Property Transferred to Kenyon College . . . . . . 146


X.    Claimed Losses From Trusts, Partnerships, Subchapter S
      Corporation, and Farming Operations  . . . . . . . . . . 149

Ultimate Findings of Fact . . . . . . . . . . . . . . . 154

Opinion . . . . . . . . . . . . . . . . . . . . . . 154

I.   Preliminary Issues . . . . . . . . . . . . . . . . . 155
     A.  Burden of Proof . . . . . . . . . . . . . . . . . 155
     B.  Evidentiary Matters . . . . . . . . . . . . . . . 157
     C.  New Issues Raised by Petitioner on Brief . . . . . . 157

II.  Issues 1,2,3, and 6--Commission and Miscellaneous
     Income . . . . . . . . . . . . . . . . . . . . . . 160
     A.  Lockheed . . . . . . . . . . . . . . . . . . . . 166
     B.  Ashland . . . . . . . . . . . . . . . . . . . . 170
     C.  General Motors . . . . . . . . . . . . . . . . . 174
     D.  SEDCO, IMICO, IMISS . . . . . . . . . . . . . . 179
     E.  Ingersoll-Rand . . . . . . . . . . . . . . . . . 181
     F.  Morgan . . . . . . . . . . . . . . . . . . . . 184
     G.  Harnischfeger . . . . . . . . . . . . . . . . . 186
     H.  Pioneer . . . . . . . . . . . . . . . . . . . . 187
     I.  Galion . . . . . . . . . . . . . . . . . . . . . 189
     J.  Clark . . . . . . . . . . . . . . . . . . . . . 192
     K.  Miscellaneous Companies/Goodyear . . . . . . . . 197
     L.  Petitioner's Withdrawals From Bank Accounts . . . . 198

III. Issues 4 and 5--Interest Income on Foreign
     Bank Accounts. . . . . . . . . . . . . . . . . . . 201

IV.  Issue 7--Amount and Character of Gain on Sale of
     Diesel Power Stock . . . . . . . . . . . . . . . . . 203

V.   Issues 8 and 9--Claimed Reduction in 1979 Reported
     Income Under a Claim of Right and Section 1341 Tax
     Computation for 1981 . . . . . . . . . . . . . . . . 207

VI.  Issue 10--Claimed Schedule C Business Expense
     Deductions. . . . . . . . . . . . . . . . . . . . . 209
     A.  Cost of Goods Sold . . . . . . . . . . . . . . . 212
     B.  Commission Expenses . . . . . . . . . . . . . . 212
     C.  Consulting Fees . . . . . . . . . . . . . . . . 216
     D.  Management Fees . . . . . . . . . . . . . . . . 218
     E.  Legal and Professional Fees . . . . . . . . . . . 222

    F.  Salaries and Wages . . . . . . . . . . . . . . . . . . 227
    G.  Office Expenses . . . . . . . . . . . . . . . . . . . 227
    H.  Interest Expense . . . . . . . . . . . . . . . . . . 230
    I.  Expenses for Insurance and Dues and Publications . 237
    J.  Depreciation . . . . . . . . . . . . . . . . . . . . 237
    K.  Rental Loss and London Rent Expense . . . . . . . . 240
    L.  Loan Origination Fee . . . . . . . . . . . . . . . . 240
    M.  Moving Expense and Investment Tax Credits . . . . . 241
    N.  Travel and Entertainment Expenses . . . . . . . . . 241

VII.  Issue 11--Dependency Exemption and Charitable
     Contribution Deductions . . . . . . . . . . . . . . . . . 254
    A.  Dependency Exemption . . . . . . . . . . . . . . . . 254
    B.  Deduction for Charitable Contribution to City of
       Columbus . . . . . . . . . . . . . . . . . . . . . . 256
    C.  Deduction for Charitable Contribution to Kenyon
       College . . . . . . . . . . . . . . . . . . . . . . 259

VIII. Issue 12--Losses From Trusts, Partnerships, Subchapter
     S Corporation, and Farming Operations . . . . . . . . . 263

IX.   Issue 13--Section 6653(b) Additions to Tax for Fraud . . 266

X.    Issue 14--Statute of Limitations for 1972 . . . . . . . 281

XI.   Issue 15 and 16--Section 6653(a) Additions to Tax for
     Negligence . . . . . . . . . . . . . . . . . . . . . . . 281

XII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . 287

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:[1]  In these consolidated cases respondent determined the following Federal income tax deficiencies and additions to tax in the notices of deficiencies dated September 22, 1988:

<u>J.J. Zand, Docket No. 32434-88</u>

|  |  | Additions to Tax | |
| --- | --- | --- | --- |
| <u>Year</u> | <u>Deficiency</u> | <u>Sec. 6653(b)</u> | <u>Sec. 6653(a)</u>[2] |
| 1972 | $509,899.26 | $265,584.61 | --- |
| 1973 | 615,949.53 | 326,663.06 | --- |
| 1974 | 1,859,675.64 | 929,837.82 | --- |
| 1975 | 2,941,539.51 | 1,789,151.60 | --- |
| 1976 | 2,647,211,47 | 1,349,444.24 | --- |
| 1977 | 1,408,023.34 |  | $7,401.17 |

---

[1]  These cases were assigned to Judge Meade Whitaker on Oct. 6, 1989, for trial or other disposition.  After extensive discovery by counsel for the parties, the cases were tried for 10 days beginning Aug. 19, 1991.  The final brief was filed on June 15, 1993.  Judge Whitaker did not dispose of the cases before he retired on permanent disability on Jan. 31, 1995.  Chief Judge Hamblen ordered the parties on Feb. 8, 1995, to file a response to the proposed reassignment of the cases.  Petitioners opposed the reassignment; respondent did not oppose the reassignment.  At an informal conference with counsel for the parties on Apr. 5, 1995, the parties were offered a new trial, which was not accepted, and it was suggested that efforts be made to settle the cases.  After being informed on Oct. 19, 1995, that the cases could not be settled, the Chief Judge reassigned the cases to Judge Howard A. Dawson, Jr., on Oct. 23, 1995, for opinion and decisions.  On Nov. 3, 1995, petitioners filed an objection to the reassignment of the cases but did not move for or request a new trial.

In these circumstances, where the trial Judge has become permanently disabled and cannot be recalled to decide the cases and where the parties have not moved for or requested a new trial or to reopen the record for submission of additional evidence, the Court has two options.  It can order a new trial, although not requested by the parties, or it can reassign the cases to another judge for disposition on the record made before the trial Judge.  The Court has chosen the latter.  Therefore, the findings of fact and conclusions herein are based on the documentary and testimonial evidence contained in the record.

[2]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

J.J. Zand and Eva C. Zand, Docket No. 32435-88

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
| 1978 | $479,425.94 | [1]$23,971.30 | --- |
| 1979 | 754,569.20 | [1] 37,728.46 | --- |
| 1980 | 171,510.84 | [1] 8,575.54 | --- |
| 1981 | 246,218.55 | 12,310.93 | 50 percent of interest due on $246,218.55 |

[1]  The correct section is 6653(a).

In an Amendment to Answer filed August 13, 1991, respondent asserted increased deficiencies in, and additions to, petitioner J.J. Zand's Federal income taxes as follows:

|  | Increase in | Increase in Addition to Tax |
| Year | Deficiency | Sec. 6653(b) |
| 1973 | $5,150.34 | $2,575.17 |
| 1974 | 59,729.00 | 29,864.50 |
| 1975 | 305,317.94 | 152,658.94 |
| 1976 | 99,952.62 | 49,976.34 |

A substantial number of adjustments for most of the years in issue have been settled by concessions made by the parties. These concessions can ultimately be reflected in the Rule 155 computations.  The following issues are presented for decision:

1.  Whether J.J. Zand (petitioner) had unreported commission or fee income received from contracts for services between him or his sole proprietorship, Caspian Trading Company, and various manufacturers.

2.  Whether petitioner had unreported commission or fee income received from contracts between various manufacturers and

Diesel Power Trading Company, whose earnings were controlled by petitioner or diverted to his use.

3. Whether petitioner had unreported income from amounts paid to WHIP, a shell corporation, over which he exercised dominion and control.

4. Whether petitioner had unreported interest income earned on First National City Bank of London, England, bank accounts in his name for the years 1974, 1975, and 1976.

5. Whether petitioner had unreported interest income earned on a Barclays Bank Bahamas account for the years 1974, 1975, and 1976.

6. Whether petitioner had taxable income from various miscellaneous items of income paid to him.

7. For the year 1977, whether petitioner's gain on the sale of his stock in Diesel Power Trading Company must be reported as a dividend under section 1248, rather than a long-term capital gain, and what is the correct amount of such gain.

8. Whether petitioner is entitled to reduce the gross income reported on his return for 1979 by the amount of $348,350 as set forth in an amended return filed for 1979.

9. Whether petitioner is entitled to use the tax computation of section 1341 for the year 1981.

10. Whether petitioner's taxable income for the years 1973 through 1981 should be increased by adjustments made by

respondent to claimed deductions on Schedule C for cost of goods sold, ordinary and necessary business expenses, travel and entertainment expenses, and depreciation.

11.  Whether petitioner's taxable income for certain years should be increased by adjustments made by respondent to claimed deductions for a dependency exemption and charitable contributions.

12.  Whether petitioner is entitled to losses claimed with respect to rental activities, trusts, partnerships, subchapter S corporations and farming activities for the years 1976 through 1981.

13. Whether any part of the underpayment of income tax for each of the years 1972 through 1976 was due to petitioner's fraud with intent to evade tax.

14.  Whether the assessment and collection of petitioner's Federal income taxes for 1972 are barred by the statute of limitations.

15.  Whether petitioner is liable for the addition to tax for negligence under section 6653(a) for the year 1977.

16.  Whether petitioners are liable for additions to tax under section 6653(a) for years 1978 through 1980 due to negligence or intentional disregard of rules and regulations, and for the additions to tax under section 6653(a)(1) and (2) for the year 1981.

FINDINGS OF FACT

Many facts have been stipulated and are so found.  The stipulations of fact and supplemental stipulations and attached exhibits are incorporated herein by this reference.  Petitioners J.J. Zand and Eva Zand[3] resided in Naples, Florida, when the petitions were filed in these cases.

## I. Preliminary Facts

### A. Background

Petitioner was born on June 14, 1923.  He became a U.S. citizen in 1953 and remained so during the years at issue.  Prior to becoming a U.S. citizen, he was a citizen of Iran.  Petitioner moved to Columbus, Ohio, in 1946, where he lived with his family until 1957.

Caspian Trading Company of Iran (Caspian Iran) was formed by four of petitioner's classmates in 1945, and owned by the Bakhtiar Brothers, who were not related to petitioner.  Its purpose was to import American equipment into Iran and to become an Iranian distributor of U.S. products.

From the mid-1950's, petitioner's business in the United States operated under the sole proprietorship name of Caspian Trading Company (CTC), located in Columbus, Ohio.  CTC's role was to act as a liaison between Caspian Iran and certain

---

[3] While Eva Zand is a petitioner for the years 1978 through 1981 because she filed joint returns with J.J. Zand, most of the adjustments at issue involve the activities of J.J. Zand, who is referred to throughout our findings of fact and opinion as petitioner.

manufacturers with which petitioner had a business relationship. During this period petitioner had an arrangement with Caspian Iran whereby he operated in Columbus, Ohio, what he referred to in his dealings with manufacturers as a U.S. "branch office" of Caspian Iran. Petitioner, through CTC, sought to act as a distributor on behalf of American manufacturers whose goods were then sold in Iran by Caspian Iran. The earnings of both Caspian Iran and petitioner were on a commission basis. There was an understanding between petitioner and Caspian Iran that all commissions earned would be split 60 percent for Caspian Iran and 40 percent for petitioner.

Petitioner moved back to Iran from Columbus, Ohio, at the end of 1957. His connections with Caspian Iran were severed in approximately October 1957. In an agreement terminating the relationship, Caspian Iran and CTC agreed that commissions earned in pending transactions would be divided 60 percent for Caspian Iran and 40 percent for CTC.

In 1958, Diesel Power Trading Company (Diesel Power) was established in Iran by petitioner, his father, Jamil Z. Irani, and Mr. Taleghani, a former classmate of petitioner. Petitioner subsequently acquired the Diesel Power stock of his father and Mr. Taleghani, and he owned 100 percent of Diesel Power from the late 1950's or early 1960's until the end of 1974. During the early period of Diesel Power's existence, petitioner's father was

highly involved in its operation. His father was Diesel Power's managing director until the mid-1960's, and the commercial license of Diesel Power at one time was issued in his name. Such license may only be issued to a resident of Iran.

Sometime between 1958 and 1961, petitioner moved his family to nearby Beirut, Lebanon. While in Teheran and Beirut, petitioner worked on Diesel Power matters using either the Caspian Iran or CTC name.

Petitioner also maintained an office in Columbus, Ohio, during these years with at least one employee. Regular communications from Diesel Power were received and passed on to various American manufacturers via the Columbus, Ohio, office; that office also expedited shipment and collected commissions earned. Petitioner returned to the United States in 1961.

### B. Ownership of Diesel Power

Farshid Khalatbari (Mr. Khalatbari) joined Diesel Power in the mid-1960's and replaced petitioner's father as the managing director. Mr. Khalatbari married Diana Zand, petitioner's sister, who was then referred to as Diana Khalatbari. In 1971 a dispute arose between petitioner and Mr. Khalatbari; consequently, Mr. Khalatbari left Diesel Power for about 10 days. He agreed to return upon assurances from petitioner that he would become a part owner of Diesel Power. It was not until November 1974, that Diesel Power, which formerly had been a limited

partnership, was converted to a corporate form.  In the course of that change, petitioner was paid 11,750,000 rials and decreased his ownership share of Diesel Power to less than 50 percent.[4]  On his original and amended income tax returns for 1974, 1975, and 1976, petitioner did not report disposition of any interest in Diesel Power.  Petitioner, Mr. Khalatbari, and Diana Khalatbari were directors of Diesel Power during the years at issue. Petitioner's brother, I.J. Zand, was also employed by Diesel Power from 1971 to 1976 as parts director and sales director. From 1971 to 1976 petitioner owned the land on which the shops, offices, and warehouse of Diesel Power were located, but he did not report any rental income therefrom on his 1972, 1973, and 1974 returns.  Petitioner sold this land to Diesel Power in 1976 and reported the gain therefrom.

## C. Audits for Prior Years

Respondent made adjustments to petitioner's 1958 income for unreported commissions.  The 1958 notice of deficiency indicated that 40 percent of the commissions earned for two of the items and 10 percent for one item constituted additional commission income.  Petitioner's Federal income tax returns for the years 1959 to 1961 were also audited.  His income for those years was increased for omitted commissions, again at the 40 percent and 10 percent rates.

---

[4] It appears that petitioner's ownership of Diesel Power was 49 percent.

After petitioner consented to extend the period of limitations for the years 1964 to 1968, his returns for those years resulted in a "no change" letter. A previous audit of petitioner's income tax return for 1972 resulted in another "no change" letter.

### D. Preparation of Tax Returns

Petitioner employed several different accountants to prepare his income tax returns during the years at issue. His returns for the years 1972 through 1976, as well as a first amended return for 1975 filed on December 20, 1976, were prepared by Robert E. Giffin. Mr. Giffin relied upon the CTC receipts journals for the preparation of these returns and was not made aware of petitioner's bank accounts or his interest in companies located in other countries. Mr. Giffin did not know at the time he prepared the returns that petitioner owned any portion of Diesel Power stock. A second amended return for the year 1975 and an amended return for the year 1976 filed on February 22, 1978, were prepared by Steven Dutton, a C.P.A. On the amended return for 1976 petitioner reported increased commission income of $134,378. Mr. Dutton worked for petitioner from September 1977 until June 1980. The returns prepared by Mr. Dutton were based upon the CTC receipts and disbursements journals. At times, Mr. Dutton reviewed the substantiation for certain claimed deductions. Petitioner's 1977 return was also prepared by Mr.

Dutton, who at that time worked for Deloitte, Haskins and Sells. Although no return preparer's name appears on petitioners' 1978 and 1979 returns, Mr. Dutton was involved in their preparation. An amended return for the year 1979 filed April 4, 1983, was prepared by Santen, Santen & Hughes Co., LPA. Deloitte, Haskins & Sells prepared the 1980 and 1981 Forms 1040 and 1040X.

### E. Bank Accounts

There were a significant number of bank accounts under petitioner's control or into which his funds were deposited during the years at issue. The accounts in the names of either CTC or petitioner were located at First National City Bank, London; City National Bank & Trust Company, Columbus, Ohio; Bank One of Columbus, Ohio; Raiffeisen Bank, Kitzbuhel, Austria; Bank of America, New York; and First National City Bank, Channel Island. The accounts in the name of Diesel Power were located at City National Bank of Columbus, Ohio; Bank of Teheran, Iran; First National City Bank, Geneva, Switzerland; First National City Bank, New York; Bank of America, New York; Citibank, Channel Island; and Banque de Paris Et Des Pays-Bas (Suisse) S.A. (Banque de Paris), Geneva, Switzerland. An account in the name of WHIP was located at Barclays Bank, Freeport, Bahamas. An account in the name of All Patents was located at Banque de Paris, Geneva, Switzerland. An account in the name of IGOS was located at City National Bank & Trust Company, Columbus, Ohio. An account in the

name of Interrep was located at Banque de Paris, Geneva, Switzerland. For convenience we list below the major accounts, their years of existence, whether petitioner was an authorized signatory, and the names by which we refer to them herein:

| Name on Account | Years in Existence | Petitioner Authorized Signatory | Name Used |
|---|---|---|---|
| Petitioner | 1973-1975 | Yes | Zand FNCB London |
| Petitioner | 1972-1976 | Yes | Zand CNB Columbus |
| Petitioner | 1972-1976 | Yes | Zand Kitzbuhel |
| CTC | 1973-1975 | Yes | CTC Bank of America |
| CTC | 1972-1976 | Yes | CTC CNB |
| Petitioner c/o CTC | 1975-1977 | Yes | CTC FNCB London |
| CTC | Unknown | Unknown | CTC Bank One |
| Diesel Power | 1971-1977 | Yes | Diesel Power CNB Columbus |
| Diesel Power | 1972-1976 | Yes | Diesel Power Bank of Teheran |
| Diesel Power | 1975-1978 | Yes | Diesel Power FNCB Geneva # 1 |
| Diesel Power | 1972-1976 | Unknown | Diesel Power FNCB Geneva # 2 |
| Diesel Power/ J.J. Zand | 1974-? | Yes | Diesel Power FNCB London |

| Name on Account | Years in Existence | Petitioner Authorized Signatory | Name Used |
|---|---|---|---|
| Diesel Power c/o CTC | 1972-1976 | Yes | Diesel Power Bank of America |

| Diesel Power | 1972-1976 | Yes | Diesel Power Banque de Paris |
|---|---|---|---|
| Diesel Power | Unknown | Unknown | Diesel Power Channel Island |
| WHIP | 1972-1976 | Yes | WHIP Barclays Bahamas |
| WHIP | Unknown | Unknown | WHIP Banque de Paris |
| All Patents | 1972-1976 | Yes | All Patents Banque de Paris |
| IGOS | 1974 | Yes | IGOS CNB Columbus |
| Interrep, S.A. | 1973 | Unknown | Interrep Banque de Paris |

During 1973 petitioner wrote checks to himself on the Diesel Power Bank of America account[5] in the amounts of $30,000, $75,000, $90,000, and $10,500. These checks were endorsed for deposit into either a CTC account or one of petitioner's personal accounts. An additional $50,000 was withdrawn from this account during 1973 and paid to petitioner/CTC. The CTC cash receipts journal reflects each of these amounts received as a loan. However, there is no other documentary evidence of a loan between petitioner and Diesel Power at this time, nor is there any documentary evidence that such a loan, if it existed, was ever repaid. Petitioner also wrote a check to himself in the amount

---

[5] Although the account number that appears on the checks contained in Exh. 508-SN is different than the stipulated account number for the Diesel Power Bank of America account, the parties have stipulated that the checks contained in that exhibit were written on the same account. Therefore, we assume that the difference in account numbers is of no significance and that there was only one Diesel Power Bank of America account.

of $400,000 during 1973, which was endorsed for deposit to City National Bank & Trust Company; this check is not reflected on CTC's cash receipts journal.

During 1974 petitioner wrote checks to himself on the Diesel Power Bank of America account in the total amount of $531,633.48. These checks were endorsed for deposit to either CTC or Zand personal accounts. All of these deposits are reflected in the CTC cash receipts journal as either loans or reimbursements with the exception of one deposit in the amount of $40,000, which is not reflected at all. There is no other documentary evidence of a loan in the record.

During 1975 petitioner wrote five checks to himself on the Diesel Power Bank of America account. One check in the amount of $150,000 was endorsed for deposit to CTC but is not reflected in the CTC cash receipts journal. A second check in the amount of $375,000 was endorsed for deposit to a Zand account; it is reflected on the 1975 CTC receipts journal as a loan. However, there is no other documentary evidence in the record of such a loan. Petitioner wrote three additional checks on the Diesel Power Bank of America account during 1975 in the total amount of $76,652.03. Two of these checks were endorsed for deposit to CTC. The third check in the amount of $50,000 was endorsed to "I.D.S." to purchase stock. The first two checks were listed on CTC's 1975 cash receipts journal as reimbursements. The check

endorsed to I.D.S. does not appear on the 1975 CTC cash receipts journal.

In 1976 petitioner wrote four checks to himself on the Diesel Power Bank of America account in the total amount of $265,000. Three of these checks in the total amount of $150,000 were endorsed for deposit to CTC or Zand personal accounts. The 1976 CTC receipts journal reflects these payments as a transfer or loans from Diesel Power. There is no other documentary evidence of loans in the record. The fourth check in the amount of $115,000 was endorsed to Ray Prussing. Although there is no documentary evidence of a loan at the time the check was endorsed, Ray Prussing paid $115,000 to petitioner in 1977. The 1977 CTC cash receipts journal lists a deposit of $115,000 as a Refund/Reimbursement.

## F. Sale of Diesel Power Stock

In December 1977 petitioner sold the remainder of his Diesel Power stock to Mr. and Mrs. Khalatbari for $6 million, $3,300,000 of which was paid as a downpayment to petitioner at that time. The Shareholder Consent and Agreement to the sale states that, prior to the sale, petitioner owned 40 percent of Diesel Power stock, and that the Khalatbari family owned the remaining 60 percent. On petitioner's 1977 income tax return, petitioner reported the sale of a 40-percent stock interest in Diesel Power. Sometime after the sale of petitioner's Diesel Power stock in

1977, Mr. Dutton prepared an analysis of petitioner's records in order to ascertain whether petitioner had received what he was entitled to for the sale of the stock. In the course of that analysis, Mr. Dutton summarized the total commissions received by CTC from manufacturers from January 1, 1973, to June 30, 1978, as reflected on the CTC receipts journal. He also reviewed the numerous commission payments between CTC and Diesel Power during those years. From his review, Mr. Dutton concluded that CTC had received a total of $6,849,743.23 in commissions, and Diesel Power actually had received $14,192,680.82 during this period. Based upon Mr. Dutton's computation of amounts due from commissions and his understanding of the commission splits, CTC was entitled to an additional $395,016.07 from Diesel Power. Mr. Dutton also concluded that the gross profits reported on petitioner's original returns were correct, except for 1975 and 1976, which had understated commission income in the amounts of $511,626.78 and $134,378, respectively. The understated commission income was reported on amended returns for those years. After these amended returns were filed, Mr. Dutton concluded that, based on information about petitioner's holdings available to him, all required amounts as reflected on the CTC receipts journal had been properly included in petitioner's income during 1975 and 1976.

In January 1978 Mr. Khalatbari withdrew all funds from and closed the Diesel Power FNCB Geneva # 1 account and Diesel Power Banque de Paris account.  In March 1978 a second payment on the Diesel Power stock sale was made by Mr. Khalatbari in the amount of $625,000.  The remaining payments due to petitioner under the stock sale agreement were $700,000 in December 1978 and $265,000 in December 1979.

In May 1978 petitioner ordered a total of $240,000 transferred from an account at the Banque de Paris into the WHIP Barclays Bahamas account.  After ordering these funds to be invested in a certificate of deposit, petitioner redeemed this certificate of deposit prior to its maturation, as well as another certificate of deposit in the amount of $361,211, and ordered that the proceeds be deposited in the WHIP Barclays Bahamas account.  In December 1978 Mr. Dutton, on petitioner's instructions, flew to the Bahamas and withdrew $610,000 from the WHIP Barclays Bahamas account and deposited these funds into one of petitioner's accounts in Ohio.  These funds were not recorded on the CTC receipts journal or petitioner's 1978 return or 1978 amended return.  Mr. Dutton performed another analysis in 1979 from which he concluded that CTC was in possession of more than $1,600,000 in Diesel Power commissions.  On his return for 1979 petitioner reported $1,617,761 as income, claiming that Diesel Power shareholders owed him a considerable amount on the sale

price of his Diesel Power stock, which was in excess of the amount held by CTC, and that he refused to pay amounts owed to Diesel Power under a claim of right.

II. Transactions With Manufacturers--Commission Income

During the years at issue there were numerous business relationships between various manufacturers and petitioner, CTC, or Diesel Power, which involved essentially three types of services performed for the manufacturers: (1) Distributorship, whereby the appointed distributor took title to the manufactured goods until sold to the end-use customer; (2) representation arrangements, whereby the representative promoted the sale of manufactured products; and (3) consultancies, whereby advice and expertise were provided in selling products. The income that arose out of these relationships is referred to by respondent in the notices of deficiency as "commission" income. The vast majority of adjustments in dispute involve commissions that were paid to CTC but treated as Diesel Power commissions on the CTC receipts journals. The activities leading up to the adjustments at issue with respect to each company are set forth below.

## A. <u>Lockheed</u>

Petitioner did business with Lockheed Aircraft Corporation (Lockheed)[6] through four entities.  One entity was a corporation located in the Bahamas called Western Hemisphere Industrial & Petroleum Corporation (WHIP), which was formed in 1969.  WHIP share certificates were issued in the names of nominees for petitioner, although at one point WHIP is referred to by one company as a nominee for the National Iranian Oil Company (NIOC). Petitioner had an ownership interest in WHIP.  Price Waterhouse, the resident agent for WHIP, was given instructions from petitioner and was paid by petitioner.  The banking and other business activities of WHIP were handled by petitioner and his CTC employees.

Petitioner's first expression of the idea to use the WHIP entity appeared in a letter dated January 14, 1969, from petitioner to Iran's then Prime Minister.  Petitioner outlined the terms of an agreement that he proposed to negotiate for the purchase of oil by Iran, explaining that the "mechanics for implementation" of the arrangement would involve WHIP. Petitioner's letter also indicated that disposition of WHIP shares would be at the discretion of the Prime Minister and that,

---

[6] Petitioner participated in business transactions with a number of companies and their affiliates.  Respondent did not distinguish among these affiliates in the notices of deficiency.  For purposes of this opinion, it is irrelevant which of the affiliates dealt with petitioner; therefore, we do not distinguish between them in the findings of fact.  Each company and all of its relevant affiliates will be referred to under one generic name.

for interim purposes, petitioner and Dr. R. Fallah had been nominated to the Board of Directors. However, petitioner and his attorney later became WHIP directors. Dr. Fallah was a Director of NIOC. Although Occidental Petroleum Corporation (Occidental) referred to WHIP as a nominee of NIOC in a February 1969 letter to Dr. Fallah, in a subsequent letter to another client, petitioner referred to WHIP as "one of our operating companies".

Petitioner was able to tie this oil purchase by Iran to the sale of Lockheed aircraft. In 1970 Lockheed indicated a willingness to sell 24 Lockheed C-130 airplanes, including ground support equipment, to the Imperial Iranian Air Force. The C-130 Hercules aircraft was a large military transport plane. While a direct sale was not implemented, in 1970 an agreement was entered into between petitioner's companies and Occidental; this agreement was related to another agreement of the same date between Occidental and NIOC. Pursuant to these agreements Occidental purchased oil from NIOC; Occidental then paid for the oil partly in cash and partly in C-130 Hercules aircraft that Occidental purchased from Lockheed. Furthermore, according to the agreement between petitioner and Occidental, Occidental was to pay a fee to WHIP of 1 cent per barrel of oil that Occidental purchased from NIOC. This fee to WHIP was "in consideration of services rendered to date and that will continue to be rendered

in reaching and the implementation of the agreement" between Occidental and NIOC.

By another letter agreement dated September 28, 1970, and signed by petitioner on behalf of WHIP, Lockheed agreed to pay WHIP for services rendered an amount not to exceed $1,229,700 under the arrangement with the Government of Iran for the C-130 aircraft. By letters of the same date, Lockheed entered into three separate contracts with CTC, WHIP, and Diesel Power; petitioner signed all three contracts on behalf of each company. The payments due under each of these contracts were based upon a percentage of Iran's payments to Lockheed. On January 11, 1971, petitioner on behalf of CTC, WHIP, and Diesel Power signed amended contracts with Lockheed. These amended contracts provided that Lockheed would pay an additional advance payment to CTC of $200,000 "in lieu of current payments otherwise due and payable to Caspian, Western and Diesel under [the] * * * Agreements." On October 1, 1971, the agreement with CTC again was amended; Lockheed thereby agreed to pay CTC an additional fee for "special services and assistance". In October 1971 Lockheed also agreed to pay CTC 5 percent of the purchase price for the sale of a C-130 Flight Simulator Mobile Training Unit to the Iranian Government. After the value of the underlying contract was reduced, in December 1972, the earlier agreements were again

modified to maintain the previously stated commission to "Mr. Zand's companies" despite the reduction.

Another company used by petitioner in his dealings with Lockheed was Sunvaco. Mr. Conley, a Lockheed official who had met petitioner in 1971, was aware that petitioner, through WHIP, already was Lockheed's representative for the sale of the C-130 aircraft. After this initial meeting, Mr. Conley and other Lockheed officials met with petitioner, who introduced them to Mr. Khalatbari and Mr. Zanganeh, and the three said they would work as a group under the name of Sunvaco.[7] On June 1, 1971, Lockheed entered into a marketing consultant agreement with petitioner and Sunvaco. Initially, petitioner and Sunvaco were to receive a monthly retainer in the amount of $4,166.66. Commission payments were to be set forth later. Petitioner signed the agreement on behalf of himself and Sunvaco. On October 29, 1971, this marketing agreement was modified to provide a 3-percent commission to be paid on sales of Lockheed Model P-3 Export Type Aircraft, a military aircraft. Further amendments to this agreement and to the earlier agreement in

---

[7] In 1981 petitioner wrote to Mr. Conley, who had been the president of Lockheed's Tehran division, indicating that petitioner needed confirmation of certain information in connection with an Internal Revenue Service investigation that Lockheed had engaged the services of at least three individuals when it retained Sunvaco. In response to petitioner's request, Mr. Conley confirmed in writing his recollection that petitioner "did not have all of the desirable capabilities to act as our marketing consultant in Iran" and that he understood Sunvaco to involve the services of at least Khalatbari, Zanganeh, and petitioner.

connection with the C-130 aircraft were made on December 7, 1972, May 1, 1973, June 8, 1973, and January 16, 1974. Each of these three amendments was signed by petitioner on behalf of himself and Sunvaco.

Mr. Zanganeh was involved in Sunvaco transactions in some respect. A 1972 letter from Lockheed to Mr. Zanganeh discusses the terms and conditions contained in the agreement with Sunvaco in connection with the TriStar Model L-1011 aircraft purchased by Iran National Airlines. The letter asks Mr. Zanganeh to confirm these terms on behalf of Sunvaco. Another version of the same letter addressed to Mr. Zanganeh worded somewhat differently affirmed, "Pursuant to Mr. J. J. Zand's request", Lockheed's understanding of the fee arrangement with Sunvaco. The record contains what appears to be a draft of a response by petitioner to Lockheed's letter. Mr. Zanganeh was paid $80,000 out of the WHIP account in 1972 and $75,000 out of a CTC account in 1974. Petitioner reimbursed himself for the CTC payment by writing a check to himself on the Diesel Power Bank of America account.

In addition to these payments to Mr. Zanganeh, petitioner and his employees instructed Lockheed how to allocate and where to mail commission payments required under the Lockheed contracts. In 1971 petitioner also instructed Price Waterhouse to transfer to an account in Switzerland $1,000,000 of the total amount of $1,229,700 expected to be received by WHIP from

Lockheed under the September 28, 1970, agreement. Petitioner further instructed Price Waterhouse that 80 percent of all other amounts expected to be received by WHIP from other sources should be transferred to the same account in Switzerland. Petitioner gave similar instructions to Barclays Bank, the location of the WHIP Barclays Bahamas account, that 80 percent of all future deposits should be transferred to an account in the name of WHIP at the Banque de Paris. There is no other evidence in the record concerning the disposition of funds to or from the WHIP Swiss account. In 1975 petitioner signed for Sunvaco and himself a certificate of compliance under the marketing and consulting agreement, certifying that the contract requirements had been satisfied and that payment of $481,600 was due and owing. As with the WHIP contracts, petitioner also directed how and to which company payments from Lockheed on the Sunvaco contracts were to be made.

Petitioner expended considerable effort on behalf of Lockheed for the sale of military aircraft to the Government of Iran. Mr. Kotchian was the President of Lockheed who originally hired petitioner for the C-130 sale. Mr. Kotchian dealt extensively with petitioner with regard to attempts to sell Lockheed products in Iran, and he was under the impression that petitioner was Lockheed's Iranian consultant. He did not know of

CTC, Diesel Power, WHIP, or Sunvaco; he had heard of Mr. Khalatbari, but he did not know Mr. Zanganeh.

By an agreement dated August 1, 1974, Diesel Power became a distributor for Lockheed Missiles & Space Company, Inc. Although the copy of this agreement in the record is unsigned, a handwritten note attached to a copy sent to a CTC employee indicates that Mr. Khalatbari had signed it on July 24, 1974. None of the amounts at issue were earned by Diesel Power under this agreement.

## B. Payments by Lockheed

In the notice of deficiency for 1972 respondent adjusted petitioner's income from Lockheed in the amount of $1,013,084.34, which is equivalent to the two amounts Lockheed paid to WHIP and Diesel Power in 1972, as follows. During the taxable year 1972 Lockheed issued checks payable to CTC in the total amount of $418,111.59, which were recorded in CTC's cash receipts journal and were deposited in the CTC CNB account. This amount is not in dispute. During 1972 Lockheed also issued 12 checks to Diesel Power which totaled $594,972.75. All but one of these checks were deposited during 1972 into the Diesel Power Bank of America account. It is unknown where the remaining check was deposited. None of the amounts of these 12 checks was recorded in the 1972 CTC receipts journal. During 1972 Lockheed also issued 12 checks to WHIP which totaled $418,111.41. Four of these checks,

totaling $171,806.42, were deposited into the WHIP Barclays Bahamas account during 1972. The record does not indicate where the remaining checks were deposited. None of the amounts paid by Lockheed to WHIP during 1972 was recorded in the 1972 CTC receipts journals. Lockheed issued the checks in the names of CTC, Diesel Power, and WHIP in accordance with instructions from petitioner or a CTC employee. Petitioner reported no dividend or other gross income from WHIP on his income tax return for 1972.

In the notice of deficiency for 1973 respondent increased petitioner's income from Lockheed by $657,735.96, which is the sum of amounts paid to WHIP and Diesel Power in 1973 as follows. During 1973 Lockheed paid Diesel Power a total of $466,147.55, which was deposited into the Diesel Power Bank of America account. None of this amount was recorded in the 1973 CTC receipts journal. During 1973 Lockheed made payments to WHIP in the total amount of $191,588.41, which were deposited into the WHIP Barclays Bahamas account. These payments were not recorded in CTC's cash receipts journal for 1973. Petitioner reported no income from WHIP on his income tax return for 1973.

In the notice of deficiency for 1974 respondent increased petitioner's income from Lockheed by $995,543.23. During 1974 Lockheed paid CTC $226,920.17 in connection with the C-130 sales and $270,851.40 in connection with the P-3 aircraft sales, which were deposited into CTC's CNB account. These amounts were

recorded as commissions on the 1974 CTC receipts journal and are not at issue. During 1974 Lockheed issued checks to Diesel Power in the total amount of $995,543.23, all of which were deposited into the Diesel Power Bank of America account. Lockheed issued these checks payable to Diesel Power in accordance with petitioner's instructions. Lockheed, WHIP, and Sunvaco are not listed on Diesel Power's financial statements for the periods ending March 20, 1974, and March 20, 1975. None of these checks was reflected on the 1974 CTC cash receipts journal.

In the notice of deficiency for 1975 respondent increased petitioner's income from Lockheed by $331,862.92. During the taxable year 1975 Lockheed issued checks payable to CTC in the total amount of $162,622.03. These checks were recorded in CTC's 1975 cash receipts journal; were deposited into CTC's CNB bank account; were reported by petitioner as gross income for 1975; and are not at issue. During the taxable year 1975 Lockheed issued checks payable to Diesel Power in the total amount of $331,862.92. These checks were issued in accordance with petitioner's instructions. At least some of these checks were payment in connection with the sale of P-3 aircraft. With the exception of one check in the amount of $6,618.86, all of these checks were deposited into the Diesel Power Bank of America account. None of these checks was included by petitioner in his 1975 gross income.

In a letter dated May 13, 1975, a senior vice president of Lockheed sent petitioner a letter expressing concern over communications that had been brought to his attention suggesting that the Government of Iran might refuse to do business with companies that used middlemen, such as petitioner, in offering products for sale to Iran.  Petitioner responded to Lockheed by explaining that the policy of Iran was to continue doing business with legitimate representatives.  In July 1975, petitioner was interviewed by U.S. Senate Foreign Relations Committee personnel concerning possible questionable payments to foreign government officials in connection with product sales.  After this interview, the record shows no Lockheed commission payments to either Diesel Power or CTC.  On January 28, 1976, the Lockheed/Zand/Sunvaco agreement was terminated effective October 10, 1975.  The termination was a result of the U.S. investigation into Lockheed's use of consultants.  The termination agreement was signed by petitioner on his own behalf and on behalf of Sunvaco.

In the notice of deficiency for 1976 respondent increased petitioner's commission and fee income from Lockheed by $321,066. Lockheed issued a check dated January 26, 1976, to Sunvaco and petitioner in the amount of $481,600.  This check was mailed to petitioner's Columbus, Ohio, address and was deposited in full into the CTC CNB account.  Of this amount $100,000 was paid by

Lockheed in settlement of an outstanding obligation for the sales of the P-3 aircraft; $381,600 was attributable to a Lockheed contract obligation for the C-130 aircraft. The 1976 CTC cash receipts journal lists $321,066 of this payment (approximately two-thirds) as "Commissions-DPTC" and the remaining $160,533.34 as "Commissions-Caspian". Petitioner included $160,533.34 of this termination payment in his 1976 gross income and excluded the remaining $321,066.

In an attachment to a letter dated June 20, 1979, from Mr. Stephen E. Dutton to Williams & Connolly, Mr. Dutton outlined the following summary of WHIP receipts and disbursements that he indicated he had prepared from bank statements:

Receipts:

| | |
|---|---|
| Lockheed | $1,476,786.58 |
| Banque de Paris | 240,000.00 |
| Interest | 111,211.00 |
| Galion | 110,000.00 |
| Diesel Power | 47,000.00 |

Disbursements:

|  |  |
|---|---|
| Banque de Paris | $880,000.00 |
| Minora (DPC) | 115,000.00 |
| Galion | 10,000.00 |
| FK (Tonekaboni) | 100,000.00 |
| Zanganeh | 80,000.00 |
| Swiss Credit Bank #29934 | 83,000.00 |
| Price Waterhouse | 2,248.85 |
| FNCB-London | 2,500.00 |
| Bank & Check Charges | 135.19 |

## C. Ashland

On April 4, 1974, Ashland Bermuda Limited (Ashland) entered into an agreement with All Patents Corporation Limited (All Patents) whereby Ashland hired All Patents as a consultant in negotiations between Ashland and NIOC. These negotiations were in connection with the purchase of crude oil to be used in a joint venture involving the operation of refineries in the United States. The name of the signer for All Patents is unrecognizable. The agreement provided that Ashland would pay All Patents a fee of 3 cents per barrel of oil that NIOC sold to Ashland in exchange for, by its own terms, "personal services" provided by All Patents. Under this and other agreements with Ashland, All Patents was a consultant providing technical assistance and other services in connection with NIOC's supply of crude oil to Ashland. There were also previously in place two

agreements dated May 18, 1973, and December 7, 1973, between Ashland and the Banque de Paris.  By these agreements Banque de Paris was to provide technical advice and assistance in connection with the joint venture in exchange for a fee.

Although Ashland representatives did not know who the legal owners of All Patents were, it was understood by Ashland that All Patents was an affiliate of petitioner.  Orin Atkins was the president of Ashland from 1964 to 1981.  Mr. Atkins retained the services of petitioner in Ashland's efforts to purchase crude oil from Iran with the expectation that, because of petitioner's fluency with the language, his familiarity with the country, and his business success in both Iran and the United States, petitioner would help to facilitate the arrangement of meetings with Iranian officials and help to shape Ashland strategy in Iran.  Petitioner was an intermediary who helped Ashland interpret the Iranian mood in Ashland's strategy development for these projects.  Petitioner also participated in negotiations and helped to arrange and prepare for meetings with Iranian officials, including the Shah of Iran.  Except for a meeting with the Shah, Mr. Atkins was accompanied by petitioner at almost all his meetings with Iranian officials.

The primary contact person in the Iranian Government for these negotiations on behalf of Ashland was Dr. Fallah, who also had some involvement in petitioner's business dealings with

Lockheed.  Petitioner wrote to Dr. Fallah on "J.J. Zand, Consultant" stationery in October 1973 concerning a meeting he had in New York pertaining to organizing a joint venture between Ashland, NIOC, and others.  Petitioner was present during meetings between Ashland and Dr. Fallah, with whom Mr. Atkins believed petitioner had a close relationship.  Petitioner sometimes met with Dr. Fallah on Ashland's behalf without other Ashland representatives.  Mr. Atkins understood that petitioner also was well acquainted with Prime Minister Hoveyda, a relationship which was helpful to Ashland's business negotiations with Iran.  While Dr. Fallah and Mr. Atkins were the principals in the negotiations between NIOC and Ashland, petitioner was the liaison between them.  Petitioner was described in a 1973 memorandum by Mrs. Priscilla Meier, an employee of CTC, to a potential client as one of the creators of the entire Ashland/NIOC agreement.  In another 1973 letter petitioner outlined to Mr. Atkins his plan for an Ashland/Iranian joint venture.  Correspondence in 1974 concerning the Ashland relationship with NIOC came to petitioner personally.  There is little or no evidence of participation by either All Patents or Diesel Power in any of the Ashland negotiations.

Petitioner also was involved with an ultimately unsuccessful proposed joint venture between Lar Exploration, a subsidiary of Ashland, and NIOC involving a contract to explore for oil and gas

in Iran.  Although the Lar Exploration consultancy agreement was signed by someone by the name of Betterman, petitioner performed the work by providing the contacts, advising strategy, and handling the negotiations.  Petitioner's advice for this project continued for about 3 years, including multiple crude oil contracts.  Petitioner was also involved in negotiations for two other unsuccessful refining and marketing joint ventures that Ashland was interested in developing with Iran.  One was a refining joint venture owned by Ashland in Buffalo, New York, that reached the letter of understanding or letter of intent stage but never resulted in a definitive contract.  In 1976 petitioner negotiated another barter arrangement between General Dynamics Corporation and Ashland.  There was no involvement by Diesel Power employees in this arrangement.

On April 18, 1975, petitioner was asked to sign a document at La Guardia Airport addressed to All Patents, c/o the Banque de Paris, which stated:

> During the period 1973 through 1974, Ashland's records show that firms or persons which you represent, received payments, including the following:

| | Date | Amount |
|---|---|---|
| Payment received for Mr. James Zand | June 6, 1973 | $12,500 |
| | Date | Amount |
| Payment to account of Interrep, S.A. for the group represented by Mr. James Zand | Sept. 30, 1973 | $100,000 |

```
Payment received for All
 Patents Corp. Ltd.              Dec. 19, 1974     $200,000

Payments to All Patents
 pursuant to agreement
 dated April 4, 1974:           March 28, 1974    $164,909
                                Sept, 13, 1974    $166,447
                                Dec. 9, 1974      $ 41,419
                                Feb. 19, 1975     $ 69,078
Payment to All Patents
 pursuant to agreement
 dated October 15, 1974         Oct. 1974         $900,000
```

Petitioner dated and signed his name on lines directly below a statement in the same document that read:

> The above information regarding payments made to firms or persons which I represent by Ashland or its subsidiaries is correct and I have no knowledge of any amounts received by me which were returned to Ashland, its subsidiaries, directors, employees or other representatives and I did not make any U. S. political contributions at the direction of Ashland.

The same letter was sent to the Banque de Paris and signed by that bank's President, Mr. Michel.

As discussed previously, during 1975 there was an investigation of Ashland by the Senate Foreign Relations Committee. On July 21, 1975, petitioner created an internal memorandum indicating that "Caspian must charge Diesel Power's account 40% of the moneys paid by Ashland to the account of All-Patent Corporation * * * . This 40% is to cover the expenses we have incurred in pursuit of the Ashland business for which they paid these expenses." In an "Aide Memoire" dated July 23, 1975, petitioner noted that he had told a member of the Senate Foreign

Relations Committee, which was looking into drafting legislation making it a crime to pay bribes to foreign officials, that he was not aware of any improper payments to foreign officials. He also stated:

> I emphasized the fact that it was I who sought Ashland and who prevailed upon them to come to Iran and who assisted them in developing their programs for Iran. * * * .

> * * * * * * *

> I stated that ever since the inception of my relationship with Ashland six years ago, my companies paid our own way * * * .

Petitioner indicated that he had told the Committee that no one in the Government of Iran had made any demands for "under-the-table" payments. On January 6, 1976, petitioner signed an affidavit for an unknown purpose stating that he had not made, and in the future would not make, any payments from funds paid to him by Ashland that he knew or had reason to know were illegal in the jurisdiction in which the payment was made.

### D. Payments by Ashland

In the notice of deficiency for 1973 respondent increased petitioner's income from Ashland by $120,900. In August 1973, Ashland issued a wire transfer of $100,000, payable to a bank account in the name of Interrep. S.A. (Interrep), account number 29893C. These funds were deposited in an account at the Banque de Paris. The stated purpose for this wire transfer was "Consulting done in relation to Iranian Venture".

With regard to Interrep and its relation to petitioner, an Ashland report to the Board of Directors dated June 26, 1975, in connection with an investigation of Ashland's political contributions, describes certain interactions between Ashland and Interrep but contains no reference to petitioner personally. There are only two documents in evidence that draw any link between petitioner and Interrep. The first document states that the $100,000 paid by Ashland to Interrep constituted "Prepayment of part of anticipated fees payable in respect to New York Venture". This document further states that there were four additional payments, as follows:

| Payee | Date | Amount | Purpose |
|-------|------|--------|---------|
| J. J. Zand | 6-6-73 | $12,500 | Fees related to Iranian participation project |
| J. J. Zand | 7-9-73 | 3,000 | O. E. Atkins check for riyals Zand advanced to Atkins in Teheran |
| J. J. Zand | 7-11-73 | 400 | Gifts for NIOC |
| J. J. Zand | 11-29-73 | 5,000 | Reimburse for Teheran hotel bills, dinner party and entertainment of Ambd. & Dr. Fallah |

The $5,000 payment to petitioner for reimbursement of certain items listed above is also referred to in a separate 1973 letter from Ashland to petitioner. This letter contained a check for $5,000 and described it as a reimbursement.

The second document linking petitioner to Interrep is a letter from Ashland to All Patents requesting verification of payments received from Ashland and requesting confirmation that there was no knowledge on the part of the signer (who was petitioner) that he had made any U.S. political contributions on behalf of Ashland. Petitioner's signature appears at the bottom of this letter. One of the payments listed in the second document was a $100,000 "Payment to account of Interrep, S.A. for the group represented by Mr. James Zand". This amount from Interrep was neither included in CTC's cash receipts journal as a receipt nor reported as income by petitioner.

In the notice of deficiency for 1974 respondent increased petitioner's income from Ashland by $1,472,775.68. In 1974 Ashland issued five checks in the total amount of $1,472,776.12 to or for All Patents. The stated purpose of four of the five checks was either "commission", "commission on crude oil purchased from NIOC", or "advice and services rendered to Ashland Oil, Inc., in connection with purchase of oil from National Iranian Oil Company and other business activities in Iran". The fifth check for $900,000 was a commission payment related to the

Lar Exploration project. None of the amounts of these checks was recorded on CTC's cash receipts journal or included in petitioner's 1974 gross income.

In the notice of deficiency for 1975 respondent increased petitioner's income from Ashland by $452,328.45, which is the sum of $69,078.45 and $383,250. Ashland issued a check payable to the Banque de Paris for All Patents on February 20, 1975, in the amount of $69,078.45 and a check payable to All Patents in the amount of $383,250 on April 21, 1975. Both checks were deposited in the Diesel Power Banque de Paris account. Ashland is not reflected as a client or a source of income on Diesel Power's financial statements for the periods ending March 20, 1974, or March 20, 1975. Neither of these payments was included in petitioner's 1975 gross income.

In the notice of deficiency for 1976 respondent increased petitioner's income from Ashland by $198,750. By an assignment agreement dated December 15, 1975, All Patents and the Banque de Paris assigned to petitioner their rights under the April 4, 1974, agreement with Ashland. The assignment agreement was signed by someone named "Betterman" on behalf of All Patents. By a letter agreement in December 1975, agreements between Ashland and All Patents were terminated. In December 1975, Ashland issued a check in the amount of $265,000 payable to petitioner. The payment was described in the particulars section

of the receipt stub as being "in consideration of release and termination of agreements with All Patents Corporation Limited and James J. Zand".  An Ashland memorandum transmitting the request for this check states that this check "will be used in payment for the termination and settlement of all obligations to All Patents * * * and James J. Zand under Letter Agreements dated May 18, 1973, December 7, 1973, and April 4, 1974."  This check was returned and, subsequently, in early 1976 Ashland reissued payment of the $265,000 to petitioner.  This payment was deposited to the Zand CNB Columbus account.  On the 1976 CTC receipts journal, 75 percent of this payment was allocated as a commission for Diesel Power; 25 percent was allocated as a commission for CTC.  Petitioner reported 25 percent of this $265,000, or $66,250, on his return for the taxable year 1976; he did not report the balance of $198,750.

## E. General Motors

In a document dated April 25, 1969, General Motors Overseas Operations Division of General Motors (GM) appointed CTC as Sales Representative to act in promoting the sale by GM of diesel locomotives, related spare parts, supplies, and equipment manufactured by GM for use in Iran.  In consideration of CTC's services as sales representative, GM agreed to pay CTC a commission of 3 percent of the sales.  The document also provided:

Neither this agreement nor any right or obligation hereunder nor the payment of any commission that Representative may hereafter accrue hereunder shall be transferable or assignable by Representative, or any assignee hereof, without GM's prior written approval.

This document was signed by petitioner on June 16, 1969, and thus became what we refer to hereafter as the 1969 GM-Caspian agreement. On May 8, 1969, GM entered into a separate agreement with Diesel Power whereby Diesel Power agreed to act as a distributor of GM Detroit Diesel engines in Iran. This agreement was signed by petitioner as "Chairman" of Diesel Power.

There was considerable correspondence between petitioner or CTC employees and GM over the next several years concerning such matters as where to send notices, various orders, and where commissions should be sent and in what amount. CTC also requested that Diesel Power furnish CTC with invoices for orders. Petitioner periodically provided GM with reviews of his negotiations on behalf of GM, and in a 1975 letter to GM reviewing the history of his relationship with GM, indicated that this relationship involved petitioner individually as well as his "associates". Petitioner kept track of all commissions received from GM.

Diesel Power also had direct contact with GM. For example, a GM employee dealt with Mr. Khalatbari in the contract negotiations for the sale of 51 locomotives to the Iranian Government. This same employee also dealt with Mr. Khalatbari in

July 1970 to establish lines of credit with the Export-Import Bank and GM in favor of the Iranian Government in connection with the purchase of the 51 locomotives from GM.  In 1974 GM again dealt with Diesel Power employees with regard to electrification of certain sections of the railroad lines in Iran and the possibility of substituting a GM electric locomotive for a diesel locomotive.

However, GM viewed petitioner as being the ultimate responsible person.  For example, a 1974 letter from GM to petitioner asks that petitioner confirm GM's understanding that petitioner and Mr. Khalatbari had agreed to pay certain extra expenses incurred in connection with negotiations leading to a contract for the sale of locomotives for the Iranian State Railways.  On June 26, 1973, the Iranian State Railways sent a letter to GM asking if Diesel Power was GM's representative for transactions related to diesel electric locomotives and spare parts.  A CTC employee responded to GM that "Mr. Zand does want you to reply indicating Diesel Power Trading Company is not your representative since, in fact, I believe Caspian (CTC) is the authorized distributor."  Petitioner also responded personally with the following suggested language to be used by GM in replying to the Iranian State Railways, "inasmuch as, in fact, and in truth Diesel Power is neither your representative nor distributor in Iran":

> In reply to your letter * * * , please be advised that the
> firm of Diesel Power Trading Company of Teheran mentioned in
> your letter are not our representatives in respect of
> transactions for Diesel electric locomotives and the
> relative spare parts that we conduct with you, sell you or
> ship to you.

GM sent a response containing very similar language to the Iranian State Railways shortly thereafter. In a subsequent letter to CTC dated October 30, 1973, Diana Khalatbari (then Diana Zand) stated as follows:

> More and more, we are concluding transactions with
> government agencies. Before obtaining letters of credit,
> all government agencies require a statement from the
> manufacturers legalized by the Iranian Consulate certifying
> that we are their authorized sole distributors. * * * .
> Please ask the following companies to prepare such a
> statement * * * .
>
> 1.  General Motors
> 2.  Ingersoll-Rand
> 3.  Galion
> 4.  Clark Equipment Company (both ITD and CMD)
> 5.  P&H

The 3-percent sales commission rate in the 1969 GM-Caspian agreement was modified twice during 1974 to 3-3/4 percent and 4 percent in connection with the sale of additional locomotives. Both modification letters were accepted by petitioner on behalf of CTC.

During 1976 even after he relinquished a portion of his Diesel Power stock, petitioner continued to represent to GM that he had control over Diesel Power. In February petitioner wrote a letter to GM stating:

> In my capacity as chairman of Diesel Power Company and as owner and General Manager of Caspian Trading Company, I hereby authorize Detroit Diesel Allison to forward all statements of account and commission statements for both Diesel Power Company and Caspian Trading Company to Caspian Trading Company * * * .

> This letter will also serve as authorization for Caspian Trading Company to collect all commissions payable on a monthly basis on both Diesel Power Company's and Caspian Trading Company's commission accounts. * * *

Shortly thereafter, GM terminated the 1969 GM-Caspian agreement with CTC. Petitioner agreed by signing the letter of termination on April 9, 1976. On November 1, 1976, Diesel Power and GM entered into another agreement for the distribution, sales, and servicing of GM engines and transmissions. This agreement was signed for Diesel Power by an unknown person other than petitioner, possibly Mr. Khalatbari, who was identified as "Managing Director".

In addition to sales to Iran, petitioner also received payments from GM for certain sales to Pakistan. In February 1974, GM appointed CTC as sales representative to promote the sale of GM diesel locomotives in Pakistan. This agreement, by its terms, was to terminate on February 19, 1975, unless extended by mutual agreement. It was signed on March 14, 1974, by an unidentifiable person as attorney-in-fact for petitioner. The agreement contained the same non-assignability clause as is found in the 1969 GM-Caspian agreement. GM further communicated with petitioner in a February

1974 letter about the Pakistani sale.  Chatru Khilnani

(Mr. Khilnani) also was a distributor for GM for the Pakistani

market.  Although petitioner indicated to Mr. Khilnani a

willingness to pay Mr. Khilnani no more than 70 percent of the

commission earned on the Pakistani locomotive sale and to pay for

Mr. Khilnani's travel expenses in connection therewith,

subsequently, there was a dispute about commissions.  On

July 13, 1974, petitioner met with Mr. Kandawalla, who was

Mr. Khilnani's associate, and Mr. Kandawalla required at least 70

percent of the commissions earned in Pakistan.  Petitioner

dictated a memo to the file noting that he agreed to pay Mr.

Khilnani the 70 percent requested because:

> Actually, on this job I never had to go to Pakistan and I
> did not put out a sales' effort (Sabety only went to
> Pakistan during the bid opening), and in all sincerity and
> fairness, I did not think we were entitled to more.

Petitioner's diary indicates that he had conferences with

Mr. Khilnani or Mr. Kandawalla on four occasions during 1974 and

1975, three prior to dictating this memo and one afterwards.  On

February 24, 1975, GM sent petitioner a letter on the subject of

"Pakistan Railways 68 EMD Locomotives" which states:

"For obvious reasons Caspian Tradings name was used as the

official agent.  Caspian Trading is only acting as a pass through

account to the real agent who is Chatru Khilnani for these pass

through services."  Petitioner attended at least one meeting

during 1976 with Mr. Khilnani and Mr. Khalatbari at the London office concerning the Pakistani sale. Petitioner apparently hired Mr. Khilnani to do some other work for him in Pakistan on matters unrelated to this case.

### F. Payments Made by General Motors

In the notice of deficiency for 1973 respondent increased petitioner's income from GM in the amount of $8,176.37. In the amendment to answer respondent asserted an increase in petitioner's 1973 income from GM to $17,943.61. During 1973 GM deposited £7,824.99 (British pounds) into the Zand FNCB London account, the equivalent of $18,146.15. This amount was not recorded in the 1973 CTC receipts journal.

There are two GM commission amounts at issue for 1974. The first is a determination in the notice of deficiency for 1974 that there was $414,855.46 in unreported "per books" income from GM. This amount is a portion of certain checks paid by GM to CTC for the sale of locomotives to Iran in the total amount of $608,194.47. All of these checks were deposited in full into the CTC CNB account. The CTC cash receipts journal showed $166,353.43 of this total amount as commissions earned by CTC. Petitioner included this amount in his 1974 income. The balance of $441,841.04 is shown as commissions earned by Diesel Power and was not reported by petitioner on his 1974 return. The second amount from GM at issue for 1974 involves payments from GM that

were deposited into the Zand FNCB London account. In the notice of deficiency for 1974 respondent determined that there was $13,221.35 in "other unreported" income from GM. In the amendment to answer respondent asserted that petitioner failed to report 1974 income from GM in the amount of $25,260.24. During 1974 GM deposited a total of £10,760.20 into the Zand FNCB London account after CTC corrected the amount and gave instructions as to the deposit location. This was equivalent to $25,260.24. None of this amount was recorded in the CTC cash receipts journal for the taxable year 1974 or as 1974 income by petitioner.

In the notice of deficiency for 1975 respondent determined that there was $1,589.04 in "other unreported" income. In the amendment to answer respondent asserted that the notice of deficiency incorrectly included $507.21 as unreported income and that the correct amount should have been $1,204.12. On April 25, 1975, GM deposited £507.21 into the Zand FNCB London account. Petitioner concedes that this amount was equivalent to $1,204.12. None of this amount was included in the CTC receipts journal for 1975. In the notice of deficiency for 1975 respondent also determined that petitioner had "Per Books Unreported" income from GM of $1,050,285.15. During 1975 GM paid CTC commissions in the total amount of $1,995,906.02, all of which were deposited into the CTC CNB account. Petitioner included $435,034.98 of this amount in gross income on his 1975

return.  However, petitioner did not include the remaining

$1,560,871.04.  Of this amount $1,049,244.20 was attributed in

the CTC receipts journal to Diesel Power commissions.  Moreover,

at least two of GM's total 1975 commission payments, in the

amounts of $334,333.17 and $396,562.22, were commissions for

locomotives in Pakistan.  CTC paid approximately 70 percent of

these Pakistani commissions, in the amounts of $234,033.22 and

$277,593.56,[8] to Mr. Khilnani's Amelia Corporation.  Petitioner

did not include the amount of the payments to the Amelia

Corporation as income in the 1975 CTC receipts journal or include

them in his 1975 income.  Petitioner did, however, later include

the Amelia Corporation payments in an amended return.[9]  On the CTC

cash receipts journal, the balance of $100,299.95 and $118,968.66

was split between CTC and Diesel Power, 40 percent for the

former, 60 percent for the latter.

---

[8] Payment was stopped on this check because it was lost in the mail, and, on Feb. 2, 1976, Mrs. Conway confirmed a telephone request to transfer $277,593.56 from the CTC CNB account to an account in the name of the Amelia Corporation in Geneva.

[9] On Dec. 20, 1976, petitioner filed an Amended U.S. Individual Income Tax Return for the taxable year 1975 on matters unrelated to this issue.  On Feb. 22, 1978, a second Amended U.S. Individual Income Tax Return was filed by petitioner for the taxable year 1975.  On the latter return, petitioner increased his previously reported commission income by $511,627 which is equivalent to the sum of the two previously discussed 1975 payments to Amelia Corporation.  On the 1975 second amended return, petitioner also increased his commission expense by this same amount.  Adjustment a.3. of the notice of deficiency for 1975 decreased petitioner's reported commission expense in the amount $355,112.79.  Of this adjustment $234,033.22 is attributable to payments made by CTC to the Amelia Corporation.

In the notice of deficiency for 1976 respondent made adjustments in connection with payments from GM for "per books unreported" income of $1,112,550.51, "other" income of $34,980.77, a "Deposit to F.N.C.B." of $38,585.50, and additional other income of $34,377.70.[10] During 1976 a portion of the commissions paid by GM to CTC was equal to a total amount of $1,482,524.70. These payments were deposited to the CTC CNB account. The 1976 CTC receipts journal allocated $385,343.07 of this amount to CTC as commissions and $1,062,803.40 of this amount to Diesel Power as commissions. The remaining $34,377.70 was noted on the CTC cash receipts journal as "Trans" and is equivalent to an amount petitioner sent to the Amelia Corporation in 1976. GM also issued a commission check in 1976 payable to CTC in the amount of $11,581.51, and four checks to Diesel Power in the total amount of $121,926.94, for a total of $133,508.45. On CTC's cash receipts journal, these checks were allocated $53,402.77 to CTC and $80,105.08 to Diesel Power. The total amount allocated to Diesel Power on CTC's 1976 receipts journal

_____

[10] We are unable to explain the $30,357.89 difference between the amount recorded in the CTC receipts journal as attributable to Diesel Power and the amount alleged to be "per books unreported" by respondent in the notice of deficiency. Part of adjustment a.3. for 1976 also proposes an adjustment for commission expense in the amount of $361,971.26.

for the above amounts was $1,142,908.40, which was not included in petitioner's 1976 income.[11]

There also were payments from GM in 1976 that were not recorded in the CTC receipts journal. On February 3, 1976, a deposit from GM was made to the Zand FNCB London account in the amount of £38,585.50. Neither this deposit nor its dollar equivalent was recorded as a receipt on the CTC receipts journal. At the average monthly exchange rate for February 1976, £38,585.50 was equivalent to $78,058.47. Although the notice of deficiency lists this as an "Deposit to F.N.C.B." of $38,585.50 in U.S. currency, in the amendment to answer respondent asserts that there was a increased deficiency with respect to this deposit to reflect the correct amount in U.S. currency. On April 27, 1976, a deposit was made by GM to the same account in the amount of £34,980.77. Neither this deposit nor its dollar equivalent was recorded as a receipt in the CTC receipts journal. At the average monthly exchange rate for April 1976, this deposit was equivalent to $64,644.76. Although this deposit was listed in the notice of deficiency as $34,980.77 in the amendment to answer respondent asserts that there was an increased deficiency with respect to this deposit to reflect the correct amount in U.S. currency.

---

[11] We are unable to explain the difference between this figure and the amount on the notice of deficiency for "Per Books Unreported" income of $1,112,550.51.

In the notice of deficiency for 1977 respondent determined that there was unreported income equivalent to all commissions attributed to Diesel Power on the CTC receipts journal, $17,878.24 of which was received from GM; and that petitioner had unreported commission income from "D.D.A."--a division of GM--in the amount of $94,743.27. During 1977 the CTC receipts journal shows receipt from GM of the total amount of $24,134.01. Of this amount $6,255.77 was recorded in the CTC receipts journal as CTC commissions; $17,878.24 was recorded as Diesel Power commissions. All but $7.93 of this total amount was deposited to the CTC CNB account. Furthermore, in December 1977, CTC received additional payments from GM in the total amount of $94,742.66. These payments were deposited in the CTC CNB account and were recorded on CTC's 1977 cash receipts journal as "Refunds/Reimbursements".

## G. SEDCO/IMICO

Prior to 1973 CTC had sold equipment for one of its other customers to SEDCO International, S.A. (SEDCO) and to a related company called IMICO.

During 1973 petitioner entered into a joint venture with a company called Stewart & Stevenson Services, Inc. (Stewart & Stevenson). Under this agreement, a stock of spare parts would be placed at a location in Iran for resale to SEDCO, IMICO, or any other customer in the Middle East. The parts were to be owned by the joint venture until sold. Payments for these parts

were to be deposited into the CTC CNB account. Although initially it was discussed as being a 50/50 arrangement between petitioner personally and Stewart & Stevenson, it later was decided to form the venture between Diesel Power and Stewart & Stevenson.

At the same time, there was an agreement between IMICO and Diesel Power for IMICO to construct a warehouse for storage of the parts. Diesel Power was to pay IMICO rent for use of the warehouse. Petitioner signed this agreement on behalf of Diesel Power. However, Diesel Power was not actually involved in petitioner's agreements with SEDCO or IMICO. For example, a Diesel Power individual asked CTC to please inform IMICO with regard to the rental payments for which Diesel Power had received bills that "this is not a DPTC project". Subsequently, Stewart & Stevenson sold its interest in the joint venture to SEDCO. Although there is evidence that petitioner and his CTC employees were personally involved in the SEDCO joint venture project, there is no evidence of any involvement in this project by Diesel Power employees. Diesel Power was merely informed of the arrangement after it was established. Under this arrangement, CTC provided quotations to SEDCO for various types of equipment. Diesel Power was not involved in the preparation or presentation of these quotations, other than to be sent copies of them.

During 1976 petitioner arranged for IMICO to be appointed the dealer within a certain location in Iran for Detroit Diesel Allison spare parts and engines under Diesel Power's distributorship in Iran. Furthermore, in 1976 petitioner and CTC assisted SEDCO in obtaining for IMICO a full service dealership of Detroit Diesel Allison products in Iran. Diesel Power was not involved in negotiating these arrangements. It was understood between CTC and Diesel Power that Diesel Power was not entitled to any commissions earned in connection with the IMICO dealership project. In 1977 Mrs. Conway of CTC wrote a memorandum to the file in which she stated:

> Due to the upheaval caused by the Lockheed situation Detroit Diesel Allison and Ingersoll-Rand have advised that commissions payments issued in the name of Diesel Power Company can no longer be mailed to Caspian Trading Company. In fact regulations have become so stringent that both manufacturers are restricted to mailing commissions to the distributor in the country in which the distributorship is held. This if course means payments must be mailed directly to Diesel Power in Teheran.

> Since Farshid will be in the country next week, it will be necessary to establish procedure for Diesel Power to receive these commission checks and to return to Caspian its' share of the commission. Caspian, of course, will retain 100% of all commission on the dealership agreement with Imico. [Emphasis added.]

H. Payments by SEDCO, IMICO, Stewart & Stevenson

In the notice of deficiency for 1973 respondent increased petitioner's income from Stewart & Stevenson by $1,000. This alleged payment is not reflected on the 1973 CTC receipts

journal.  In the notice of deficiency for 1973 respondent also increased petitioner's income from IMICO by $7,752.15.  During 1973 the CTC receipts journal reflects receipts from IMICO or IMISS[12] in the total amount of $52,777.81.  This amount was deposited in the CTC CNB account and was allocated as $5,168.06 in commissions to CTC, $7,752.15 in commissions to Diesel Power, and $39,857.60 in costs of purchases.

In the notice of deficiency for 1974 respondent increased petitioner's income from SEDCO by $64,394.40.  During 1974 SEDCO issued checks payable to CTC in the total amount of $744,226.49, all of which were deposited in the CTC CNB account.  This total amount was recorded in the 1974 CTC receipts journal as $42,929.60 in commissions for CTC, $64,394.40 in commissions for Diesel Power, and $636,902.49 in purchases.

In the notice of deficiency for 1974 respondent also increased petitioner's income from Stewart & Stevenson by $13,002.61.  The CTC receipts journal for 1974 lists payments from Stewart & Stevenson of a total amount of $21,671.01, which was deposited into the CTC CNB account.  This Stewart & Stevenson amount was allocated in the CTC receipts journal as $8,668.40 in commissions to CTC, and $13,002.61 in commissions to Diesel Power.

---

[12] Although we have been unable to identify the relationship, we assume that IMISS is an affiliate of IMICO.

In the notice of deficiency for 1974 respondent also increased petitioner's income from IMICO/IMISS by $581.27. The CTC receipts journal for 1974 reflects a payment from IMICO/IMISS of $16,468.68, which was deposited in the CTC CNB account. Of this amount, $387.51 was recorded as a commission for CTC, $581.27 was recorded as a commission for Diesel Power, and $15,499.90 was recorded as a purchase.

In the notice of deficiency for 1975 respondent increased petitioner's income from SEDCO by $54,080.33. The CTC receipts journal for 1975 reflects payments from SEDCO in the total amount of $665,881.63, which were deposited in the CTC CNB account. That journal records $36,053.57 as commissions to CTC, $54,080.33 as commissions to Diesel Power, and $575,747.73 as purchases.

In the notice of deficiency for 1975 respondent also increased petitioner's income from Stewart & Stevenson by $8,887.73, which consists of $7,409.42 in "per books unreported" income and $1,478.31 in "other unreported" income. The CTC receipts journal for 1975 reflects receipt in 1975 of a total of $12,349.04 from Stewart & Stevenson, which was deposited in the CTC CNB account. This amount was recorded in the CTC receipts journal as a total of $4,939.62 in commissions for CTC[13] and a

---

[13] We note that respondent alleges in the proposed findings of fact that petitioner reported $3,461.31 of the total amount received from Stewart & Stevenson during 1975, but we have found that the CTC books attributed $4,939.62 to CTC.

total of $7,409.42 in commissions for Diesel Power. The parties presented no evidence concerning the $1,489.31 of alleged "other unreported" income in the notice of deficiency.

In the notice of deficiency for 1976 respondent made an adjustment to petitioner's income from IMICO/IMISS of $1,727.27. The CTC receipts journal for 1976 reflects receipt during 1976 of payments from IMICO in the total amount of $30,236.10, which were deposited in the CTC CNB account. The journal records $1,151.53 of this amount as commissions for CTC, $1,727.27 as commissions for Diesel Power, and $27,357.30 as purchases.

In the notice of deficiency for 1976 respondent also proposes to increase petitioner's income from SEDCO by $92,058.39. The CTC receipts journal for 1976 reflects a total amount received from SEDCO of $678,941.33, which was deposited in the CTC CNB account. That journal records $61,372.27 as commissions to CTC, $92,058.39 as commissions to Diesel Power, and $525,510.67 as purchases.

In the notice of deficiency for 1978 respondent increased petitioner's income from IMICO by $942.02, from SEDIRAN by $111,955.01, and from SEDCO by $38,033.49. CTC's 1978 receipts journal attributes no commissions from IMICO, SEDIRAN (apparently an affiliated company), or SEDCO to Diesel Power. Instead, all are attributed to CTC commissions or "purchases".

## I. Ingersoll-Rand

Diesel Power was the distributor in Iran for certain construction machinery and industrial equipment for Ingersoll-Rand Company (Ingersoll-Rand). Ingersoll-Rand operating companies included Ingersoll-Rand World Trade (IRWT), which handled equipment manufactured outside the United States and sold outside the United States, and Ingersoll-Rand, SA (IRSA), which handled sales of U.S. equipment outside the United States. Ingersoll-Rand had a relationship with Diesel Power whereby Ingersoll-Rand employees occupied Diesel Power offices until 1976.

The Court is unaware of a written contract between Ingersoll-Rand and either Diesel Power or CTC. Ingersoll-Rand's primary contact at Diesel Power was Mr. Khalatbari, who negotiated certain changes made in 1974 to a distribution agreement with Diesel Power. Diesel Power performed the local on-site functions of obtaining equipment quotes and orders for Ingersoll-Rand. Petitioner was involved in some of the more high-level negotiations with the Iranian Government in connection with projects that would affect Ingersoll-Rand. CTC employees billed and collected Ingersoll-Rand commissions and directed to which accounts commissions should be paid. Originally, CTC employees instructed Ingersoll-Rand that commission payments be

made to the London Zand account, the Banque de Paris, and to CTC. However, during 1975 Mrs. Conway of CTC canceled her prior instructions and instructed Ingersoll-Rand to send commissions to the Diesel Power Banque de Paris account. In 1975 Mrs. Conway instructed Ingersoll-Rand to change the procedure again and to make certain commission checks payable to a company called International Gas & Oil Supply Company, Ltd. (IGOS). IGOS was formed in 1973, and petitioner had a one-third interest in IGOS. Mr. Khalatbari inquired from Ingersoll-Rand at that time about procedures for transferring the distributorship to IGOS, although it is unclear whether such a transfer occurred. During 1975 Mrs. Conway changed the IGOS bank mailing address to CTC's Ohio address, and IGOS bank statements were mailed to CTC at that address starting in 1975. In 1976 Mrs. Conway further instructed Ingersoll-Rand that commissions were to be sent to the Zand FNCB London account. At some time in 1977, Ingersoll-Rand was asked to have distributors provide confirmation that payment of commissions to locations outside their country of residence was appropriate under that country's laws. Therefore, Mrs. Conway told Ingersoll-Rand that commissions could no longer be sent directly to CTC. Instead, Mrs. Conway directed Ingersoll-Rand to hold the commission checks for pickup by a CTC representative.

## J. Payments by Ingersoll-Rand

In the notice of deficiency for 1973 respondent increased petitioner's income from Ingersoll-Rand by $48,222.04.[14] During 1973 Ingersoll-Rand made payments of $41,129.39, which were deposited in the Diesel Power Bank of America account. Ingersoll-Rand also deposited £174.54 at Mrs. Conway's instruction in the Zand FNCB London account in September 1973. In 1973 the CTC receipts journal reflects receipt of payments of $976.86 from Ingersoll-Rand. These payments were recorded as commissions to Diesel Power of $586.12 and commissions to CTC of $390.74. In 1973 $976.86 was deposited in the CTC CNB account. Respondent concedes that petitioner is not liable for any increased 1973 commission income from Ingersoll-Rand except to the extent that petitioner withdrew funds from the Diesel Power Bank of America account.

In the notice of deficiency for 1974 respondent increased petitioner's income from Ingersoll-Rand by $197,259.65. During 1974 Ingersoll-Rand issued checks or made wire transfers to the Diesel Power Bank of America account in the total amount of

---

[14] We are unable to ascertain the basis for this figure originally determined by respondent.

$197,079.14.[15]  During 1974 $1,669.64 in commissions from Ingersoll-Rand was deposited to the IGOS CNB Columbus account. These payments were not included in the CTC receipts journal. Respondent now concedes that petitioner is not liable for any increased commission income from Ingersoll-Rand except to the extent that he withdrew funds from the Bank of America account.

In the notice of deficiency for 1975 respondent increased petitioner's 1975 commission income from Ingersoll-Rand by $781,078.02.  During 1975 Ingersoll-Rand issued checks or made wire transfers to the Diesel Power Bank of America account in the total amount of $781,078.02.  In the amendment to answer respondent increased this amount by an additional $691,602.46. This additional figure was based in part upon deposits made by Ingersoll-Rand to the IGOS CNB Columbus account and the Banque de Paris, and payments mailed directly to Diesel Power.  The additional figure is also based in part upon an alleged 1975 deposit to the Zand FNCB account in the amount of $197,513.88. Respondent now concedes all but the $197,513.88 that was allegedly deposited to the Zand FNCB account.

In the notice of deficiency for 1976 respondent increased petitioner's commission income from Ingersoll-Rand by

---

[15] We are unable to explain the reason that this figure differs slightly from the stipulated deposit.

$243,665.65. In the amendment to answer respondent increased this figure by an additional $144,812.48. During 1976, at the direction of Mrs. Conway, Ingersoll-Rand deposited commissions totaling £5,494.40 into the Zand FNCB London account. At the average monthly exchange rate for March 1976, this was equivalent to $10,688.05. (International Financial Statistics, March 1976.) In a sworn affidavit dated February 26, 1981, handwritten by one of the IGOS shareholders, Hossein Shirazi, (Mr. Shirazi), stated that during both 1976 and 1978 IGOS paid $120,000 to petitioner for Ingersoll-Rand commissions. Mr. Shirazi was not a witness in this proceeding. No income from IGOS was reported on petitioner's 1976 return. Petitioner reported $120,000 as income attributable to IGOS on his 1978 Federal income tax return. Respondent now concedes a portion of the earlier positions and contends only that petitioner failed to report $130,769.02 in 1976 commissions from Ingersoll-Rand. This amount consists of the alleged $120,000 distribution from IGOS described by Mr. Shirazi in his affidavit and the equivalent of $10,769.02 deposited in the form of British pounds in the Zand FNCB London account.

### K. Morgan

Although there was no written agreement or contract between Morgan and Diesel Power, petitioner, or CTC, there apparently was

an understanding to combine resources in sales of equipment to certain companies, and to split evenly between Morgan, on the one hand, and Diesel Power or CTC, on the other, the net commissions resulting therefrom.  This understanding was variously described internally by a Morgan employee as "a joint venture with Diesel Power", and by CTC employees as "the Morgan/Zand marriage" or the "Zand/Morgan agreement".  During 1975 petitioner and CTC employees were involved in providing quotations and negotiating orders for equipment under this arrangement.  However, Diesel Power employees furnished most of this service from Teheran. Petitioner and CTC employees kept track of Morgan commissions and made the decisions as to when Morgan commissions that were due would be paid, in what amounts, and to whom.  Morgan sometimes corresponded with Diesel Power about orders and commissions, and Diesel Power employees also kept CTC informed about commissions that were due or had been paid.  CTC also was involved in billing Morgan for its share of certain expenses that Morgan apparently had agreed to share with Diesel Power or CTC, sending a copy of one such bill to Diesel Power.

## L. Payments by Morgan

In the notice of deficiency for 1976 respondent increased petitioner's income from Morgan by $473,552.70, $24,219.46 of which was itemized as "PER BOOKS UNREPORTED" and $449,333.24 of

which was itemized as "OTHER UNREPORTED".  During 1975 or 1976 Morgan issued two checks totaling $200,000 to CTC, which were recorded on CTC's 1976 receipts journal as commissions for CTC and deposited in the CTC CNB account.  These two checks are not at issue.  Morgan also issued seven checks to Diesel Power totaling $525,786.48, which were not recorded in CTC's journal for either 1975 or 1976.  These checks were deposited in either the Diesel Power Bank of America account or the Bank of Teheran in the name of Diesel Power.  Four of the seven Diesel Power checks were issued by Morgan in accordance with explicit instructions from petitioner.

In the notice of deficiency for 1977 respondent increased petitioner's income for "SALES COMMISSIONS D.P.T.C." in the amount of $179,224.28.  Respondent contends that $56,302.97 of this increase was attributable to commissions for Diesel Power from Morgan.  CTC's 1977 receipts journal reflects receipt from Morgan of a total of $85,594.63, all of which was deposited in the CTC CNB account.  This amount is allocated in the CTC receipts journal as $29,291.66 in CTC commissions and $56,302.97 in Diesel Power commissions.

### M. Harnischfeger

On July 17, 1972, Harnischfeger International Corporation S.A. (Harnischfeger) and Diesel Power entered into a distributor

agreement.  Petitioner signed the agreement as chairman of Diesel
Power.  The agreement provided for Diesel Power to market
Harnischfeger construction equipment in Iran.  In a letter of the
same date to petitioner, Harnischfeger proposed to amend certain
provisions of the distributor agreement.  Petitioner accepted
these amendments on August 25, 1972.  On May 24, 1976, a new
distributor agreement very similar to the 1972 agreement was
entered into between Harnischfeger and Diesel Power.  Again,
petitioner signed the new agreement as chairman of Diesel Power.

From 1972 through 1976 there was considerable direct contact
between Diesel Power employees and Harnischfeger.  I.J. Zand of
Diesel Power communicated directly with Harnischfeger concerning
price quotes and sales of Harnischfeger equipment.  However, CTC
continued in its normal role of controlling the payment of
commissions by issuing the bills.  In 1975 CTC employees
submitted a quotation for Harnischfeger equipment to a company in
the United States and contacted Harnischfeger concerning trade
fairs, where equipment would be displayed.  Expressing
dissatisfaction with the sales and service coverage by Diesel
Power over the previous few years, Harnischfeger terminated the
1976 distributor agreement with Diesel Power by a letter
addressed to petitioner dated September 1976, pursuant to the 30-
day notification provision in the agreement.  On at least four

occasions in 1977 Mrs. Conway, on behalf of CTC, sent letters to Harnischfeger requesting commission payments payable to Diesel Power.

## N. Payments by Harnischfeger

In the notice of deficiency for 1974, respondent increased petitioner's "per books unreported" income from Harnischfeger by $525.41. No payments from Harnischfeger are reflected in the CTC receipts journal. That journal does reflect a payment from a company called Parker Hannifin (allegations pertaining to which will be discussed later under "Miscellaneous Companies") in the amount of $875.68. Of this payment $525.41 was recorded as a commission to Diesel Power, and $350.27 was listed as a commission to CTC. This payment from Parker Hannifin was deposited in the CTC CNB account. Respondent proposes to increase petitioner's income from Parker Hannifin by an amount which apparently does not include this payment. The parties do not address respondent's 1974 "per books" income from Harnischfeger in their briefs, nor do they explain why respondent alleges an amount from Harnischfeger that is equivalent to the amount of a stipulated payment from Parker Hannifin.

In the notice of deficiency for 1975 respondent increased petitioner's income from Harnischfeger by $78,000. In March 1975, a bill for $130,000 in commissions with petitioner's

signature on CTC stationery was sent to Harnischfeger asking that payment be sent to CTC. In April 1975, Harnischfeger issued a check to CTC in the amount of $130,000, which was deposited into the CTC CNB account. This amount was recorded in CTC's 1975 cash receipts journal as $52,000 in commissions to CTC and $78,000 in commissions to Diesel Power. Neither CTC nor petitioner included the $78,000 amount attributed to Diesel Power in income for 1975.

In the notice of deficiency for 1976 respondent increased petitioner's income from Harnischfeger by $33,809.71. During 1976 Harnischfeger, upon instructions from a CTC employee, issued checks payable to CTC in the total amount of $56,349.52. These checks were deposited into the CTC CNB account. They were recorded as commissions for CTC of $22,539.81 and for Diesel Power of $33,809.71.

In the notice of deficiency for 1977, respondent increased petitioner's income for "SALES COMMISSIONS D.P.T.C." in the amount of $179,224.28. Of this amount $56,158.59 was attributable to commissions for Diesel Power from Harnischfeger. The CTC receipts journal for 1977 lists receipt from Harnischfeger of a total amount of $93,597.66, which was deposited into the CTC CNB account. That journal allocated $37,439.07 as commissions for CTC and $56,158.59 as commissions for Diesel Power.

## O. Pioneer

On March 3, 1958, Pioneer Engineering (Pioneer) and CTC entered into an export distributors agreement. This agreement was signed by petitioner as General Manager and proprietor of CTC. At that time, Pioneer was a division of Poor & Company, Inc. The distributors agreement between Pioneer and CTC was amended with regard to matters not at issue here by an addendum of June 12, 1964. Petitioner executed this amendment on behalf of CTC. Subsequently, Pioneer merged with Poor & Company to become Portec, Inc. (Portec), and Pioneer became a division of Portec. For convenience, we refer to Pioneer as the company with which the relevant transactions occurred.

During the years at issue there was communication between Diesel Power and CTC about Pioneer because Diesel Power helped to process Pioneer orders. Most of the correspondence was about Pioneer orders and commissions. Some messages asked for follow-up on requests from Pioneer. In April 1976, Diana Khalatbari circulated a memo to several Diesel Power employees and to petitioner concerning the potential for increasing Pioneer asphalt equipment sales.

There also were direct dealings between Pioneer and Diesel Power. Some letters were in appreciation for Diana and Farshid Khalatbari's time during trips by Pioneer executives to Iran.

Pioneer and Diesel Power also corresponded directly with each other concerning orders and customer requests. Correspondence between Pioneer and Diesel Power indicated that courtesy copies consistently were sent to CTC. In March 1975, Diesel Power directly sent a Pioneer price quotation to the Ministry of Commerce. In August 1976, Mrs. Meier, of CTC, informed Pioneer that Diesel Power had a new sales manager, Mr. A. Ryhani, and invited Portec to meet with Mr. Ryhani concerning Pioneer products.

The general manager and vice president of Portec during the years 1973 to 1980 was under the impression that petitioner, CTC, and Diesel Power were one and the same. Pioneer listed CTC as a customer in the journal records Pioneer kept during 1975 and 1976. In correspondence from Pioneer to Diesel Power, Pioneer appeared to consider CTC and Diesel Power to be the same company. CTC helped to confirm this impression by corresponding on behalf of Diesel Power. Consequently, on matters of importance, Pioneer corresponded directly with CTC. In an April 1975 letter Pioneer informed CTC that all contracts in excess of $5 million had to be approved by Pioneer. In August 1975, Mrs. Meier asked Pioneer to have Iranian customers not correspond directly with Pioneer but through Diesel Power. In addition, Pioneer and CTC corresponded directly about orders and prices.

CTC also was responsible for Pioneer commissions. In October 1975, Pioneer confirmed a telephone conversation with Mrs. Meier concerning a commission and requested instructions regarding payment. CTC and Pioneer corresponded in December 1975 and the following month concerning commissions on certain orders. In a letter dated February 18, 1976, Mrs. Conway, of CTC, requested payment of a commission in the amount of $232,615.80 payable to Diesel Power and further stated: "There should be no mention of the source of this request, i.e., Caspian Trading Company." The letter also requests issuance of a commission check in the amount of $56,161.89 payable to CTC. A memo to the file dated June 1, 1976, summarizes commissions from Pioneer.

Regardless of the direct dealings between Diesel Power and Pioneer, petitioner was in control of the distributor agreement with Pioneer. On December 19, 1974, Pioneer wrote to CTC as follows:

> we should bring the Distributor Agreements up to date; and in reviewing this, we note that our agreement form is the old form of Pioneer Engineering rather than Pioneer Division of PORTEC. This in itself would be OK; however, the existing agreement was executed between ourselves and Caspian Trading of Columbus.
>
> In the file on your company there is a letter dated July 30, 1959, to Diesel Power Trading pointing out that our distributor in Iran is actually Diesel Power Trading and because of this, it would be more proper to have the agreements made out in that name rather than Caspian Trading.

According to this older letter, new agreements making this change were sent with the letter; however, I am unable to locate them here.

Rather than getting into piecemeal amendments, it would be more practical to do it all at once. I do feel that our earlier letter was correct in that our dealer is actually Diesel Power Trading, rather than Caspian Trading. Would you please check this out and confirm to us that we should make out new agreements listing Diesel Power Trading.

At the bottom of this letter, there is a handwritten note in blue pen: "Mr. Zand: should new agreement be in name of Diesel PTC?" and another handwritten note in red pen indicating "Yes". In April 1975, Mrs. Meier asked Pioneer to send a letter addressed to "to whom it may concern", stating that "Diesel Power Company, Teheran, Iran, is your authorized and exclusive distributor in Iran." She explained in her letter that Mr. Khalatbari had informed her that "this is required for purposes of prequalifying Pioneer on some forthcoming inquiries being issued by various governmental departments." On April 25, 1975, a letter from Pioneer responded to Mrs. Meier's request as follows: "By means of this letter we confirm that our authorized and exclusive distributor in Iran is Diesel Power Company." The distributor agreement between CTC and Pioneer was never amended to replace CTC with Diesel Power as the authorized distributor.

By letter dated July 14, 1978, Pioneer terminated its distributor agreement with CTC. Petitioner received and accepted the termination on behalf of CTC on July 17, 1978. In his

July 17, 1978, letter accepting termination, petitioner stated that he agreed with Pioneer that "until such time as we have created a substitute for Diesel Power, which has ceased to exist and operate as the company that I created in 1958, you had no choice but to cancel our agreement." He further stated: "I will be creating a representation outlet for your line in Iran * * * . We are not about to leave you without representation as we continue to feel obligated to serve your interests in Iran." In a letter dated May 18, 1979, petitioner represented to Pioneer that Diesel Power had no interest in or right to a sales commission of $121,813.43 earned on a particular order; that CTC was entitled to this commission; and that CTC would hold Pioneer harmless against any claim that Diesel Power might assert with regard to this commission. Along with a letter 1 week later, Pioneer sent a commission check to petitioner and expressed regret that this might be the last business transaction between Pioneer and CTC.

## P. Payments by Pioneer

In the notice of deficiency for 1973 respondent increased petitioner's income from Pioneer in the amount of $1,440.47. The 1973 CTC receipts journal lists a payment from Pioneer of $16,838.31. This payment was deposited in the CTC CNB account. $1,156.75 of this payment is recorded in the CTC receipts journal

as a commission for Diesel Power; $771.17 is reported as a commission for CTC; and $14,891.74 is recorded as a "cost of purchase." The 1973 receipts journal also reflects a payment from Pioneer in the amount of $472.86. This payment was deposited in the CTC CNB account. Of this amount $283.72 was recorded in the CTC receipts journal as a commission for Diesel Power, and $189.14 was recorded as a commission for CTC.

In the notice of deficiency for 1974 respondent determined an adjustment to income from Pioneer Portec in the amount of $269.31. The 1974 CTC receipts journal lists receipt of a payment from Pioneer in the amount of $448.85. This payment was deposited in the CTC CNB account. The CTC receipts journal records $269.31 of this payment as commissions for Diesel Power and $179.54 as commissions for CTC.

In the notice of deficiency for 1975 respondent increased petitioner's income from Pioneer by $300,090.87. During the taxable year 1975 Pioneer issued two checks payable to CTC in the total amount of $400,121.15, both of which were deposited in the CTC CNB account. The 1975 CTC receipts journal records a total of $100,030.28 as Pioneer commissions for CTC and a total of $300,090.87 as Pioneer commissions for Diesel Power. Petitioner reported on his 1975 income tax return the $100,030.28 recorded

as CTC commissions.  Petitioner did not report on his 1975 income tax return the $300,090.87 recorded as Diesel Power commissions.

In the notice of deficiency for 1976 respondent increased petitioner's income from Pioneer by $876,850.39 in "Per books" unreported income and $232,640.80 in "Other" unreported income, for a total of $1,109,491.19.  During the taxable year 1976 Pioneer issued checks payable to CTC in the total amount of $1,447,634.21.  All of these checks were deposited in the CTC CNB account.  The 1976 CTC receipts journal records a total of $570,783.82 as Pioneer commissions to CTC and $876,850.39 as Pioneer commissions to Diesel Power.  Also during 1976, there was a wire transfer from Pioneer to the Diesel Power Bank of Teheran account in amount of $232,615.80, with an additional $25 listed on the check order for "Airmail or cable charge" and "Commission".  Respondent concedes the additional $25.  This wire transfer was not recorded in the 1976 CTC receipts journal.

In the notice of deficiency for 1977 respondent increased petitioner's income from Pioneer by $12,201.80.  The 1977 CTC receipts journal lists receipt from Pioneer of $20,336.34, which was deposited to the CTC CNB account.  The journal records $12,201.80 as commissions to Diesel Power and $8,134.54 as commissions to CTC.

In the notice of deficiency for 1978 respondent increased petitioner's income from Pioneer by $84,293.45.  The 1978 CTC receipts journal notes receipt from Pioneer of $84,293.45.  Of this amount $50,576.07 is recorded as commissions to Diesel Power, and $33,717.38 is recorded as commissions to CTC.

## Q. Galion

Diesel Power and the Galion Iron Works & Manufacturing Company (Galion) had a direct buyer-seller relationship prior to the years at issue.  Galion sold equipment to Diesel Power by means of time drafts whereby Diesel Power would resell the Galion equipment to its customers and, with the payments from those customers, pay Galion for the time drafts.  Diesel Power defaulted at one point on these time drafts.  Mr. Khalatbari, as managing director of Diesel Power, negotiated and signed an agreement dated July 28, 1969, between Galion and Diesel Power restructuring the debt due from Diesel Power to Galion.  Petitioner, as director, officer, and principal shareholder of Diesel Power, guaranteed payment under the provisions of the agreement.  Neither Mr. Khalatbari nor Diana Zand gave a similar personal guarantee.  Shortly thereafter, in a document dated December 1, 1969, an export, distributor, sales and service agreement was executed.  The cover page states that the agreement was between Diesel Power and Galion, but the signature page

identifies CTC as the distributor. Petitioner signed this agreement as Owner and General Manager of CTC.

Most of the direct correspondence between Diesel Power and Galion during the years at issue concerned quotes or orders for Galion equipment. Other direct correspondence involved minor matters, such as claims and exhibitions. Diesel Power corresponded with CTC concerning Galion equipment for orders, warranty and service procedures, and receipt of checks from Galion.

CTC corresponded directly with Galion on more important matters, such as the cancellation of orders, new product lines, and the payment of commissions. Commissions earned on Galion equipment that had been shipped to Diesel Power were credited to CTC. In 1976 petitioner negotiated an additional commission from Galion with respect to a service fee. On one occasion in 1976, Mrs. Conway sent a letter to Galion requesting that a check be sent payable to the Diesel Power Bank of Teheran account and directed that the check be charged against CTC's commission account. The letter also contains the following statement:

> This transfer should be accompanied by the following explanation: "Re Galion Equipment." There should be no mention of the source of this request i.e. Caspian Trading Company. Diesel Power will handle all other details upon the Bank of Teheran's receipt of your bank transfer.

In addition to petitioner's direction of commission payments, petitioner ultimately was in charge of the Galion relationship. For example, when a question arose whether a change of control from one Iranian ministry to another would affect the acquisition of certain Galion equipment, CTC told Galion that the new Minister "is a good friend of Mr. Zand's, so there is no difficulty by this change." Petitioner personally handled Galion sales to a ministry. CTC employees also confirmed to others the impression that CTC was ultimately responsible for Galion sales by corresponding with a potential customer of Galion equipment with the following language: "Our company name in Iran is Diesel Power Company." In a letter to another purchaser of Galion equipment there was a reference to "our Teheran office Diesel Power". Petitioner's ultimate authority was understood among various CTC employees. At the bottom of a letter from Diesel Power to Mrs. Meier in 1976 concerning a rebate that had been negotiated on some cranes by Mr. Shirazi of Diesel Power, a handwritten note from "MA" says "ask JJZ"; an apparent response states "pay to us here 40/60". In 1978 there was evidence that petitioner still was in control of the Galion relationship. Mr. Khalatbari did not sign a contract for the sale of Galion equipment to the Iranian ministry and was described to a CTC employee by an Iranian business associate as "your man on the

spot" who was mismanaging petitioner's Iranian business. Petitioner discussed this problem with Galion and planned, if it became necessary, to arrange for someone else to sign the contract on Galion's behalf.

There appears to have been some tension between petitioner and Diesel Power about the issue of control with respect to Galion commissions. Mr. Shirazi of Diesel Power sent a letter during 1975 to Galion stating:

> As a result of an organizational change in our company we have set up new procedures. One of these changes has been to deal directly with all the manufacturers we represent. This change has resulted because we have found Caspian to be over loaded [sic] with work and have been under tremendous pressure as of late.

The letter indicates that a copy was sent to CTC. Shortly thereafter, Mrs. Meier wrote to Galion as follows:

> I have discussed this at length with Mr. Zand and will be advising Mr. Shirazi that while Diesel Power may and should correspond with Galion directly on spare parts matters, their direct communication should be limited to that and in all direct communications whether originating from your office or Diesel Power a blind copy should be sent to Caspian.
>
> At the request of Mr. Zand, all machinery orders will continue to be processed through Caspian.

In a letter dated March 17, 1976, Mrs. Conway wrote to a Galion affiliate in Europe, stating: "As a result of negotiations held in Teheran in August 1975, between Mr. I. J. Zand of Diesel Power Company" and Galion, certain commission fees had been paid to

Diesel Power. The letter requests that the balance of the commission due be transferred to CTC. A 1975 Galion letter to one of its European affiliates states that, while the affiliate had provided commission funds directly to Diesel Power on certain past shipments, this procedure was "contrary to Caspian Trading's instructions to us. Mr. Zand called me the other day and advised me of this." The letter further stated that the correct procedure was to credit the affiliate's books in the name of Diesel Power, send a copy of the credit to CTC, and "Await notification from Caspian as to when and how dispersement is to be made." This letter shows that a copy was sent to petitioner but does not show that a copy was sent to Diesel Power. Petitioner's control over the earning of commissions also is reflected in a 1976 memo to the Galion file, which states:

> Mr. Zand suggested and Farshid graciously agreed that Caspian retain 100 percent of the profit on the Galion * * * parts and engine orders yearly until such time as Caspian covers their overhead. Once Caspian's overhead is satisfied, then the division is Caspian 75 percent and Diesel Power 25 percent.

### R. Payments by Galion

In the notice of deficiency for 1973 respondent determined that there was unreported "Per books" income from Galion in the amount of $170,798.84 and "Other" income from Galion of $2,368.24. During the taxable year 1973 Galion issued checks payable to CTC totaling $284,664.74, all of which were deposited

in the CTC CNB account.  The CTC receipts journal for 1973

records commissions from Galion for CTC in the amount of

$113,865.90 and for Diesel Power in the amount of $170,798.84.

The notice of deficiency for 1974 increased petitioner's

commission income from Galion by $60,129.43.  During the taxable

year 1974 Galion issued checks payable to CTC in the total amount

of $100,215.71, all of which were deposited in CTC's CNB account.

The 1974 CTC receipts journal records the amount of $40,086.28 as

CTC commissions and $60,129.43 as Diesel Power commissions.

In the notice of deficiency for 1975 respondent increased

petitioner's "Per books" income from Galion by $1,202,188.66 and

"Other" income by $3,780.  For the taxable year 1975 Galion

issued checks payable to CTC in the total amount of

$1,870,239.25.  These checks were deposited to CTC's CNB account.

Of this total amount $221,069.80 constituted reimbursement to CTC

for costs of purchases.  This amount was not included by

petitioner as cost of goods sold on his 1975 return.[16]  The 1975

CTC receipts journal records $447,231.27 as commissions to CTC.

The remaining $1,202,188.18[17] was listed as commissions to Diesel

_____

[16] Thus, respondent made no adjustment to petitioner's total Schedule C income for $221,069.80 in the notice of deficiency for 1975.

[17] We note that the stipulation states that the total amount included in income was $447,231.27 and that, consequently, the net total of the deposits not included in petitioner's income, as listed in the stipulation, is $1,201,938.18.  We are unable to identify from the 1975 CTC cash receipts journal two of the deposits listed in the stipulation as having been included

Power. Respondent now claims that only the $1,201,938.20 is at issue for 1975, thus apparently conceding the alleged "Other" income in the notice of deficiency.[18]

In the notice of deficiency for 1976, respondent increased petitioner's "Per books" income from Galion by $12,845.78 and "Other" income by $391,286.34. Respondent now asserts that $390,843.54 is at issue. During the taxable year 1976, Galion paid Diesel Power a total amount of $390,843.54. These payments were deposited in the Diesel Power Bank of Teheran account and were made pursuant to letters from CTC to Galion requesting the payments. None of these payments was recorded in the CTC receipts journal for 1976. Petitioner did not include in his 1976 gross income any portion of the $390,843.54. On June 24, 1976, Galion made a payment to Diesel Power in the amount of $6,000, payable to the Diesel Power Bank of Teheran account. There is no record of this amount in CTC's receipts journal for 1976. Respondent appears to have conceded the adjustment in the notice of deficiency with respect to the $6,000 payment.

---

in income; therefore, we are unable to ascertain whether the specific amounts listed in the stipulation are correct, but we assume for our findings that they are and that there was an error in addition. Because the total amount included in income is $250 less than indicated in the stipulation, the total amount not included is $250 higher.

[18] We are unable to determine why the amount attributed to Diesel Power on the CTC receipts journal of $1,202,188.18 differs from the amount at issue according to respondent's brief by $250. We assume that respondent meant to use the "Per books" figure in the notice of deficiency.

Respondent increased petitioner's 1977 income from Galion by $57,339.32.[19] The 1977 CTC receipts journal lists two payments from Galion. Both payments were deposited to the CTC CNB account. One payment in the amount of $307.52 was allocated $184.51 to Diesel Power commissions and $123.01 to CTC commissions. The other payment in the amount of $57,154.81 was designated refunds/reimbursements. On brief, respondent fails to mention the $184.51 Diesel Power commission. Furthermore, on brief, respondent concedes that the $57,154.81 is a reimbursement. Therefore, the $57,339.32 is no longer at issue.

In the notice of deficiency for 1978 respondent increased petitioner's commission income from Galion in the amount of $671,394.73. Respondent now contends that $415,896.98 constitutes unreported commission income to petitioner. The CTC receipts journal for 1978 lists a payment from Galion in the amount of $32,560.36 in the "Other" column. The CTC receipts journal also shows a Galion payment in the amount of $638,894.37. Of this payment $383,336.62 is designated as Diesel Power commissions and $255,557.75 as CTC commissions.

---

[19]There is a discrepancy between the stipulated figure of $57,339.32 and the notice of deficiency. The notice of deficiency shows $57,154.81 as the adjustment to 1977 income. We accept the stipulated figure.

## S. <u>Clark</u>

Petitioner's relationship with Clark International Marketing S.A. and its affiliates (all of which will be referred to collectively as Clark) dates back to at least 1966. On June 6, 1966, petitioner signed an agreement designating Diesel Power as sales representative for Clark products. Petitioner signed this agreement as Director General of Diesel Power. In 1972 petitioner, on behalf of himself and CTC, agreed to honor all unpaid obligations in the form of drafts or account charges incurred by Diesel Power. On May 1, 1973, Clark and Diesel Power entered into a distributor agreement. By this agreement, Diesel Power would market Clark products, and Clark would sell its products in Iran exclusively to Diesel Power. Mr. Khalatbari signed this agreement on behalf of Diesel Power. On May 1, 1975, another distributor agreement identical to the 1973 agreement was entered into in the names of Diesel Power and CIMSA, a Clark affiliate. Mr. Khalatbari also signed that agreement on behalf of Diesel Power.

Although Mr. Khalatbari signed the Clark agreements, petitioner and CTC were in control of important matters and policy decisions. In August 1973, Mrs. Meier wrote to Clark on

CTC letterhead discussing the possibility of sales of Clark equipment to NIOC as follows: "Members of Diesel Power are in contact with NIOC on a regular basis" and would encourage purchase of "our" products. In November and December 1973, CTC ordered Clark equipment for sale in Iran and requested that commissions be paid. Referring to Diesel Power as "our sister company in Iran", CTC also instructed Clark's German affiliate to send all monthly statements and copies of all correspondence, invoices, and credit or debit notes pertaining to Diesel Power accounts to CTC. At various times from 1974 through 1977 CTC employees contacted Clark asking for copies of invoices and instructing Clark to forward commissions to Diesel Power bank accounts in the Channel Islands, the Banque de Paris, and the Zand London account. CTC also instructed Clark to forward checks directly to CTC. There are no similar letters in the record from Diesel Power directing Clark's payments. In 1975 CTC wrote to Clark discussing Diesel Power's proposal to exhibit Clark equipment at the upcoming Teheran Trade Fair. Furthermore, after a dispute in March 1976, petitioner wrote a lengthy letter to Clark's German affiliate expressing concern about discourteous behavior by a Clark employee to a representative of the Iranian

Air Force. Petitioner emphasized that such behavior was particularly inappropriate because the largest forklift sale in Clark history was involved. In response to an allegation that Diesel Power had not earned its commission in the forklift transaction, petitioner explained that "Diesel Power" had succeeded in negotiating the sale without public bids, and that petitioner had met with the parties during the negotiations. Petitioner further explained that CTC employees had written and telephoned Clark employees on several occasions concerning a letter of credit in favor of Clark and commission payments, indicating that "both our offices in Iran and the U.S. continued to give valuable support to the Clark organization". Although petitioner had little direct contact with Clark employees, these employees understood that Diesel Power was petitioner's company.

Notwithstanding this understanding, Diesel Power was Clark's contractual partner. Clark issued a statement that Diesel Power was its sole distributor. However, as discussed previously, Diana Zand had asked CTC to obtain statements from several distributors stating that Diesel Power was their representative in order to facilitate transactions with the Iranian Government. At CTC's request, in a letter dated August 19, 1974, addressed

"TO WHOM IT MAY CONCERN", Clark confirmed that Diesel Power was its authorized sole distributor in Iran. In certain respects, this representation is supported by Diesel Power's considerable contact with Clark. Diesel Power provided quotes for Clark equipment to local companies and, in one instance, asked a Clark representative to travel to Iran about an order. In November 1974, Mr. Ott, of Clark, sent a letter to Mr. Khalatbari restating some of the main problems that Diana Zand had mentioned during his recent visit to Teheran. One of these problems Mr. Ott mentioned involved tax issues:

> The accrual of commissions in the manufacturing country might be subject to taxation if the governmental tax authorities have the last word in the pending negotiations. However, a meeting of tax experts has been scheduled in Strasbourg on 7 November 1974 for the purpose of working out a satisfactory solution.

Diesel Power also notified a Clark German affiliate in 1975 of the change in Diesel Power's organization from a partnership to a "private joint stock company". Thereafter, when Clark grew dissatisfied with the level of sales in Iran, Clark canceled the 1975 distributor agreement with Diesel Power. Both Mr. Khalatbari and I.J. Zand wrote to Clark protesting the cancellation and insisting that Diesel Power remain Clark's authorized sole distributor in Iran. Despite these contacts with

Clark there is no evidence that Diesel Power employees directed any payments from Clark.

In 1977 there was a disagreement between CTC and Mr. Khalatbari about certain Clark and Ingersoll Rand commissions. On May 24, 1977, Mrs. Conway and Mrs. Meier wrote a memorandum to petitioner discussing the amount of commissions that CTC had received from Diesel Power on the Clark and Ingersoll-Rand orders. They indicated that "many man hours were expended servicing this order and in obtaining the actual commission for Diesel Power". They further noted that a 15-percent commission was "more than equitable" because "CTC enjoyed a 60/40 split" during the same time period for performing the same type of services for other companies. They also wrote that they had approached Mr. Khalatbari about a 10-percent commission but Mr. Khalatbari had responded that "Diesel Power was not in a position to pay at that time." The memorandum also indicates a belief that Mr. Khalatbari was manipulating the form of orders in order to minimize the amount of commission due to CTC. The matter apparently was resolved, and Mr. Khalatbari agreed to pay a portion of the commissions to CTC. However, by April 1977, the $325,000 agreed upon had not been paid. Mrs. Meier then sent a

letter to Mr. Khalatbari reminding him of the agreement and asking when payments could be expected. CTC received $325,000 from Mr. Khalatbari in June 1977. This amount was listed on the CTC receipts journal as "Other" with a note indicating that this was a commission "due CTC from DPC".[20]

By 1978 the relationship between CTC and Diesel Power was in its last stages. In a memo to the file dated April 24, 1978, Mrs. Conway noted the receipt of three checks from Clark. She described therein the allocation of each check to the two companies and concluded with the following postscript to Diesel Power:

> These checks are being treated in accordance with the agreement between Caspian Trading Company and Diesel Power Company and Diesel Power's share has been credited to Diesel Power's account with Caspian, and will be disposed of under the on-going negotiations.

### T. Payments by Clark

In the notice of deficiency for 1973 respondent increased petitioner's income from Clark by $35,300.29. During 1973 Clark issued two checks payable to CTC in the total amount of $56,301.23. Clark also issued one check payable to Diesel Power in the total amount of $2,532.60. Thus, total commission

---

[20] This amount is not in dispute.

receipts from Clark were $58,833.83.  CTC endorsed these checks and all were deposited in the CTC CNB account.  The CTC 1973 cash receipts journal records $35,300.29 of the total payments from Clark as "DPTC" commissions and $23,533.54 as "Caspian" commissions.

In the notice of deficiency for 1974 respondent increased petitioner's income from Clark by $39,972.49 "Per books" income and $17,925.58 for "Other" income for a total of $57,898.07.  In the amendment to answer respondent asserts that there were Clark payments deposited to the Zand FNCB London account of £17,141.67, equivalent to $39,837.99.  During 1974 Clark issued total payments to CTC of $8,621.92 and to Diesel Power of $57,991.50, or a total of $66,613.42.  Mrs. Conway had requested that at least some of the payments be made to the CTC CNB account, and they were so deposited.  CTC's 1974 cash receipts journal lists $26,645.37 of this amount as CTC commissions and $39,968.05 of this amount as Diesel Power commissions.  Clark also paid the following amounts that were not reflected on the CTC receipts journal, and not reported as income by petitioner in 1974:

| Amount | Account to which deposited |
|---|---|
| $12,175.75 | Zand FNCB |
| 10,949.35 | Zand FNCB |

```
 1,124.55       Zand FNCB
50,658.25       Mailed to Diesel Power or a Diesel Power
                  account
```

In the notice of deficiency for 1975 respondent increased petitioner's income from Clark by $173,185.21 "Per books" income and $1,009,165.22 "Other" income for a total of $1,182,350.43. Respondent asserts in her answer that Clark paid petitioner $1,095.63 in 1975. In the amendment to answer respondent asserts that Clark paid petitioner £1,095.63, equivalent to $2,622.94 in 1975. During 1975 Clark issued checks to CTC in the total amount of $285,260.12. These checks were deposited to CTC bank accounts. In the 1975 CTC receipts journal $114,104.04 of the total amount is recorded as CTC commissions, all of which was included in CTC's 1975 income. The remaining $171,156.08 was recorded as Diesel Power commissions. CTC did not include this amount in income. During 1975 Clark issued checks to Diesel Power in the total amount of $1,011,451.47. One of these checks, in the amount of $3,381.88, was deposited to the CTC CNB account. The remaining checks were deposited, at least in part, to Diesel Power accounts at the Banque de Paris, Bank of America, or CNB at CTC's request. On the 1975 receipts journal $1,352.75 is recorded as CTC commissions and $2,029.13 as Diesel Power

commissions. Petitioner reported the $1,352.75 on his return, but did not report the balance of the $1,011,451.47. During 1975 Clark also deposited £1,095.63, equivalent to $2,622.94,[21] into the Zand FNCB London account. This deposit was not recorded on the CTC cash receipts journal. During 1975 Clark also issued payments directly to Diesel Power or to a Diesel Power bank account in the total amount of $59,823.83. These payments were not recorded in the 1975 CTC receipts journal.

In the notice of deficiency for 1976 respondent increased petitioner's income from Clark by $134,086.23 "Per books" income and $253,173.06 "Other" income. During 1976 Clark paid CTC $19,754.24. The 1976 CTC receipts journal allocates $11,852.54 to Diesel Power commissions and $7,901.70 to CTC commissions. During 1976 Clark paid Diesel Power a total of $674,658.88. Of this amount $455,125.68 was deposited in the CTC CNB account. The remaining $219,533.20 was not recorded in the 1976 CTC receipts journal. The 1976 CTC journal also lists $81,489.53 as CTC commissions and $122,234.29 as Diesel Power commissions. During 1976 Clark also made payments directly to Diesel Power or

---

[21] Respondent's answer asserted that Clark paid $1,095.63 to petitioner in 1975, but in the amended answer asserted that this was the figure in pounds, not dollars.

to bank accounts in the name of Diesel Power in the total amount of $681,783.24. These payments were not recorded in the 1976 CTC cash receipts journal.

In the notice of deficiency for 1977 respondent determined additional income for "Sales commissions D.P.T.C.", $22,545.46 of which was attributable to commissions from Clark. During 1977 Clark issued checks payable to Diesel Power or to Diesel Power bank accounts in the total amount of $38,569.34. None of this amount was recorded on CTC's cash receipts journal. The journal does list receipt from Clark of $22,723.98, all of which was deposited in the CTC CNB account. Of this amount $14,013.71 was allocated to Diesel Power commissions and $8,710.27 to CTC commissions.

In the notice of deficiency for 1978 respondent determined additional income from Clark in the amount of $36,796.41. The 1978 CTC receipts journal reflects a total of $21,831.24 received from Clark, $6,640.14 of which was allocated to CTC and $15,191.10 of which was allocated to Diesel Power.

## U. Miscellaneous Commissions/Goodyear

Petitioner, CTC, and Diesel Power also had relationships with many other companies resulting in the payment of numerous

other commissions. CTC supplied quotations for some of the orders with these companies. CTC was asked to supply instructions for payment of commissions, and CTC requested payment of the commissions earned in the course of these relationships. Mrs. Meier corresponded with Goodyear during 1973 concerning petitioner's contacts in connection with sales of certain equipment to the Iranian Air Force and instructed that commission payments be made to the Zand FNCB London account. On August 9, 1973, petitioner prepared a memorandum of understanding whereby petitioner agreed to help facilitate these sales, and Goodyear agreed to pay petitioner an annual fee. There also is an unsigned distributor agreement dated August 1973 between Diesel Power and Goodyear concerning the sale of Goodyear products. During 1974 and 1975 both Diesel Power and CTC employees assisted in obtaining price quotes from Goodyear and sales of Goodyear products.

V. Payments by Miscellaneous Companies/Goodyear

The following payments were recorded in the CTC receipts journal for 1973:

| Payor | Amount | CTC Commission | Diesel Power Commission |
|-------|--------|----------------|-------------------------|
| Rosco Mfg. Co. | $1,003.32 | $401.33 | $601.99 |
| Euclid | 106.02 | 42.41 | 63.61 |
| American Hoist | 116.97 | 46.79 | 70.18 |
| Iran Aircraft | 24,181.00 | 2,648.39 | 3,972.58 |
| Morrison Knudson | 18,377.47 | 275.95 | 413.92 |
| Parker-Hannifin | 917.37 | 366.95 | 550.42 |
| Atlantic Richfield | 11,537.00 | 591.35 | 887.03 |

All payments listed above were deposited into the CTC CNB account during 1973, although the parties have not stipulated as to deposit of the Atlantic Richfield check.  In the notice of deficiency for 1973 respondent increased petitioner's income from the companies listed above by the amounts, totaling $6,659.73, attributed to Diesel Power commissions in the CTC receipts journal.

The following payments were recorded in the CTC receipts journal for 1974:

| Payor | Amount | CTC Commission | Diesel Power Commission |
|-------|--------|----------------|-------------------------|
| GM-Lavan | $1,632.85 | $170.71 | $256.06 |
| G. Power-Gould | 1,635.36 | 654.14 | 981.22 |

| | | | |
|---|---|---|---|
| Clemco- | | | |
| Holland | 446.22 | 267.73 | 178.49 |
| Rosco | | | |
| Mfg. Co. | 1,263.76 | 505.50 | 758.26 |
| L.J. Stone | 609.17 | 243.67 | 365.50 |
| Atlantic | | | |
| Richfield | 19,171.30 | 967.20 | 1,450.80 |
| Parker | | | |
| Hannifin | 2,315.04 | 926.01 | 1,389.03 |

All payments listed above were deposited to the CTC CNB account during 1974.  In the notice of deficiency for 1974 respondent increased petitioner's income from the above companies by the total amounts attributed to Diesel Power in the CTC receipts journal.[22]

In the notice of deficiency for 1974 respondent also increased petitioner's income from Goodyear by $21,089.92 and from Leopold (a Goodyear affiliate) by $4,545.72.  In the amendment to answer respondent asserts that the £25,655.64 deposited to the Zand FNCB account in 1974 by Goodyear was equivalent to $58,919.69.  During 1974 various Goodyear affiliates deposited a total of £25,665.64 to the Zand FNCB

---

[22] In the notice of deficiency for 1974, respondent made an adjustment to income from Clemco-Holland in the amount of $27,178.49.  Respondent now appears to have abandoned the argument with respect to all but $178.49 of that amount.

London account.  These deposits were not recorded as receipts in the CTC receipts journal.

The following payments were recorded in the CTC receipts journal for 1975:

| Payor | Amount | CTC Commission | Diesel Power Commission |
| --- | --- | --- | --- |
| Manchester Machines | $1,632.02 | $652.81 | $979.21 |
| Airoceanic Motors | 51,666.00 | 20,666.40 | 30,999.60 |
| Rosco | 13,190.28 | 5,141.74 | 8,048.54 |
| Parker Hannifin | 6,145.51 | 2,458.18 | 3,687.33 |
| Parsons Jurdin | 213,123.73 | 5,989.13 | 8,983.70 |
| Bucyrus Blade | $2,114.53 | $794.35 | $1,191.53 |
| G.M. Terex | 3,521.28 | 1,408.51 | 2,112.77 |
| Exxon | 149,413.00 | 4,490.00 | 6,735.00 |

With the exception of $5,296.68, all payments listed above were deposited to the CTC CNB account during 1975.  In the notice of deficiency for 1975 respondent increased petitioner's income from the above companies by the total amounts attributed to Diesel Power in the CTC receipts journal.

In the notice of deficiency for 1975 respondent determined an increase in petitioner's income from Goodyear by $117,854.49. In the amendment to answer respondent asserts that payments from Goodyear in the total amount of $134,776.70 constituted unreported gross income to petitioner.  During 1975 Goodyear deposited checks in the total amount of $59,767.98 to the CTC

FNCB London account and the Zand FNCB London account.  During
1975 Goodyear also issued checks in the total amount of
$75,008.62 that were deposited to the Diesel Power Bank of
America account.  These amounts were not listed in the CTC
receipts journal for 1975.

The following payments were recorded in the CTC receipts
journal for 1976:

| Payor | Amount | CTC Commission | Diesel Power Commission |
|---|---|---|---|
| Ateco- American | $991.20 | $396.48 | $594.72 |
| Houston | 49,800.00 | 3,984.00 | 5,976.00 |
| Atlantic Richfield | 92.13 | (3.68) | (5.52) |
| Parsons Jurdin | 2,730.13 | 1,092.05 | 1,638.08 |
| Exxon/ Galion | 118,432.26 | 8,055.08 | 12,082.61 |

All payments listed above were deposited to the CTC CNB account
during 1976.  In the notice of deficiency for 1976, with the
exception of Exxon, respondent increased petitioner's income from
the above companies by the total amounts attributed to Diesel
Power in the CTC receipts journal.  The proposed increase in
petitioner's income from Exxon is $12,302.95.[23]  During 1976
Goodyear deposited checks in the amount of $4,492.13 to the CTC
CNB account.  These payments were recorded in the CTC receipts
journal as $1,796.85 in CTC commissions and $2,695.28 in Diesel
Power commissions.  In the notice of deficiency for 1976

---

[23] We are unable to explain why this amount is greater than the
stipulated Exxon amounts attributed to Diesel Power in the CTC receipts
journal.

respondent increased petitioner's income from Goodyear by $2,695.28.

In the notice of deficiency for 1977 respondent determined that petitioner had unreported income from Diesel Power sales commissions.  Of these payments $10,952.15 is attributed to Exxon, $3,000 to Orton, and 56 cents to Atlantic Richfield.  The following payments were recorded in the CTC receipts journal for 1977:

| Payor | Amount | CTC Commission | Diesel Power Commission |
|-------|--------|----------------|-------------------------|
| Exxon | $147,558.45 | $7,301.43 | $10,952.15 |
| Orton | 5,000.00 | 2,000.00 | 3,000.00 |
| Atlantic Richfield | 2.88 | .38 | .56 |

All payments listed above were deposited to the CTC CNB account during 1977.

III.  Interest and Dividend Income--First National City Bank, London, England, and Crown Life Insurance Company

During 1974 and 1975 petitioner maintained an account with First National City Bank (FNCB) in London, England, account number 1612131.  This account generated interest income of $38,055.71 in 1974 and $43,641.69 in 1975.  Petitioner also received payments from Crown Life Insurance Company of $436.50 in 1974 and $445.30 in 1975, which were recorded as "dividends" in CTC's cash receipts journal.

Petitioner did not include the interest from the FNCB account or the dividends from Crown Life on his 1974 or 1975

Federal income tax returns. Petitioner did not disclose the existence of foreign bank accounts in his name on those returns or on the two amended 1975 returns filed in 1976 and 1978.

Mr. Giffin, who prepared petitioner's 1974 and 1975 tax returns, was not aware that the FNCB account in London existed. Furthermore, employees of CTC were not aware that some of the foreign bank accounts in petitioner's name existed.

In 1976 petitioner earned interest on an FNCB account, number 245925, in the amount of £27,466.39. During 1976 he also received payments from Crown Life of $459.05, which were recorded as dividends in CTC's cash receipts journal. Petitioner did not include either the interest on the FNCB account or the dividends from Crown Life on 1976 Federal income tax return.

On Form 4683 filed with his 1976 return petitioner reported that his financial interest in FNCB account number 245925 did not exceed $50,000. However, during 1976 General Motors paid over $140,000 into FNCB account number 245925. Petitioner's employee requested these deposits.

To Diesel Power and to third parties (including General Motors and Clark), CTC employees referred to FNCB accounts numbers 1217690 and 245925 as petitioner's accounts.

Petitioner offered no documentation, such as statements or policy notices, that the amounts paid to him by Crown Life were returns of premiums.

The 1974 interest income earned on the London FNCB account of $38,055.71 and dividends from Crown Life of $436.50 are includable in petitioner's gross income.

The 1975 interest income earned on the London FNCB account of $43,641.69 and dividends from Crown Life of $445.30 are includable in petitioner's gross income.

The 1976 interest income earned on the London FNCB account of £27,466.39 and dividends from Crown Life of $459.05 are includable in petitioner's gross income.

IV.   Interest Income--WHIP Account at Barclays Bank Bahamas

During 1974, 1975, and 1976 interest was earned on bank accounts or time deposits in the name of WHIP at the Barclays Bank in Freeport, Bahamas, in the respective amounts of $25,025, $29,338.94, and $16,998.06.

Petitioner, through his attorney, formed WHIP.  Petitioner was the sole shareholder of WHIP.  Named shareholders were nominees.  In 1975 petitioner paid $628.30 to Price Waterhouse for account services to WHIP and claimed a deduction on his tax return for this amount.  WHIP's banking and other business activities were handled by petitioner and CTC employees. Petitioner was sole signatory over WHIP's bank account at Barclays Bank Bahamas. From the time of WHIP's formation in 1969 through at least 1978, WHIP did not carry on any independent

business activities.  Rather, WHIP served as a shell corporation and was not an operating company.

In 1978, at petitioner's direction, Mr. Dutton, then an employee of Caspian Development Company (CDC), withdrew $610,000 from the WHIP account at Barclays Bank Bahamas.  Mr. Dutton then deposited these funds to petitioner's CNB account in Columbus, Ohio.

Petitioner signed an agreement in July 1970 with Occidental Petroleum under which payments were to be made to WHIP.

Petitioner directed all payments into the WHIP Barclays Bank Bahamas account; he was the sole person who withdrew funds from the account; and he unilaterally took the funds from the account and deposited them to this own account in Columbus, Ohio. Therefore, the interest on the Barclays Bank Bahamas account for the WHIP shell entity of $25,025 in 1974, $29,338.94 in 1975, and $16,998.06 in 1976 was earned and controlled by petitioner.

V.  Character of Gain on Disposition of Diesel Power Stock

Petitioner acquired all of Diesel Power's stock from his father and Mr. Taleghani in 1958.  He paid nothing for it.

In December 1977 petitioner sold all of the stock he then owned in Diesel Power to Mr. and Mrs. Khalatbari.  Under the sale agreement, he was to be paid $3,300,000 on December 21, 1977, $625,000 on March 1, 1978, $700,000 on or before December 15, 1978, and $265,000 on or before December 3, 1979.  The total cash

payments amount to $4,890,000. In addition, petitioner was to receive 40 percent of any amounts paid from Diesel Power's pending claim in arbitration against Clark. Petitioner was to also receive 40 percent of the claim by Diesel Power against Ingersoll-Rand from the cancellation of the Ingersoll-Rand franchise.

On his 1977 Federal income tax return petitioner reported a long-term capital gain in the amount of $4,805,864 from the sale of 200 shares of Diesel Power stock he had held since 1958. His claimed basis in the Diesel Power stock was $3,525,000. The gross sale price of $4,809,389 was approximately $80,000 less than the contract sale price.

In the notice of deficiency for 1977 respondent determined, pursuant to section 1248, that petitioner was required to treat the gain from the sale of his Diesel Power Stock as ordinary dividend income, rather than long-term capital gain. Respondent also determined that the gain from the stock sale was $3,925,000, rather than $4,805,864 as reported on petitioner's 1977 return.

Petitioner satisfies all requirements for section 1248 to apply. Petitioner has been a U.S. citizen since 1953 and was a citizen during the years at issue. He owned 100 percent of Diesel Power stock until late 1974, which was within Diesel Power's 1974 fiscal year ending March 20, 1975. Petitioner owned over 40 percent thereafter until 1977. For the period March 22,

1972, through March 21, 1973, petitioner reported 100 percent
ownership of Diesel Power's voting stock on an Information Return
with Respect to Controlled Foreign Corporation (Form 2952) filed
with the Internal Revenue Service. Diesel Power's foreign
commission deposits from the Bank of America in New York City,
combined with the retained earnings and amounts due shareholders
on the Diesel Power financial statements, show that during its
fiscal year ending March 20, 1975, retained earnings and profits
exceeded $5 million.

### VI.  Claimed Capital Losses for 1978 and 1979

Petitioner claimed capital losses for 1978 and 1979.  On his
1978 Federal income tax return petitioner reported a short-term
capital loss of $15,767 from the sale of commodity futures.  He
deducted $3,000 of the reported loss and carried over to his 1979
return a loss of $12,767.  For 1979 he applied the short-term
capital loss carryover of $12,767 against a short-term capital
gain of $7,500.  In 1979 he also reported a net long-term loss of
$8,229 from small business corporations.  He deducted $3,000 of
the claimed net losses in 1979.

In the notice of deficiency for 1978 and 1979 respondent
disallowed the claimed losses and determined that petitioner was
required to include the $7,500 short-term gain in his 1979
taxable income.  Respondent disallowed the losses because
petitioner did not establish that they were incurred, nor did

petitioner establish his basis in the commodity futures reported in 1978.

Petitioner presented no evidence, such as canceled checks, brokerage statements, or sale agreements, to support the capital losses claimed in 1978 and 1979.  Therefore, his taxable income should be increased by $3,000 in 1978 and $10,500 in 1975.

## VII.  Asserted Claim of Right for 1979

When petitioner sold his Diesel Power stock to the Khalatbaris in 1977, the sale price was $4,890,000 plus 40 percent of certain additional commission income.  By March 1978 petitioner had received $3,925,000 for the stock sale.  On his 1977 income tax return petitioner reported his gross sale price for the Diesel Power stock as $4,809,389, or $806,111 less than the cash sale price, excluding the potential additional commission income.

In 1975 and, thus, prior to petitioner's sale of the Diesel Power stock, the following events occurred:  Clark canceled its distribution agreement with Diesel Power; Ingersoll-Rand canceled its agreement with Diesel Power; all commission agreements with Lockheed were canceled; and the Ashland agreement for crude oil purchases, joint refining ventures and exploration was terminated.

As of March 1979, prior to the time the original 1979 return was filed, Special Agent Bennett had begun a criminal investigation regarding petitioner's tax returns.

On petitioner's 1979 joint Federal income tax return, as originally filed, petitioner included in income $1,617,761 which he had received, had in his possession, and for which he claimed ownership. Petitioner filed an amended joint return for 1979, claiming that his 1979 income should be reduced by $348,350. Petitioner states that this amount is attributable to a lawsuit involving the 1977 sale of his Diesel Power stock. The record contains no explanation as to how the $348,350 claimed reduction was calculated.

On the joint 1981 tax return petitioner claimed that the calculated tax due of $315,928 should be reduced to $0. Petitioner states that he is entitled to deduct $735,000 previously included in income under a claim of right because that amount had been repaid. The only evidence offered in support of the $735,000 calculation was Exhibit 556-UJ. That exhibit was admitted by the Court for the limited purpose of establishing that litigation had occurred.

The 1977 sale of Diesel Power stock was a separate tax event from the 1979 claim of right over commission income held by petitioner. Therefore, he is not entitled to reduce reported 1979 income by the $348,350 unexplained claim.

VIII.  Claimed Schedule C Expense Deductions

For the years 1973 through 1981 respondent disallowed claimed expense deductions in the deficiency notices because (1) they had not been substantiated, (2) they were not shown to be ordinary and necessary, or (3) they were not shown to be the expenses of petitioner, but were those of another taxpayer.[24]

A.  Cost of Goods Sold for 1973

For the year 1973 petitioner had purchase debits (expenditures) in the total amount of $100,966.70, computed as follows:

| Company | Purchase Debits (Expenditures) |
|---|---|
| Portec-Pioneer | $22,029.00 |
| Kuehnennagel | 766.23 |
| Hobart Brothers | 5,134.94 |
| Hobart Brothers | 36.38 |
| Hobart Brothers | 1,006.53 |
| Intersoll Rand, SA | 6,930.00 |
| F. Khalatbari | 15,233.00 |
| Atlantic Richfield | 10,058.62 |
| Galion | 39,772.00 |
| Total purchase debits | $100,966.70 |

For the year 1973 petitioner's purchase credits (reimbursements of purchase expenditures) were in the total amount of $122,888.07, computed as follows:

---

[24]    Certain adjustments have been resolved by the parties and can be reflected in the Rule 155 computations.

| Company | Date | Purchase (CR) | |
|---------|------|---------------|---|
| Morrison-Knudson | 01/04/73 | $11,546.12 | |
| | 03/12/73 | 5,134.95 | |
| | 04/13/73 | 1,006.53 | |
| | | | $17,687.60 |
| Galion | 05/11/73 | | 335.33 |
| Imico/Imiss | 06/07/73 | 85.00 | |
| | 11/21/73 | 39,772.00 | 39,857.00 |
| Pioneer-Portec | 07/12/73 | 14,891.74 | |
| | 07/12/73 | 18.65 | 14,910.39 |

| Company | Date | Purchase (CR) | |
|---------|------|---------------|---|
| Iran Aircraft | 10/12/73 | | 17,560.03 |
| Atl. Richfield | 11/01/73 | | 10,058.62 |
| Massey Insurance | | | 449.50 |
| Pioneer Ret. ck | 03/20/73 | | 22,029.00 |
| Total purchase credits | | | $122,888.47 |

For the year 1973 petitioner's purchase credits of $122,888.07 exceed purchase debits of $100,966.70 by $21,921.37. On his 1973 income tax return petitioner claimed cost of goods sold in the amount of $11,320.75. According to this method of computing cost of goods sold, purchase debits were goods purchased, and purchase credits were reimbursements received.

For the year 1973 petitioner overstated cost of goods sold by $33,242.12.

B.  Cost of Goods Sold for 1977

For the year 1977 petitioner's total cost of goods sold was $525,714.36.  Galion was the principal payee, but others were listed as GMOO, GMODC, Clark, and Cantwell.  Petitioner claimed cost of goods sold on his Schedule C for 1977 in the total amount of $594,530.  Therefore, cost of goods sold for 1977 was overstated by $68,815.64.

C.  Cost of Goods Sold for 1978, 1979, and 1981

For the years 1978, 1979, and 1981 respondent increased petitioner's deductions for cost of goods sold in the amounts of $148,706, $95,633.60 and $5,862, respectively, because they were related to additional income respondent determined that petitioner received from Galion.  Having found that petitioner's taxable income should be increased by the amounts received from Galion, respondent correctly increased petitioner's cost of goods sold for those years.

D.  Claimed Deductions for Commission Expenses

Hillary Wood resided in Paris, France, during the 1970's. The only service provided by Ms. Wood to petitioner was to introduce him to Minister of Court Alam.  Petitioner met Ms. Wood only once at a dinner party at which she accompanied an employee of Continental Oil.  Petitioner made payments to Hillary Wood in the amounts of $1,503.42, $18,041.04, $18,042.24, $18,043.44, and

$18,043.44, respectively, for the years 1973 through 1977.  He deducted these amounts.  These claimed commission expenses and other business expenses with respect to Hillary Wood were not ordinary and necessary business expenses of petitioner.

In 1973 and 1974 petitioner's brother, I.J. Zand, an employee of Diesel Power, performed services for petitioner.  The payments he made to I.J. Zand of $16,100 in 1973, $25,000 in 1974, and $2,130 in 1978 were made because Diesel Power could not fully compensate I.J. Zand.  Petitioner deducted these amounts as a commission expense.  The claimed commission expenses constitute ordinary and necessary business expenses of petitioner.

Petitioner's brother, Monty Zand, assisted petitioner and Diesel Power in selling some equipment in Iran.  Petitioner paid him $15,000 in 1973 and deducted this amount on his 1973 income tax return.  The commission expense paid to Monty Zand was an ordinary and necessary business expense of petitioner.

Mehdi Sabety was an employee of Diesel Power.  He was not employed by CTC.  He did not render any services to CTC or to petitioner.  Therefore, the commission expenses in the amounts of $11,000, $10,000, and $2,000 claimed by petitioner with respect to Mehdi Sabety for the years 1973, 1974, and 1978, respectively, were not his ordinary and necessary business expenses.

The Bank of Minora was a small Iranian bank that would exchange U.S. dollars for Iranian rials. Petitioner and CTC employees used the Bank of Minora to make transfers to Diesel Power. In 1973 and 1974 petitioner deducted as "commission expense transfers" to the Bank of Minora the amounts of $23,686 and $30,000. The conversion of currency from U.S. to Iranian was an ordinary and necessary business expense of petitioner.

Petitioner's cash disbursements journal for 1973 lists a payment of $35,000 on July 7, 1973, to an illegible payee. This amount was deducted as a commission expense. It has not been proven to be an ordinary and necessary business expense of petitioner.

There is no evidence in the record to support unidentified commission expenses in the amounts of $170 and $16,000 for the years 1973 and 1975, respectively, that were claimed by petitioner on his 1973 and 1975 income tax returns.

Petitioner paid Hossein Zanganeh $80,000 in 1973 and $75,000 in 1974 for assisting him in selling Lockheed aircraft in Iran. The $80,000 payment is not at issue. Petitioner deducted the 1974 payment as a commission expense. However, Diesel Power reimbursed petitioner for this payment.

Sadek Massey was an employee of Diesel Power. Petitioner paid Sadek Massey $2,000 in 1974 and deducted that amount on his

1974 income tax return. There is no evidence in the record of any business purpose for this payment.

Ladham Alam was the daughter of Mr. Daftari. Petitioner provided her with funds for her schooling. Petitioner paid Ladham Alam $4,756 and recorded the payments as expenses of Diesel Power. Petitioner claimed a deduction of $5,250 on his 1974 return. There is no evidence in the record of an ordinary and necessary business purpose for the payments to Ladham Alam in 1974. Thus, it is disallowed as an ordinary and necessary business expense of petitioner.

Jack Rose of General Motors asked petitioner to be involved in the efforts to sell GM locomotives to Pakistan. During the period March 10 through March 14, 1974, petitioner met with associates of Mr. Khilnani with respect to the sale of GM locomotives in Pakistan. An agreement was reached on March 14, 1974. Mr. Khilnani was employed by or affiliated with Amelia Corporation. Petitioner paid Amelia Corporation $234,033.42 in 1975 and $362,003.36 in 1976, and claimed deductions for these amounts on his Federal income tax returns. There is no evidence that Diesel Power was involved in the sale of GM locomotives to Pakistan; all items sold by Diesel Power were shipped exclusively to Iran. Consequently, the commission expenses in the amounts of $234,033.42 and $362,003.36 claimed by petitioner with respect to

Amelia Corporation for the years 1975 and 1976, respectively, are his ordinary and necessary business expenses.

Mr. Emilian was the service manager of Diesel Power. In 1975 petitioner paid lodging expenses, car rental, and medical expenses for Mr. Emilian's son and $4,443 in unidentified cash payments to Mr. Emilian. These payments totaled $7,028.33 and were deducted on petitioner's 1975 return. Mr. Emilian was accompanied by his family on a trip to the United States in 1975. There are no receipts for the lodging, airfare, or car rental expenses, nor is there any itemization of the $4,443 given to Mr. Emilian in cash. Therefore, the claimed commission expense is disallowed as an ordinary and necessary business expense of petitioner.

In 1975 petitioner paid $1,000 to Mr. Bolanhemat, a former employee of the Iranian State Railways, who was in the United States for a training session. Petitioner deducted this amount in 1975. Petitioner presented no evidence of how the $1,000 was spent. Furthermore, petitioner presented no evidence of any connection between Mr. Bolanhemat's training and petitioner's business. Therefore, the claimed commission expense was not an ordinary and necessary business expense of petitioner.

Diesel Power attempted to market Lockheed's earth resources program in Iran. In 1976 petitioner paid $10,000 to Alfred

Borsharpour, who assisted Diesel Power in this venture, and petitioner deducted this amount on his 1976 Federal income tax return. This claimed commission expense was not an ordinary and necessary business expense of petitioner.

In 1976 petitioner paid Don Kahler $1,500 and deducted it as a commission expense on his 1976 Federal income tax return. Mr. Kahler was an interior decorator who assisted in redecorating CTC's offices, kitchen, and conference room. The payment of $1,500 was in settlement of a disputed bill. Although not a commission expense, it was an ordinary and necessary business of CTC, petitioner's sole proprietorship.

In 1978 petitioner paid $500 to Celia Longenbaker, an employee of Caspian Development Company (CDC), and $736.54 to TWA for a Mr. Rayhanni's travel expenses to Chicago. Petitioner deducted these amounts as commission expenses in 1978. There is no evidence in the record of the business purpose of Mr. Rayhanni's travel to Chicago nor an explanation why the $500 check was written to Celia Longenbaker. Therefore, this claimed commission expense is not an ordinary and necessary business expense of petitioner.

### E. Claimed Deductions for Consulting Fees

Larry Castoe was a stockbroker who provided brokerage and financial services to petitioner, Diesel Power, and others. Petitioner purchased stock through Mr. Castoe on one or two occasions as did Mr. Khalatbari. Petitioner provided Mr. Castoe

with office space and paid him a monthly fee; petitioner also paid for various office supplies, stock exchange fees, and financial publications and services. Petitioner claimed professional fee deductions of $9,312.49 in 1976 for payments made on behalf of Mr. Castoe. Petitioner also claimed consulting fee deductions in the amounts of $18,266.10 in 1977, $14,377.13 in 1978, and $12,445.39 in 1979 for fees paid to or on behalf of Mr. Castoe. Petitioner did not have an extensive investment portfolio during the years at issue. Other than through earnings and capital gains on his investments, there is no evidence showing how petitioner was to personally profit from Mr. Castoe's activities. Therefore, the claimed deductions for consulting fees and professional fees were not ordinary and necessary business expenses of petitioner.

In 1978 petitioner and Harris Corporation reached an agreement whereby he would provide aid and assistance to Harris Corporation in its areas of foreign operations for a period of 10 years for which he would be compensated $300,000 per year. The agreement provided that all matters with respect to Harris' operations would remain confidential; petitioner had no authority to bind or obligate Harris without specific written authorization. Petitioner engaged his brother, I.J. Zand, to assist him in providing services to Harris Corporation and agreed to split the fees to be paid by Harris Corporation with his

brother. Petitioner paid I.J. Zand $100,000 in 1978 and deducted that amount on his 1978 Federal income tax return. Respondent has conceded that this payment was deductible in 1978. CTC's 1979 disbursement journal lists an account payable to I.J. Zand on June 15, 1979, in the amount of $50,000. However, neither petitioner's books nor other evidence show when this account payable to I.J. Zand was paid, if at all. Petitioner deducted the $50,000 on his 1979 income tax return. Therefore, the consulting fee in the amount of $50,000 to I.J. Zand is not deductible by petitioner in 1979 because he has not shown that the amount was paid.

### F. Claimed Deductions for Management Fees

Caspian Development Company (CDC) was incorporated on September 17, 1976, and 100 shares of stock were issued. Petitioner held 51 voting shares, Mr. Khalatbari held 24 voting shares, Diana Khalatbari held 24 nonvoting shares, and Priscilla Meier held 1 nonvoting share. The officers of CDC were petitioner, president; Joe Dinunzio (petitioner's son-in-law), vice president; Clem Meier, vice president; and Priscilla Meier, secretary.

CDC was described as a payroll company. CDC had a number of subsidiaries during the years at issue, including Caspian Electric Company, Caspian Farms Systems, Caspian Machinery, and Charleston, Inc. In addition, CDC owned Madison County Farm.

CDC was also a 70 percent partner in Green Prairie Partnership, whose principal asset was a farm in Alabama; and CDC was a 50-percent partner in Franklin Green Partnership whose principal assets were buildings on the Bowling Green Farm (another farm partnership).  Petitioner and Clem Meier each held a 25-percent partnership interest in the Franklin Green Partnership.

Petitioner claimed a CDC management fee expense on his 1977 Federal income tax return in the amount of $96,396.  There is no evidence showing either how this amount was determined or what services CDC rendered to petitioner for this fee.  Furthermore, Mr. Dutton, petitioner's 1977 return preparer, could not confirm that a disbursement on June 22, 1977, in the amount of $100,000 to CDC was for a management fee or for any other specific services.  Therefore, the claimed management fee deduction of $96,396 neither is an ordinary and necessary business expense of petitioner nor was paid.

The CDC management fee expense claimed for the year 1978 in the amount of $72,609 consists of wages, payroll taxes on wages, a management fee equal to 10 percent of the wage expense, and rent, less a rent credit.  There is nothing in the record to show that the purpose of the wage expense percentage was a management fee.  Furthermore, instead of reporting the rent credit (the rent expense of CDC to petitioner) on his 1978 Federal income tax

return, petitioner offset the amount claimed as a management fee expense by the amount of the rent credit received.

During 1979 petitioner computed a management fee payable to CDC in the amount of $67,943 in a similar manner. However, petitioner failed to offset the amount claimed as a management fee expense by the rent credit, which was $16,269. Petitioner also did not report the rent credit as rental income on his 1979 tax return. The computation of the management fee for 1979 lists two accounts payable to CDC in the amounts of $44,475.29 and $7,198.69.

Petitioner has not substantiated that the alleged management fees claimed in 1978 and 1979 to CDC were actually paid. Although petitioner's cash disbursements journal for 1978 lists a number of payments to CDC, the purpose for most of the payments is not identified, and none of the listed payments match the amounts reflected in Exhibit 3138. Furthermore, during 1978 CDC owed petitioner $1,303,460 for loans or similar debts. Certain other payments reflected in the 1978 disbursements journal are listed under a column identified as rent. These amounts pertain to the deduction claimed on petitioner's Schedule C for 1978 rent expense of $31,842.

During 1979 petitioner did not issue any checks to CDC in payment of the claimed management fees. The cash disbursements

journal for 1979 does not list any disbursements from CTC to CDC as payment of management fees.

Thus, petitioner presented no evidence that the management fees for 1978 and 1979 were paid; likewise, there is no evidence of specific offsets made in payment of the management fees for which the deductions were claimed. Therefore, these claimed management fees for 1978 and 1979 are not deductible by petitioner because they are not his ordinary and necessary business expenses; furthermore, the amounts claimed were not shown to have been paid.

G.  Claimed Deductions for Consulting Fees or Salary

CDC issued two invoices to CTC, dated February 29, 1980, in the amount of $6,487.83, and April 9, 1980, in the amount of $461.73. These invoices were offered in support of deductions claimed for consulting fees and salaries of $102,101 and for investment counsel fees of $4,500. Petitioner's cash disbursements journal for 1980 does not reflect payment of these amounts. Therefore, petitioner is not entitled to deductions claimed for consulting fees and salaries of $102,101 and investment counsel fees of $4,500 for 1980 because these amounts are not his ordinary and necessary business expenses and the amounts were not paid.

H.  Claimed Deductions for Legal and Professional Fees

In 1975 petitioner paid DuBois Jansson $2,907.34 for services rendered with respect to acquiring railroad equipment that would be sold to the Iranian State Railway.  Petitioner deducted this amount on his 1975 Federal income tax return.  On his tax returns and in his books and records for the years 1973 through 1977 petitioner took the position that the income from only 40 percent of the products sold to Iranian State Railways was taxable to him. Petitioner contends that the income from the remaining 60 percent of the products sold constituted income of Diesel Power.  Because we have found that all of the income was petitioner's, he is entitled to deduct professional fees of $2,907.34 paid to DuBois Jansson for 1975.

During the years 1976, 1977, and 1978 petitioner deducted legal fees paid to the law firm of George, Greek, King, McMahon & McConnaughey in amounts that were at least $57,921.08, $57,419.26, and $25,059.21, respectively.  These fees were paid for a variety of services, including acquisitions of real estate, matters involving the Harris Corporation, handling the arbitration of a dispute between Clark and Diesel Power, handling a home purchase matter for petitioner's brother, Monty Zand, landlord-tenant issues, research concerning joint ventures, matters involving insurance and pension plans, tax matters, preparations of a will and trust, and a number of conferences

concerning various farms. Of the total amounts paid to the George, Greek law firm for the years 1976, 1977, and 1978, the amounts of $20,607,58 (1976), $17,950.59 (1977), and $6,315.68 (1978) were paid with respect to the Clark arbitration involving Diesel Power.

Other legal and professional fees paid by petitioner with respect to the Clark arbitration matter involving Diesel Power were payments to the law firm of Walder, Wyss, & Maier in the amounts of $1,400.85 for 1976 and $761.71 for 1977, Coudert Freres in the amount of $500 in 1976, and a deposit paid to A. Sarasin & Cie in the amount of $22,500 in 1977.

When Clark canceled its distributorship with Diesel Power, Diesel Power was left with Clark equipment inventory on hand that it could not sell. The distributorship agreement provided for arbitration to resolve such disputes. In this matter Diesel Power was represented by the George, Greek, law firm.

The legal and professional fees claimed by petitioner as paid to George, Greek in the amounts of $57,921.08, $57,419.26, and $25,059.21 for the years 1976, 1977, and 1978, respectively, are not deductible because it has not been shown that these amounts were ordinary and necessary business expenses of petitioner. The legal and professional fees deducted by petitioner concerning the Clark arbitration matter and paid to Walder, Wyss & Maier in the amount of $1,485 for 1976 and $761.71

for 1977, and to Coudert Freres in the amount of $22,500 in 1977 are not deductible because they were not ordinary and necessary business expenses of petitioner.

The professional fee claimed by petitioner in the amount of $9,312.49 in 1976 paid to Larry Castoe was not his ordinary and necessary business expense.

During 1976 petitioner paid $19,799.12 to J. Foley, an architect. This amount is includes $4,779.12 paid with respect to a housing project for General Dynamics and $15,000 paid with respect to the purchase and construction of the building on Riverside Drive that housed CTC's operations. For the years at issue petitioner reported no income from General Dynamics or a housing project. These professional fees were not ordinary and necessary business expenses of petitioner. Instead, they were capital expenditures.

In 1977 petitioner paid the accounting firm of Price Waterhouse & Company the amount of $2,425.20 for Price Waterhouse's annual fees as resident agent for WHIP, a Bahamian corporation. He deducted this amount on his 1977 return. This payment was an ordinary and necessary business expense of petitioner because WHIP was merely a shell corporation.

In 1978 petitioner issued two checks in the total amount of $5,000 to Sandra Rossi and Celia Longenbaker. These payments were recorded in CTC's journal as payment for Mr. Shamloo, an

Iranian lawyer. Petitioner deducted these two payments in 1978. There is no evidence as to the business purpose of these payments or why they were made to Sandra Rossi and Celia Longenbaker instead of Mr. Shamloo. Therefore, they are disallowed.

In 1979 petitioner deducted legal fees paid to the New York law firm of White & Case in the amount of $3,710. Of this amount $2,660 represents fees paid in connection with the purchase of a cooperative apartment in New York City for petitioner's daughter. This amount ($2,660) is disallowed as an ordinary and necessary business expense of petitioner.

In 1979 petitioner deducted a legal fee paid to the law firm Chester, Saxbe, Hoffman & Wilcox in the amount of $910. There is no evidence in the record of the business purpose for this payment. Therefore, it is disallowed.

### I. Claimed Deductions for Salaries and Wages

In 1974 and 1976 petitioner paid his brother, I.J. Zand, $9,000 and $5,000, respectively. Petitioner deducted these amounts as salaries or wages. I.J. Zand was not paid the amounts due to any employment by CTC or petitioner. Rather, I.J. Zand was an employee of Diesel Power from 1971 through 1976. Therefore, the deducted amounts are disallowed.

### J. Claimed Deductions for Office Expenses

In 1973 petitioner acquired a desk costing $1,202.24 and other furniture costing $296.25. He expensed these purchases and

claimed depreciation on a desk with a basis of $1,202.24 and on furniture with a basis of $296.25. These furniture costs were not an ordinary and necessary business expenses. Instead, they were capital expenses.

In 1974 petitioner acquired a Morgan desk costing $592.28, a Lazarus office machine costing $258.76, a Morgan desk costing $954.97, an IBM typewriter costing $696, and telephone equipment costing $1,518.40. He deducted these items on his 1974 return. They were not ordinary and necessary business expenses; they were capital expenses.

For the years 1975 and 1976 petitioner claimed deductions for office furniture and equipment in the amounts of $16,873.59 and $4,407.96, respectively. There is no evidence in the record regarding these expenditures. In the notice of deficiency for the years 1975 and 1976 respondent capitalized various items of office furniture and equipment, and these amounts were set forth in the depreciation schedule attached to the notice. These expenditures were not ordinary and necessary business expenses but were capital expenditures.

In 1973 petitioner purchased briefcases from Albanese in the amount of $1,500 and Bruni in the amount of $350 that were given to various Iranians. He deducted these purchases. He also claimed a deduction in 1973 for Christmas gifts in the amount of $404.80. There is no evidence in the record regarding the

recipients of the Christmas gifts and briefcases, the business purpose for the gifts, or the amount in gifts to any one individual for the year. Therefore, the claimed deductions are disallowed.

In 1975 petitioner made a payment to Ohio Bell in the amount of $7,359.75 for a telephone bill dated November 14, 1975, which contains a one-time charge of $6,626.30 and other charges for services of $661.16. Petitioner deducted the entire bill of $7,359.75 on his 1975 return. There is no evidence in the record as to the type of equipment or service or the business purpose for the one time charge of $6,626.30. Therefore, it is disallowed. Respondent concedes the remainder ($661.16).

In 1975 petitioner claimed a deduction for office expenses of $1,121.29 paid to American Express, a refund of $174.05, a bank overcharge of $102.36, and insurance premiums of $1,000. For the year 1977 petitioner claimed office expenses for $25 paid to the University Club, $85 paid to Susie Strong, $211.05 paid to Mehdi Sabety, and $100 paid to Donna Stone. There is no evidence in the record of the business purposes for these payments. Therefore, they are disallowed.

Petitioner claimed deductions for dues paid to the Columbus Country Club in the amounts of $45, $585, and $468, and to the OSU Faculty Club in the amounts of $77, $108, and $99, for the years 1975, 1976, and 1977. Petitioner also paid golf club dues

of $250 in 1977.  In 1976 his daughter's wedding reception was held at the Columbus Country Club, and he was billed $7,631.77 for the reception.  Petitioner maintained no records comparing his business use to his personal use of these clubs, nor did he keep records of the dates that he used the clubs for business purposes or the nature of their business use.  Hence, the office expenses claimed for the dues paid to the Columbus Country Club and the OSU Faculty Club are disallowed.

In 1977 petitioner deducted as office expenses $215.22 paid to Standard Oil and $358.17 paid to Ed Potter.  In 1977 he paid several Standard Oil charges incurred by his son-in-law, Joe Dinunzio.  In 1977 also he paid two auto repair bills made out to C.J. Maier.  The bill dated November 28, 1977, is noted CDC.  These claimed deductions are disallowed.

In 1977 and 1978 petitioner deducted payments to Eva Carlson in the amounts of $830.11 and $468.12.  Eva Carlson later became Eva Zand.  There is no evidence showing the purpose of these payments.  Therefore, they are disallowed.

In 1978 petitioner deducted $9,000 paid as prepaid rent for the year 1979 for the rental of his son-in-law's, Joe Dinunzio's, condominium in Naples, Florida.  The amount of the rent paid was based on the estimated fair rental value of the condominium plus the cost of furnishing it.  Mr. Dinunzio acquired the condominium in the fall of 1978 from the Riviera Condominium Company of

Naples. Petitioner was a shareholder of the Riveria Condominium Company of Naples. In 1979 and 1980 petitioner owned two condominiums in the Riveria Condominium Complex. Clem and Priscilla Meier also owned a condominium in the same area.

Mr. Dinunzio was no stranger to petitioner. In 1976, at age 20 and while still in college, Mr. Dinunzio married petitioner's daughter, Sherie. After graduating from college, he began working for some of the entities that petitioner controlled. For example, Mr. Dinunzio was vice-president of CDC, Caspian Machinery, Caspian Electric, and Caspian Florida. Furthermore, petitioner purchased a home in Columbus for Mr. Dinunzio and his daughter. Petitioner also provided Mr. Dinunzio with a Cadillac.

Mr. Dinunzio maintained diaries showing who used the condominium during the years 1979 and 1980. Some of the persons who used Mr. Dinunzio's condominium were employees of CDC, such as Cindy Seaman, Celia Longenbaker, Priscilla Meier, Jane Kellermeyer, Steve Dutton, and Mr. Dinunzio; others who used the condominium included business associates who wished to bid on work that was to be done on a building being constructed by CDC, clients of petitioner, and friends of Mr. Dinunzio.

In addition, for the year 1980 petitioner substantiated payments in the amount of $3,360.74 for Mr. Dinunzio's Florida condominium. However, petitioner deducted $4,022.68 with respect to this condominium as rent expense.

The rent expenses claimed by petitioner with respect to Mr. Dinunzio's Florida condominium--$9,000 in 1978 and $4,022.68 in 1980--were not shown to be petitioner's ordinary and necessary business expenses.  Moreover, he has not substantiated that he paid more than $3,360.74 for 1980.

Additionally, for the year 1980 petitioner deducted as rent expense $6,451.86 paid for a New York city condominium for his daughter.  This claimed deduction is disallowed.

### K. Claimed Deductions for Interest Expenses

In 1967 Mehdi Sabety invested $20,000 through petitioner in fast-moving General Motors parts or in an entity known as Caspian International Jordan.  Petitioner did not sign a note or incur personal liability to Mr. Sabety.  At the rate of $250 per month beginning in 1967, Mr. Sabety would receive, in principal and/or interest, 15 percent of his investment each year the payments continued.

Petitioner made payments to Mehdi Sabety in the amounts of $3,000 for 1973, $3,000 for 1974, $2,950.96 for 1975, $3,000 for 1976, and $1,000 for 1977.  He claimed interest expense paid to Mr. Sabety of $3,250 in 1973, $3,000 in 1974, $2,950.96 in 1975, $3,000 in 1976, and $2,404.80 in 1977.  Because petitioner has failed to prove what part of the payments represented interest and what part represented principal, these amounts claimed as interest expenses are disallowed.

For the year 1975 petitioner claimed an interest expense paid to Diesel Power in the amount of $137,500.17 on his original income tax return. Petitioner's amended tax return for 1975 reduced the interest expense paid to Diesel Power by $41,245.39. On December 30, 1975, petitioner paid Diesel Power $125,000. This amount is listed in CTC's cash disbursements journal under the transfer column; it is noted as "interest on loan" drawn by petitioner. In 1978 his accountant listed this payment as a transfer.

Petitioner did not introduce into evidence any notes or other loan documents evidencing a debtor-creditor relationship between himself and Diesel Power. Testimony presented at trial with respect to moneys borrowed by petitioner from Diesel Power was not specific with respect to the amounts of such alleged loans, dates of such loans, interest rates, or repayment schedules. Therefore, petitioner is not entitled to any interest deduction in 1975 for the amount paid to Diesel Power in 1975.

On June 1, 1976, petitioner paid W.P. Glass $24,400.87. This amount was deducted as interest expense. This payment was for the purchase of real estate for the A-Z Ranch Partnership. Therefore, it is not deductible as interest expense.

In 1976 petitioner made three payments to Crown Life Insurance totaling $178.80. In 1976 he deducted $219.80 as

interest paid to Crown Life.  There is no evidence that these payments were for interest.  Thus, they are disallowed.

On September 10, 1979, three members of the Mirhosseini family each lent petitioner $80,000.  Petitioner agreed to invest a total sum of $240,000 in his operating companies and to provide the Mirhosseini family with a return on the principal of 25 percent per year, payable quarterly in advance.  During approximately the same time period petitioner borrowed other funds at interest rates of 8 percent to 12-1/2 percent.  He deducted as interest paid to the Mirhosseini family $15,000 in 1979, $43,879 in 1980, and $36,000 in 1981.  However, petitioner's journals show no payments to the Mirhosseinis in 1979, 1980, and 1981.  Therefore, petitioner is not entitled to any deduction for interest expense for payments to the Mirhosseini family in 1979, 1980, and 1981.

In 1977 petitioner created six trusts, two for each of his three daughters.  The two trusts for each daughter were funded with $25,000 and $75,000.  Each of the trusts was for a term of 10 years and 1 day.  The three trustees of the trusts were Priscilla Meier, George Hairston, and David Johnston.  The terms of the trust agreements granted the three trustees investment discretion.  In 1977 trust funds were lent to CDC, a corporation in which petitioner held a controlling interest.  The loans were repaid to the trusts.  On February 5, 1980, the corpus of each

trust was lent to petitioner with a rate of return of 12 percent per annum. Petitioner gave a mortgage on his residence and condominium as security for the loans.

Petitioner claimed deductions for interest paid to the trusts in the amounts of $30,000 in 1980 and $45,000 in 1981.

Priscilla Meier was an employee of petitioner or CDC. George Hairston and David Johnston, the other trustees, were attorneys. The funds in the trusts were invested in entities controlled by petitioner. The trustees, acting in unison, were independent and not subordinate or subservient to petitioner, the grantor. Petitioner is entitled to the deductions for interest paid to the J.J. Zand trusts for the years 1980 and 1981.

### L. Claimed Deductions for Insurance Expenses

Petitioner is entitled to deduct insurance expenses of $825 for 1974 and $1,458 for 1975. He is not entitled to deduct $1,365 for 1977 because the amount was not identified. In 1980 petitioner paid insurance premiums to McElroy-Minister in the amount of $5,385. The policy with McElroy-Minister was a liability policy covering various companies owned by him, including CDC, CDC's four subsidiaries, and CTC. This amount is deductible.

### M. Claimed Deductions for Dues and Publications

In the notice of deficiency for 1978, 1979, and 1980, and 1981 respondent disallowed deductions claimed for dues and

publications in the amounts of $2,211, $4,168, $1,979, and $1,873, respectively. On brief petitioner conceded the amounts of $1,734.08 for 1978, $624 for 1979, and $624 for 1981. Respondent conceded $926 for 1979 and $234 for 1980. The remaining amounts of $476.08 for 1978, $2,618 for 1979, $1,745 for 1980, and $1,249 for 1981 were not ordinary and necessary business expenses of petitioner, and are, therefore, disallowed.

N.   Claimed Deductions for Depreciation

In the notice of deficiency for the years 1973 and 1976 respondent disallowed depreciation claimed by petitioner in the amounts of $560.90 and $10,902.44, respectively. Petitioner presented no evidence to refute respondent's determination. Therefore, the amounts are disallowed.

From 1974 through 1976 petitioner owned an apartment in Kitzbuhel, an Austrian village located in the Tirol Mountains noted for its skiing. Petitioner skied in Kitzbuhel and took skiing lessons there. Petitioner, his family, and his friends used the Kitzbuhel apartment for personal vacations.

Petitioner claimed depreciation expenses on the Kitzbuhel apartment in the amounts of $3,366.90 in 1974 and $3,990.91 in 1975. He did not keep any records of the number of days the Kitzbuhel apartment was used for business compared to the number of days of personal use. Therefore, he is not entitled to any depreciation expenses on the Kitzbuhel apartment for the years

1974 and 1975 because he has not shown that it was an asset used in his trade or business or for the production of income.

In 1978 petitioner provided Cadillacs to Mr. Dinunzio (his son-in-law), Mr. Dutton, and Clem and Priscilla Meier, each of whom was a CDC employee.  Petitioner also had an automobile.  He claimed depreciation on automobiles in the amounts of $9,311.30 in 1974, $8,280.80 in 1975, $7,339 in 1977, $13,865 in 1978, $12,000 in 1979, $12,000 in 1980, and $645 in 1981.

In the notices of deficiency respondent allowed automobile depreciation of $4,072 in 1974 and $2,068 for each of the years 1978 through 1980.

Petitioner presented no evidence with respect to the basis claimed for the various automobiles reflected on his depreciation schedules.  He and the employees admitted that the automobiles were often used for personal purposes.  Mr. Dinunzio, Mr. Dutton, and the Meiers sometimes used the automobiles provided by petitioner in their employment for CDC or its subsidiaries.

Petitioner is not entitled to depreciation expenses on the automobiles in excess of the amounts allowed by respondent because he has not shown the extent to which the automobiles were used in his trade or business or his bases in the automobiles.

Petitioner is not entitled to a loss of $2,716 claimed on the trade-in of automobiles for 1978.

### O.  Claimed Rental Loss

In 1975 petitioner claimed a rental loss of $41,049.53.  In the notice of deficiency respondent reduced the loss by $35,228. There is no evidence to support rental expenses claimed by petitioner in computing his rental loss for the year 1975. Therefore, it is not allowed.

### P.  Claimed Rent Expense--London

In 1976 petitioner deducted $10,000 paid to his brother-in-law and sister, Farshid and Diana Khalatbari, for the use of their London apartment, limousine, and chauffeur.  He did not present any evidence to show the number of days he used the London apartment or the business purpose for such use. Therefore, because petitioner has not shown that this $10,000 rental expense was an ordinary and necessary business expense or that he satisfied the record-keeping requirements of section 274 with respect to foreign travel, he is not entitled to a deduction for rental expense.

### Q.  Claimed Deduction for Loan Origination Fee

On May 25, 1978, petitioner paid W. Lyman Case & Company $7,000 as a loan origination fee for the purchase of the Madison County Farm.  He deducted this payment in 1978.  The Madison County Farm was owned by CDC in 1978.  Therefore, petitioner is not entitled to the claimed deduction for the loan fee because

the amount was a capital expense of CDC; it was neither an ordinary and necessary business expense nor an interest expense of petitioner.

### R.  Claimed Moving Expense Deduction

In 1979 petitioner deducted a moving expense paid for Mr. Dutton in the amount of $1,227.  Mr. Dutton was an employee of CDC.  Therefore, it is disallowed because it was not an ordinary and necessary business expense of petitioner.

### S.  Investment Tax Credits

In the notices of deficiency respondent allowed additional investment tax credits in the amounts of $280.60 for 1974, $1,353.53 for 1975, and $695.15 for 1977.  Respondent disallowed investment tax credits in the amounts of $475.89 for 1976, $688.24 for 1978, and $599.60 for 1979.  Respondent determined that petitioner is liable for investment tax credit recapture of $344.58 for 1973.  Petitioner presented no evidence with respect to the investment tax credits set forth in the notices of deficiency.  Therefore, he is not entitled to those investment tax credits disallowed by respondent, and he is liable for the investment tax credit recapture.

### T.  Claimed Deductions for Travel and Entertainment Expenses

For the years 1973 through 1981 petitioner's claimed, allowed, and disallowed travel and entertainment expenses were as follows:

| Year | Amount Claimed by Petitioner | Amount Allowed by Respondent | Amount Disallowed by Respondent |
|------|------------------------------|------------------------------|---------------------------------|
| 1973 | $98,481.64 | $78,568.27 | $19,913.37 |
| 1974 | 126,068.79 | 50,784.39 | 75,284.40 |
| 1975 | 157,946.48 | 80,631.47 | 77,315.01 |
| 1976 | 98,578.45 | 78,578.45 | 20,000.00 |
| 1977 | 60,184.00 | -0- | 60,184.00 |
| 1978 | 74,970.00 | -0- | 74,970.00 |
| 1979 | 41,444.00 | -0- | 41,444.00 |
| 1980 | 28,368.00 | -0- | 28,368.00 |
| 1981 | 19,604.00 | -0- | 19,604.00 |

Respondent disallowed the above travel and entertainment expenses on the grounds that (1) they were not petitioner's ordinary and necessary business expenses, (2) they were not expended for the purposes designated, or (3) they were not substantiated in accordance with the requirements of section 274.

For each of the years 1973 through 1979 petitioner kept a travel diary that reflected both his location and the names of individuals he met with and entertained. However, in most instances the business purpose and the place of lodging or entertainment are omitted. Many of the individuals named in the diaries, particularly those for 1973 through 1976, had business relationships with Diesel Power, WHIP, All Patents, and IGOS. No witnesses named in petitioner's diaries provided testimony corroborating any specific meeting, entertainment, or expense reflected in the diaries. Furthermore, petitioner's employees and office personnel acted pursuant to his directions; hence,

none of them had independent knowledge pertaining to his underlying claimed expenses for travel and entertainment.

By the Court's Order dated October 9, 1992, summaries of the diaries for 1973 (Pet. Exh. 3114), 1974 (Pet. Exh. 3116), 1975 (Pet Exh. 3118), 1976 (Pet. Exh. 3119), 1977 (Pet. Exh. 3120), 1978 (Pet. Exh. 3195), and 1979 (Pet. Exhs. 3202 and 3206), were not received in evidence. Additionally, because there were no diaries for 1980 and 1981, the Court did not receive in evidence petitioner's summaries (Exhs. 3209, 3211, and 3214) of travel and entertainment expenses claimed for those years.

Petitioner's diaries do not meet the "adequate records" substantiation requirements necessary to deduct travel and entertainment expenses pursuant to section 274.

<u>1973</u>

Although petitioner claimed a deduction of $98,481.64 on his 1973 tax return for travel and entertainment expenses, only $80,192.81 was recorded in CTC's disbursements journal. Petitioner claimed cash expenses of $17,500, but his travel diary showed no more than $8,154 in cash expenses. Some of these were for personal rather than business expenses. His return preparer estimated petitioner's cash expenses by comparing the number of checks petitioner wrote for cash with the number of days his diary shows he was out of the United States. No allowance was made for any personal travel. Hence, petitioner is not entitled

to a deduction for travel and entertainment expenses for 1973 in excess of the amount allowed by respondent.

## 1974

Although petitioner claimed a deduction of $126,068.70 on his 1974 tax return for travel and entertainment expenses, only $76,347.25 was recorded in CTC's disbursements journal. Petitioner claimed cash expenses of $24,500, but his travel diary showed no more than $7,495 in cash expenses. Some of these were for personal rather than business expenses. One of the claimed travel expenses was a check dated November 22, 1974, to Diesel Power for $27,618.39 and reflected on petitioner's workpapers as "Hotel Bill". Again, the return preparer estimated cash expenses in the same manner as he did for 1973.

Furthermore, petitioner also claimed a $24,000 deduction for Kitzbuhel office expenses. There is no evidence to support such claimed expense on Schedule C of his 1974 tax return.

Thus, petitioner is not entitled to a total deduction for 1974 travel and entertainment expenses in excess of the amount allowed by respondent.

## 1975

Although petitioner claimed a deduction of $157,946.48 on his 1975 tax return for travel and entertainment expenses, only $108,446.48 was recorded in CTC's disbursements journal. Included in the total amount that he deducted, petitioner claimed

$24,500 for cash expenses, $15,000 for a London apartment, and $10,000 for his Kitzbuhel apartment.  Also included were resident membership dues for the Columbus Country Club as well as airline tickets and hotel bills for Diesel Power employees and their families.  While petitioner claimed $24,500 for cash expenses, his travel diary showed no more than $9,946 in cash expenses. Some of these were for personal rather than business expenses.

Petitioner's 1975 workpapers failed to show the amounts of the checks that he wrote for cash in 1975.  Instead, the cash expense was an estimate based on 270 travel days.

Additionally, the return preparer saw no supporting records, canceled checks, or other documents to support the $15,000 claimed for the London apartment or the $10,000 claimed for the Kitzbuhel apartment.

Therefore, petitioner is not entitled to a deduction for 1975 travel and entertainment expenses in excess of the amount allowed by respondent.

### 1976

Although petitioner claimed a deduction of $98,578.45 for travel and entertainment expenses on his 1976 tax return, only $71,565.24 was recorded in CTC's disbursements journal. Petitioner claimed cash expenses of $15,000, but his travel diary showed no more than $7,430 in cash expenses.  Similarly, expenses of $5,000 claimed for Kitzbuhel are not substantiated.

Some of petitioner's claimed travel and entertainment expenses were personal. His workpapers do not show the amounts of the checks for cash that he wrote in 1976.

Consequently, petitioner is not entitled to a deduction for 1976 travel and entertainment expenses in excess of the amount allowed by respondent.

### 1977

Although petitioner claimed a deduction of $60,184.24 on his 1977 income tax return for travel and entertainment expenses, only $42,631.31 was recorded in CTC's disbursements journal. Petitioner claimed cash expenses of $17,380, but only $6,470 was shown in his travel diary. At least $4,212.96 was unidentified.

Many of the claimed expenses were personal. Some of the claimed expenses related to meetings with Bill McCabe concerning various Florida real estate projects and exploration of business opportunities in Naples, Florida.

Petitioner has not shown which travel and entertainment expenses for 1977 were personal and which were business related. Therefore, he is not entitled to the claimed deduction for that year.

### 1978

Petitioner claimed deductions in 1978 for travel and entertainment of $74,970, cash expenses of $20,000, and car expenses of $1,537.03. Respondent disallowed all of the

deductions that petitioner claimed for travel and entertainment, cash expenses, and car expenses in that year. Only $67,686.10 was recorded on CTC's disbursements journal. Petitioner's travel diary reflects cash expenses of no more than $6,888. Many of the cash expenses were personal.

Petitioner's travel and entertainment expenses claimed in 1978 included expenses with respect to his various activities in Naples, Florida, including activities of the separate corporations and partnerships of Caspian Development, dealings with Bill McCabe, and the Gramercy. His claimed travel and entertainment expenses in 1978 also included expenses relating to the sale of his Diesel Power stock and his arbitration with Mr. Khalatbari.

Petitioner has not established which travel and entertainment expenses for 1978 were personal and which were business related. Therefore, he is not entitled to the claimed deduction for that year.

### 1979

Although petitioner claimed a deduction for 1979 of $41,444 for travel and entertainment expenses and for automobile expenses of $3,936, only $33,406.04 is recorded in CTC's disbursements journal. Petitioner conceded $2,141.25 as unidentified.

Travel and entertainment expenses that petitioner claimed in 1979 included expenses relating to various projects in Naples,

Florida, dealings with Bill McCabe, WHIP and CDC employees, and his litigation with Mr. Khalatbari concerning petitioner's Diesel Power stock.

Petitioner has not established that he is entitled to the claimed deductions for travel and entertainment expenses and automobile expenses for 1979.

### 1980

Petitioner claimed a deduction on the 1980 tax return for travel and entertainment expenses of $28,368 and a deduction for car expenses of $1,926. Only $10,477.76 is reflected on CTC's 1980 disbursements journal. Petitioner conceded that $7,560.22 of the travel and entertainment expenses claimed on the 1980 tax return is unidentified. No travel diary is in evidence for 1980.

Petitioner has not established that he is entitled to the claimed deductions for travel and entertainment expenses and automobile expenses for 1980.

### 1981

Petitioner claimed a deduction on the 1981 tax return of $19,604 for travel and entertainment expenses and $231 for car expenses. Only $554.88 was recorded in CTC's disbursements journal. Petitioner conceded that $82 of travel and entertainment expenses claimed on the 1981 return is unidentified. No travel diary is in evidence for 1981.

Petitioner has not proven that he is entitled to the claimed deductions for travel and entertainment expenses and for automobile expenses for 1981.

IX. Claimed Dependency Exemption and Charitable Contribution Deductions

A. Dependency Exemption Deduction Claimed for Tara Daneshvari

For each of the years 1973 and 1974 petitioner claimed a dependency exemption for Tara Daneshvari. She was the daughter of Dr. and Mrs. Daneshvari, Iranians who were living in Columbus, Ohio.

There is no evidence in the record documenting the period of time that Tara resided with petitioner, the amount of support provided by him to her, the amount of support provided by Tara's parents to her, or facts concerning her status as a resident or nonresident alien. Therefore, petitioner is not entitled to dependency exemption deductions claimed for Tara for the years 1973 and 1974.

B. Deduction for Charitable Contribution Claimed for Property Transferred to the City of Columbus, Ohio

On Schedule A of his 1976 Federal income tax return petitioner claimed $51,662.62 as a charitable contribution arising from the transfer of a house located on 3404 Riverside Drive, Columbus, Ohio, to the City of Columbus. Included in the amount claimed was $13,000 paid by CTC check dated December 22, 1976. This $13,000 check was issued at petitioner's direction to

the City of Columbus, Department of Recreation and Parks, as a donation to move the house to the other side of the river where it was used as a public place. The city did not move the building until 1977. On December 20, 1976, the City of Columbus passed an ordinance accepting petitioner's donation of a single family stucco house containing about 2,300 square feet plus an attached garage, located at 3404 Riverside Drive, and dedicating it to public use for recreation and park purposes.

The depreciation schedule attached to petitioner's 1975 income tax return shows that petitioner acquired the house (identified as adjoining building) and land in October 1975 at a total cost of $57,334.41. The cost for depreciation purposes was allocated as $27,333.41 to the house and $30,000 to the land. This allocation was not challenged by respondent. When the house was donated to the City of Columbus 14 months later it had a fair market value of at least $27,333.41. The house was rented sometime during the period before it was donated to the City of Columbus. Therefore, petitioner is entitled to a charitable contribution deduction of $40,333.41 ($27,333.41 plus $13,000) in 1976. No greater deduction is allowed because petitioner did not prove a fair market value for the house in excess of $27,333.41.

In the notice of deficiency for 1976 respondent determined that no charitable contribution deduction was allowable because the property was purchased with the intent to demolish the house.

C.  Deduction for Charitable Contribution Claimed for
    Property Transferred to Kenyon College

On the 1979 income tax return petitioner claimed a
charitable contribution deduction in the amount of $657,000
arising out of real estate donated to Kenyon College.  This
deduction was reduced to zero in the notice of deficiency by
ordinary income realized.

The claimed charitable contribution consisted of property
owned by the McZand Corporation, a subchapter S corporation, and
listed on its tax return as being acquired for the following
amounts and on dates of purchase indicated:

| Land | Date | Amount |
|------|------|--------|
| Stoneridge Land | 09/77 | $511,000 |
| Westgrove Land | 05/78 | 438,000 |
| Pickerington Land | 05/78 | 411,000 |

The $657,000 amount of the charitable contribution claimed
by petitioner was calculated by determining that the fair market
value of the Stoneridge, Westgrove, and Pickerington tracts was
$1,360,000 (the sum of the properties' costs) less mortgages of
$703,000 for a net value after debt of $657,000.

The McZand Corporation was involved in real estate
development.  Initially, petitioner and his children owned 50
percent of McZand Corporation's stock, and David William McCabe,
in his individual capacity or as custodian for his children,
owned the remaining 50 percent.  Subsequently, on October 22,

1979, petitioner acquired all 360 outstanding shares of McZand Corporation stock. The only amount that the McZand Corporation characterized as shareholder contribution to capital was $500.

However, as of December 31, 1977, the McZand Corporation financial records show $324,145.50 of claimed debt due each to Bill McCabe and the same amount of claimed debt due (collectively) to petitioner and his children. At the time of these advances by McCabe and petitioner in September 1977, additional capital contributions, also in the form of advances, were contemplated. As of July 1978 the claimed debt amount from McZand Corporation to McCabe was $532,545.50, with the same amount shown as a claimed debt to petitioner and his children.

As of December 1979 the claimed debt due from McZand Corporation to petitioner and his children was $772,827.69, the same amount claimed due to McCabe. The claimed McZand Corporation debt to McCabe and to petitioner and his children was subordinated to bank and development loans. At all times prior to October 1979 the claimed McZand Corporation debt to petitioner's family and McCabe was in the same proportion as McCabe's and petitioner's family's stock holdings. None of the notes evidencing these debts was secured, nor was there collateral for them. Although McZand did not pay interest on the claimed debt, the claimed interest rate was 6 percent. As of February 1978 the McZand corporate debt to CNB was 8.75 percent.

McZand Corporation's 1977 financial statement shows that while the corporation's equity was less than $30,000, its debt exceeded $725,000. The corporation's December 1978 financial statement shows that while McZand Corporation's equity was less than $85,000, its debt exceeded $3 million.

On December 26, 1979, McZand Corporation executed deeds transferring the Stoneridge, Westgrove, and Pickerington tracts from McZand's name to petitioner. On the same date petitioner signed deeds transferring the property to Kenyon College. There are no documents of record to indicate that petitioner assumed the mortgage indebtedness on the real estate transferred from McZand Corporation to petitioner and from petitioner to Kenyon College.

In computing its taxable income for 1979, McZand Corporation failed to take into account any realized gain upon the disposition of one of the three parcels of property transferred from McZand to petitioner.

According to the McZand Corporation's trial balance workpapers, the transfer of the properties to petitioner was in full payment of the note due him. However, at the same time, petitioner allegedly purchased McZand Corporation's note to McCabe at less than fair market value.

In March 1980 petitioner transferred his 100-percent ownership in McZand Corporation to Caspian Florida, a subsidiary

of CDC.  As of March 31, 1980, the McZand note payable to McCabe in the amount of $772,827.69 had been assigned to petitioner. Furthermore, as of the March 31, 1980, trial balance the value of McZand's common stock, all of which was owned by petitioner, constituted the sole contribution of $500 to McZand's capital.

The claimed debt from McZand Corporation to petitioner and his children was a capital contribution rather than a loan.

The Stoneridge, Westgrove, and Pickerington properties were distributed to petitioner for no consideration.  As of December 1979 petitioner's disposition of the Stoneridge, Westgrove, and Pickerington properties would have produced $657,000 of short-term gain.

Petitioner's claimed deduction for the transfer of property to Kenyon College is reduced by $657,000; i.e., the amount of ordinary income or short-term capital gain that would have been recognized had petitioner sold the property.

X.  Claimed Losses From Trusts, Partnerships, Subchapter S Corporation, and Farming Operations

On his 1976 tax return petitioner claimed a loss of $1,518 for the Yanson Trust which respondent disallowed.  There is no evidence in the record showing that any loss was incurred in 1976 or the amount thereof.  Therefore, petitioner is not entitled to a 1976 loss of $1,518 from the Yanson Trust.

On the amended tax return for 1979 petitioner claimed a loss of $23,709. There is no evidence establishing the entity for which the loss was claimed or any substantiation for it. Therefore, it is disallowed.

Both the Bowling Green and Franklin Green partnerships were on the cash method of accounting for tax purposes.

Petitioner claimed Bowling Green partnership losses of $12,768 in 1979 and $19,073 in 1980. There are no canceled checks, invoices, or any primary records in evidence for the Bowling Green partnership for those years. Hence, it cannot be determined that expenditures were made, producing the claimed losses. Moreover, the Caspian Farm Systems' corporate journal shows that Caspian Farm Systems disbursed or paid expenses of Bowling Green.

Additionally, based on the Schedule K-1 of Bowling Green's 1979 return, all reported debt of $48,749 (excluding accounts payable) was nonrecourse.

Consequently, there is no evidence of record to establish either petitioner's basis in the Bowling Green partnership for the years 1979 or 1980, or that he was economically at risk for any amount contributed to the partnership. Therefore, petitioner is not entitled to the Bowling Green partnership losses claimed for 1979 and 1980.

Petitioner also claimed losses of $3,596 for 1979 and $4,140 for 1980 from the Franklin Green partnership. However, there are no invoices, canceled checks, or other primary records of the Franklin Green partnership in evidence for 1979 and 1980. Hence, it cannot be established that Franklin Green partnership paid expenses that were ordinary and necessary expenses resulting in distributive partnership losses. Therefore, petitioner is not entitled to the claimed losses from Franklin Green partnership in computing 1979 and 1980 taxable income.

Similarly, petitioner claimed losses from the McZand Corporation, a subchapter S corporation, of $11,997 for 1979 and $39,147 for 1980. He became the sole shareholder of McZand Corporation in 1979. No canceled checks, invoices, or other primary records of McZand Corporation for 1979 and 1980 are of record for these claimed losses. The McZand Corporation's return for 1979 reported an $85,317 gain from the sale of Westgrove real estate to petitioner as sole shareholder. However, McZand Corporation did not include that amount in calculating its income.

In March 1980 petitioner transferred 100 percent of his ownership in McZand Corporation to Caspian Florida, a subsidiary of CDC.

Petitioner is not entitled to McZand Corporation losses of $11,997 and $39,147 in computing 1979 and 1980 income.

Likewise, no primary records of Southern Florida Real Estate Sales Corporation, such as invoices and canceled checks, are in evidence for the 1979 activity of Southern Florida Real Estate Sales Corporation or for the loss petitioner claimed from that entity. Therefore, petitioner is not entitled to a $3,228 loss from Southern Florida Real Estate Sales in computing 1979 taxable income.

The only evidence of record for the claimed 1979 Admiralty Point Trust loss of $2,933 is a $3,000 check payable to Oscar Yanson with the notation "Admiralty Point venture". There is no evidence of when any loss was incurred on this real estate venture. Therefore, petitioner failed to establish that he incurred a loss of $2,933 from the Admiralty Point Trust in computing 1979 taxable income.

On the 1979 tax return petitioner claimed a section 1244 loss of $20,895 from Danny's Hideaway. Respondent agrees that the evidence shows that petitioner incurred a loss when he sold his stock in Danny's Hideaway during 1979, but there is no evidence that the ordinary loss provisions of section 1244 are applicable. There is no evidence that petitioner incurred a claimed loss from Danny's Hideaway in the year 1980 in the amount of $5,771. Therefore, that claimed loss is disallowed.

On the 1979 tax return petitioner claimed a farm loss of $128,458 attributable to a farm called Madison County Farm. On

the 1980 tax return he claimed deductions for Schedule F farm expenses of $249,204 for the same farm, all of which were disallowed by respondent.

The journals and chart of accounts of Caspian Farm Systems are the only records in evidence for the 1979 disallowed net farm loss and the 1980 disallowed expenses adjusting the 1980 reported farm loss to positive farm income. In 1979 and 1980 Caspian Farm Systems was a corporation and filed consolidated tax returns with CDC. There are no invoices, canceled checks, or other records in evidence of payment for the amounts claimed on petitioner's Schedule F as losses and deductions for 1979 and 1980. There is also no evidence of record that any portion of the disallowed expenses paid by petitioner in 1979 and 1980 for the Madison County Farm were ordinary and necessary expenses currently deductible. Petitioner presented no evidence that he, as a cash basis taxpayer, paid any amount during the years 1979 and 1980 for the claimed Madison County deductions. Therefore, in computing 1979 taxable income, petitioner is not entitled to a farm loss of $128,458 and, in computing 1980 taxable income, he is not entitled to deduct unsubstantiated farm expenses of $249,204.

ULTIMATE FINDINGS OF FACT

1. Petitioner substantially understated his taxable income for the years 1972 through 1977.

2. Petitioner substantially overstated his business expenses, losses, and deductions for the years 1973 through 1981.

3. The underpayments of income taxes which were required to be included in petitioner's Federal income tax returns for the years 1972 through 1976 were due to fraud with intent to evade tax.

4. The assessment and collection of petitioner's Federal income taxes for 1972 are not barred by the statute of limitations.

5. Petitioner's omission of substantial amounts of income and overstatement of expenses and deductions for 1977 were due to negligence or intentional disregard of rules and regulations.

6. Petitioner's overstatements of business expenses, deductions, and losses for the years 1978 through 1981 were due to negligence or intentional disregard of rules and regulations.

OPINION

It is no doubt apparent that these cases involve some measure of factual and legal complexity. That complexity is reflected in the magnitude of the record and is exacerbated by the contentions and arguments of the parties. Not surprisingly,

our task of finding the facts has been laborious and sometimes frustrating. We have plodded through 1,917 pages of testimony from 32 witnesses. The stipulations of fact contain 1,191 paragraphs, and there are over 1,800 exhibits of documentary evidence in the record. There are some factual inconsistencies and contradictions which the parties have exploited to their advantage in 933 pages of briefs. Nevertheless, we have done the best we can to reconcile conflicting portions of the record, although we acknowledge that perfect harmony has not been attainable.

Before considering the substantive issues involved in these cases, we will address some preliminary issues relating to procedural and evidentiary matters.

I. Preliminary Issues

A. Burden of Proof

As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); United States v. Janis, 428 U.S. 433, 440-441 (1976); Welch v. Helvering, 290 U.S. 111, 115 (1933). In addition, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he is entitled to any deduction claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). This includes the burden of substantiation. Hradesky v.

Commissioner, 65 T.C. 87 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). By contrast, the Commissioner has the burden of proof with respect to the issue of fraud with intent to evade tax, and that burden of proof must be carried by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The Commissioner also has the burden of proof as to the assertion of an additional deficiency. Rule 142(a).

Petitioners contend that they have presented sufficient evidence to establish that respondent's determinations were erroneous, and, therefore, the burden shifted to respondent to go forward with the evidence. We disagree. Petitioners have failed to show on this record that respondent's deficiency determinations were arbitrary and excessive or, for that matter, erroneous. Respondent's determinations were made after extensive and comprehensive audits and after investigation by special agents of the Internal Revenue Service for possible criminal income tax evasion. Judged by any standard, respondent's determinations were reasonable. Consequently, the burden of going forward with the evidence did not shift to respondent. The burden of proof with respect to the deficiencies remained with petitioners. See Marcello v. Commissioner, 380 F.2d 499, 507 (5th Cir. 1967).

B.  Evidentiary Matters

In some respects the parties have indicated disagreement with, or taken exception to, certain evidentiary rulings made by Judge Whitaker.  While there may be some support for the views expressed by counsel for the parties, the Court is not inclined to modify or reverse rulings made by him with regard to evidentiary matters.

C.  New Issues Raised by Petitioner on Brief

For the first time in his brief, petitioner raised three new issues:  (1) A $10,000 charitable contribution to the Teheran National University in 1974; (2) losses totaling $5,369 in 1975 from IDS/McCullough Oil Programs; and (3) deductions claimed for business use of automobiles which he has asserted should be allowed as fringe benefits to employees.  These issues were not raised in any pretrial or posttrial pleadings.

Petitioner did not present canceled checks, receipts, or other primary records to show a payment of $10,000 to Teheran National University in 1974.  He also offered no evidence that the Teheran National University was created or organized in the United States or a possession thereof, or under the laws of the United States, any State, the District of Columbia, or any possession of the United States.  Moreover, Mr. Giffin,

petitioner's accountant, did not characterize the alleged $10,000 payment to Teheran National University as a charitable contribution, as stated in petitioner's brief, but characterized it as a business expense. There is no evidence to show the alleged payment of $10,000 to Teheran National University in 1974 was an ordinary and necessary business expense. Accordingly, petitioner is not entitled to deduct $10,000 as a charitable contribution or as a business expense for a payment to Teheran National University.

With respect to the losses claimed in 1975 for the IDS/McCullough Oil Programs, there are no canceled checks, invoices, or any primary records in evidence from which it can be determined that any losses were incurred. There is no evidence of record establishing petitioner's basis. Consequently, he is not entitled to the claimed losses.

It is not surprising that petitioner has changed his position in his brief with respect to the claimed automobile expenses because the evidence presented shows that records were not maintained to distinguish between personal and business use of the automobiles, and that a significant portion of the automobile use was for the business activities of CDC and other entities, rather than those of petitioner or CTC. Thus, he

failed to show that the automobile-related expenses and depreciation claimed are deductible. Furthermore, on his income tax returns, petitioner claimed deductions for automobile expenses and automobile depreciation, not fringe benefits taxable as compensation to his employees. His position did not change through trial. But, on brief, petitioner cites cases and sections of the Internal Revenue Code that hold that an employee's use of an employer-provided automobile is compensation to the employee, and that the employer is entitled to a deduction for providing automobiles to his employees. However, petitioner presented no evidence that the use of the automobiles by the employees was intended as compensation. There is no evidence that the employees' Forms W-2 included an amount for automobile usage, or that the employees were issued any other income documents to reflect compensation received as a result of the use of the automobiles. None of the employees who testified about their use of the automobiles provided by petitioner claimed that any usage of the automobile was to be treated as compensation. We view petitioner's belated argument that the automobile expenses are taxable as fringe benefits to employees as having been made because of his inability to show that the automobiles were used in his trade or business. In short, this fringe

benefit argument is not supported by any evidence that the automobiles were intended to be treated as compensation. Therefore, petitioner is not entitled to deduct the claimed automobile expenses as fringe benefit payments to his employees.

II.  Issues 1,2,3, and 6--Commission and Miscellaneous Income

Turning now to the substantive issues, we first address the issue of commission income.  Under the "assignment of income" doctrine, it is a fundamental principle of income tax law that income must be taxed to the person who earned it.  United States v. Basye, 410 U.S. 441, 449-451 (1973).  Under this principle, we must decide on this record who "earned" the commission income received from the various companies involved with petitioner during the years in question.  In deciding this issue, we attempt to put some substance into the concept of earning income.  On one hand, we recognize that because "the true earner cannot always be identified simply by pointing 'to the one actually turning the spade or dribbling the ball,' this Court has applied a more refined test--that of who controls the earning of the income." Fritschle v. Commissioner, 79 T.C. 152, 155 (1982).

But, on the other hand, "the existence of a corporation formed for a valid business purpose should not be nullified merely because the shareholders are actively interested in

assuring the success of the corporation." Ross Glove Co. v. Commissioner, 60 T.C. 569, 591 (1973). As these statements demonstrate, particularly in cases involving closely held corporations, such as is present here, or one-man personal service corporations, there is a tension between the doctrine prohibiting the assignment of income and the recognition of a corporate business form as a separate legal entity from its owners. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). Here too, in resolving the issue of whether the individual or his wholly owned corporation is taxable on income earned through the performance of personal services, the primary focus is upon whether the individual or the corporation controls the earning of the income. Bagley v. Commissioner, 85 T.C. 663, 675 (1985), affd. 806 F.2d 169 (8th Cir. 1986); Johnson v. Commissioner, 78 T.C. 882, 890-891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984); Leavell v. Commissioner, 104 T.C. 140 (1995). A two-prong test has been set forth by this Court in order for the wholly owned or closely held corporation, rather than the service-performer employee, to be considered responsible for the income. First, the service-performer employee must be an employee of the corporation whom the corporation has the right to direct or control in some meaningful sense; and, second, there must exist between the

corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position. Johnson v. Commissioner, supra at 891. The essential factor in all of the tests used is control over the earning of the income in question.[25]

Before applying these principles to the facts before us, we will first discuss some of petitioner's contentions. First, he has spent a significant portion of his brief trying to establish that Diesel Power did in fact exist, that it had employees and offices, and that it actually conducted business. He cites at least one case in his legal argument that deals with "sham" corporations. Hospital Corp. of America v. Commissioner, 81 T.C. 520 (1983). Respondent has not contended that Diesel Power was a "sham" or shell corporation, and we, therefore, do not consider

---

[25] We note that this line of cases was expressly created in a situation where a service-performer employee is supplying most or all of the services that produce the income in question. The situation before us at first blush appears to be somewhat different in that many individuals working at Diesel Power and CTC provided services to carry out the functions of the various relationships at issue, whether the relationships constituted consultancies, promotional or representative arrangements, or distributor agreements. However, at least until the end of 1974, and, in many cases, significantly after that date, all of these individuals were acting under petitioner's direction and control, and we conclude therefrom that the services were performed on his behalf. This would be no different than, for example, the situation where a physician who forms a personal service corporation employs assistants, secretaries, and nurses to help earn the income received in providing medical care. Therefore, the principles expressed in Johnson v. Commissioner, 78 T.C. 882 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984), and other cases following it are appropriately applied here. The issue is who controlled the earning of the income, not whose personal efforts produced it. See Fritschle v. Commissioner, 79 T.C. 152, 155-156 (1982); American Savings Bank v. Commissioner, 56 T.C. 828, 839-842 (1971).

this aspect of petitioner's contentions because it is not at issue.

Second, petitioner contends that there was an "agreement" between himself or CTC and Diesel Power to split commissions in various percentages. This is the primary theory by means of which petitioner attempts to justify attributing much of the income in question on the CTC receipts journal to Diesel Power. We note that there were a significant number of transfers of commissions between Diesel Power and CTC during the years at issue, which tends to support petitioner's argument that there was some kind of unwritten understanding between Diesel Power and CTC concerning the splitting of commissions. However, this "agreement", even if it did exist, is irrelevant to the issue before us. A voluntary agreement to relinquish the right to receive income is insufficient. In <u>Lucas v. Earl</u>, 281 U.S. 111 (1930), the taxpayer entered into a contract with his wife whereby she was entitled to one-half of his income. The Supreme Court held that under assignment of income principles the entire amount was taxable to the taxpayer because he could not assign away income that he earned. <u>Id.</u> at 115. Hence, if petitioner earned the commissions involved herein, he could not assign them to Diesel Power. Accordingly, the commission split understanding was irrelevant. We also note in connection with this alleged splitting of commissions that there were numerous payments

directly to Diesel Power that were not reported as income by petitioner and which respondent did not allocate to petitioner as income in the deficiency notices. In other words, respondent appears to concede that Diesel Power did actually earn a considerable amount of commissions in its own right. The areas of contention mostly involve commissions that were paid to CTC, a portion of which were then attributed to Diesel Power on the CTC receipts journal, as well as certain commissions that were issued in the name of Diesel Power that were allegedly earned by CTC or petitioner, but were not reflected on the CTC receipts journal.

Third, petitioner contends that he relinquished his controlling interest in Diesel Power in 1971 or 1974. He testified that in 1971 he and Mr. Khalatbari had a dispute because Mr. Khalatbari wanted to be a Diesel Power shareholder and that, as a result of this dispute, Mr. Khalatbari left Diesel Power for a few days. Petitioner then indicated that, when Mr. Khalatbari returned, petitioner agreed to transfer 60 percent of his interest in Diesel Power to Mr. and Mrs. Khalatbari. This agreement was allegedly not "formalized" until 1974. The record shows that petitioner received 11,750,000 rials for the transfer of his 60-percent interest. When petitioner transferred the remainder of his stock to the Khalatbaris in 1977, there is no disagreement that there was a payment of money. We conclude that there was in fact a reduction of petitioner's ownership in Diesel

Power, but that this reduction did not occur until the end of 1974 rather than 1971. Other than his testimony, petitioner did not present any evidence to support a transfer of stock control prior to 1974. Given the behavior of petitioner and the employees involved, as well as the apparent attitudes of those who dealt with them in business transactions between 1971 and 1974, we question whether petitioner gave up full ownership of Diesel Power without documentary support before November 1974, when petitioner sold 60 percent of his interest in Diesel Power to the Khalatbaris. While this was a "family" business where a certain amount of informality is to be expected, we think a transaction of such magnitude, if it had occurred in 1971, would have been accompanied by some written evidence. Petitioner has presented none. Therefore, we conclude that petitioner continued to own 100 percent of Diesel Power until at least November 1974.[26]

However, it is still possible that petitioner was sufficiently subject to the direction and control of Diesel Power in a meaningful sense even prior to the end of 1974, so that it would be correct to allow its income to be taxed separately from petitioner within the meaning of Johnson v. Commissioner, 78 T.C. at 891. Similarly, it also is possible that petitioner retained

---

[26] Similarly, petitioner's statements at trial that Diesel Power "instructed" CTC to "pursue receipt of commissions and to transfer them to Diesel Power" is not supported by any contemporaneous documentary evidence. Documents reviewed by the Court indicate instead that it was at petitioner's instructions that such pursuit of commissions was accomplished.

sufficient control over Diesel Power even after he sold his remaining 40-percent interest in 1977 to be taxed on its income. Petitioner's relationships with Diesel Power vis-a-vis each business arrangement differed substantially, and we have concluded that ownership of Diesel Power was by no means the only test by which to ascertain control over its earnings. Therefore, we will examine the facts related to each company with which petitioner dealt to determine the extent to which petitioner or Diesel Power was in a meaningful sense independently in control of the earning of the income in question.

## A. Lockheed

The income with respect to payments from Lockheed involves payments Lockheed made to WHIP, Diesel Power, and Sunvaco during the years 1972 through 1976.

Petitioner contends that WHIP was intended to be a completely separate entity that was created at the direction of Dr. Fallah. Petitioner further contends that he had been instructed to deposit 80 percent of WHIP's earnings to a Swiss bank account for Dr. Fallah; the remaining 20 percent was to be deposited to an account for the benefit of Diesel Power. Petitioner indicated that neither he nor Diesel Power received any of the WHIP funds. He also stated that the $610,000 he withdrew from the WHIP account in 1978 was the Diesel Power share remaining from the WHIP arrangement.

However, petitioner's stated belief about these funds has little to do with the issue of who earned the income. We are unwilling to base a finding solely upon petitioner's testimony that there was a WHIP Swiss bank account for the benefit of an Iranian Government official to which most of the Lockheed commissions were sent (an arrangement which, we note, may have been illegal) and that these commissions were directed to such an account merely because petitioner was following that official's instructions. Aside from the $610,000 withdrawal in 1978, petitioner has failed to convince us that he did not actually receive any of the WHIP funds.

Moreover, regardless of where the WHIP funds actually went, they were earned primarily through the efforts of petitioner via his contacts with the Iranian Government. First, WHIP was entirely subject to petitioner's control: The formation of this entity was his idea (or so he informed the then Prime Minister of Iran); he set up the entity; and he managed the entity in that Price Waterhouse was subject to his control in connection with the management of WHIP. There is no evidence that Diesel Power earned these funds. Second, petitioner handled the WHIP accounts as if they were his own, moving funds around from location to location at will, and finally withdrawing the remaining $610,000 for himself in 1978 in an attempt to obtain disputed funds from Diesel Power. This is hardly the behavior that petitioner would

exhibit if the funds in the WHIP Barclays Bahamas bank account were subject to the control of Dr. Fallah, Diesel Power, or the WHIP entity itself. Accordingly, the WHIP funds should have been reported as income by petitioner.

A significant amount of the Lockheed fees was paid to Diesel Power on petitioner's instructions and were, therefore, not included in the CTC receipts journal. Some of these payments were commissions from the P-3 aircraft sale, and some were not. To the extent that the payments were based upon the P-3 aircraft sale, we discuss them in the following paragraph. To the extent that the payments were not based on the P-3 aircraft, there is little evidence in the record showing Diesel Power's involvement in earning the commissions. Petitioner did virtually all of the planning and implementing of the C-130 Lockheed sales. He signed the consulting agreements and he modified them to adjust commissions. There is very little evidence that Diesel Power had anything to do with these transactions other than to be the named recipient of some of the checks. Accordingly, we hold that the entire amount of the Lockheed payments to Diesel Power that involved anything except the P-3 aircraft sales should have been reported by petitioner as income.

Both Sunvaco and Diesel Power received commissions from Lockheed for the sale of P-3 aircraft. The only fee that appears to be at issue with regard to Sunvaco is the termination fee paid

in 1976. We think some of the funds paid to Sunvaco as well as payments to Diesel Power that involved the P-3 aircraft sales were not entirely petitioner's income. Petitioner contends that he did not have sufficient experience to market the P-3 airplanes alone and, in support thereof, directs our attention to a Lockheed letter stating that it was not Lockheed's intention to hire only petitioner to market the P-3 aircraft. That letter was written in response to petitioner's request. Although it was written in preparation for tax litigation, the letter does confirm that Lockheed hired not merely petitioner to do this consulting work to market the P-3 aircraft, but also Mr. Zanganeh and Mr. Khalatbari as well. This indicates that these two gentlemen actually performed some of the work for the P-3 aircraft sales independently and at their own expense. We do not agree with respondent that Mr. Zanganeh and Mr. Khalatbari were merely petitioner's employees who were compensated for their services. Hence, Mr. Zanganeh and Mr. Khalatbari earned a portion of the income. In the absence of any evidence as to what percentage of the work each man performed, we assume that they worked equally. Thus, we hold that the portion of the termination payment to Sunvaco attributable to the sale of the P-3 aircraft ($100,000) was not income solely to petitioner; he realized income of only one-third of that amount. With regard to the payments to Diesel Power involving the P-3 aircraft, we also

hold that petitioner realized only one-third of the income. The balance of the Sunvaco termination payment ($381,600) and the balance of the Diesel Power payments that were not attributable to the P-3 aircraft should have been entirely reported as petitioner's income because he was the sole earner.

## B. Ashland

Respondent asserts that during the 1973 taxable year Ashland issued checks payable to petitioner in the amounts of $400, $5,000, $12,500 and $3,000. However, the exhibit upon which these allegations are based was admitted into evidence by the Court's Order of October 9, 1992, only as a summary; hence, we are not willing to use it as substantive evidence that such payments were made without any proof that the contents of this exhibit are correct. However, we note that the $5,000 payment referred to in the summary was independently confirmed to be a reimbursement in a letter accompanying the check from Ashland. Therefore, that amount was not required to be included in petitioner's income.

With regard to the 1973 payments from Ashland to Interrep, one of the two documents drawing any link between petitioner and Interrep was this same summary noted above. For the same reason, we are unwilling to use it as substantive evidence. The only other link between petitioner and Interrep is a letter from Ashland addressed to All Patents and affirmed by petitioner,

seeking verification that certain payments had been made and had not been improperly used. One of the payments listed in this letter was a "Payment to account of Interrep, S.A. for the group represented by Mr. James Zand". Petitioner testified that he signed the letter at the airport when he was in a hurry, read the affirmation at the end of the letter, and did not read the rest of the letter. He also indicated that he did not recall receiving any money from Interrep; there is no evidence to the contrary. We conclude that the record does not contain adequate evidence that petitioner was sufficiently related to Interrep that he should be taxed on its income.

With regard to the Ashland's commission payments to All Patents in 1974 and 1975, we conclude that, although the Ashland consultancy agreement was in All Patents' name, not petitioner's, it was for the "personal services" of petitioner. Ashland representatives testified at trial that they were under the impression they had hired petitioner to act as an intermediary between Ashland and NIOC. Furthermore, Ashland understood that petitioner owned All Patents, at least in part, although there is no concrete evidence to that effect in the record. While petitioner testified that he understood Ashland's payments to All Patents were for the benefit of NIOC, there is no indication that Ashland intended to receive services from Dr. Fallah or any other NIOC representative under the consultancy agreement.

In addition, petitioner held himself out to the U.S. Senate Foreign Relations Committee as Ashland's representative through "his companies".  While petitioner might have had a certain incentive to increase his own business stature by holding himself out as the owner of those companies, we think that his representation was not based on a factual foundation.  At the trial, in response to a question about who received the funds from the All Patents account petitioner testified,  "I have absolutely no knowledge and I didn't want to have any."  By this he appeared to be implying that there may have been something improper or illegal about the arrangement between NIOC and Ashland via All Patents.  But there is evidence that petitioner was Ashland's actual representative and performed the services for which payments were made.  Accordingly, we hold that petitioner earned the funds received pursuant to the Ashland consulting agreement.

Lastly, we note that Ashland's 1975 payments in All Patents' name were deposited to the Diesel Power Banque de Paris account, of which petitioner was an authorized signatory, rather than to an All Patents account.  However, there is no evidence that Diesel Power was involved in the Ashland negotiations.  We find no significance in the fact that petitioner relinquished part of his interest in Diesel Power in late 1974.  If, as petitioner contends, the Ashland payments to All Patents did not belong to

him, he would have been misappropriating NIOC funds by depositing them into a Diesel Power account. Therefore, we conclude that petitioner was simply using the Diesel Power Account to receive the 1975 Ashland funds he had earned.

We conclude that petitioner earned Ashland's 1974 and 1975 payments to All Patents and, therefore, such payments constitute his income.

With regard to Ashland's 1976 payment in the amount of $265,000 attributed to Diesel Power on the CTC receipts journal, the evidence as previously discussed shows very little involvement in Ashland matters by Diesel Power. Petitioner testified that the 1976 payment was for his services in obtaining the release from All Patents. While both an Ashland witness and petitioner stated that Ashland also met with Mr. Khalatbari and I.J. Zand on several occasions, there is no indication that either Mr. Khalatbari or I.J. Zand believed that Diesel Power was Ashland's representative. To the contrary, Mr. Khalatbari and I.J. Zand believed petitioner was Ashland's representative. The documentary evidence also shows a significant amount of correspondence between petitioner and Ashland representatives; yet, there is no correspondence in the record between Ashland representatives and either Mr. Khalatbari or any other Diesel Power employee. Hence, in our judgment, petitioner was the primary (if not the only) independent participant in the Ashland

negotiations and was the person who arranged and was involved in many meetings between Ashland and NIOC.  We also conclude that petitioner's relinquishment of part of his Diesel Power stock in late 1974 does not alter the fact that he earned the 1976 Ashland commissions that were paid to Diesel Power's name.  Accordingly, the portion of Ashland's 1976 payment attributed to Diesel Power on the CTC receipts journal was income to petitioner.

## C.  General Motors

We note a preliminary issue that affects 3 of the years at issue.  The parties have stipulated that GM deposited British pounds equivalent to $18,146.15 into the Zand FNCB London account during 1973.  Although respondent asserts in a proposed finding of fact that petitioner failed to include $18,337.08 from GM in 1973 income, respondent has not properly asserted this higher figure in a timely fashion.  This Court has jurisdiction to determine additional amounts in excess of the amount determined in the notice of deficiency only "if claim therefor is asserted by the Secretary at or before the hearing".  Sec. 6214(a).  Respondent neither asserted this increased amount in an amended answer nor raised it at trial.  Thus, we lack jurisdiction over the amount in excess of the amount determined in the notice of deficiency and will disregard such excess.  Jasionowski v. Commissioner, 66 T.C. 312, 317 (1976).  In addition, the Court's consideration of respondent's assertion of the increased amount

would result in unfair surprise to petitioner where it was raised for the first time on brief.  See Aero Rental v. Commissioner, 64 T.C. 331, 338 (1975).  Since respondent has not asserted the higher stipulated figure, we are limited to the $17,943.61 alleged in the amendment to answer.  We are similarly limited with respect to certain of respondent's assertions for 1974 and 1976.  With regard to 1974, the notice of deficiency determined that there was $414,855.46 in unreported "per books" income from GM.  Although the facts indicate that there were payments listed on the CTC receipts journal attributed to Diesel Power in excess of that amount, respondent did not assert a higher amount for that portion of the deficiency.  Respondent will be limited to the asserted amount.  For 1976, the total amount attributed to Diesel Power on the 1976 CTC receipts journal was $1,142,908.40.  The notice of deficiency, however, determined "per books unreported" income of $1,112,550.51.  Respondent will be limited to assertions for the latter amount.

Respondent contends that all GM payments to the Zand FNCB London account and all GM payments attributed to Diesel Power on the CTC receipts journal should have been included in petitioner's income for 1973 through 1977.  Petitioner, on the other hand, claims that Diesel Power was GM's Iranian distributor and that the payments to the Zand FNCB London account during 1973 through 1977 belonged only to Diesel Power.  We disagree with

petitioner. The facts indicate otherwise. Not only did petitioner overtly state to GM that Diesel Power was not GM's authorized representative, but his behavior also indicated the same. The record shows that petitioner was in control of negotiations concerning the amount of commissions and that he earned those commissions by performing the work for them. He or one of his CTC employees also directed GM where to make commission payments. Petitioner argues that, when the agreement was first signed with GM, GM did not distinguish between CTC of Iran and CTC of Ohio. After Diesel Power was established, he argues, no one thought to change it, and in fact Diesel Power was GM's representative for the sale of locomotives. He also contends that the Zand FNCB London account was a Diesel Power account used for the receipt of commissions in pounds sterling from, among others, GM. This appears to be inconsistent with the contemporaneous written material in evidence, to which we are inclined to give greater weight. The Zand FNCB London account was in petitioner's name, and instructions came from CTC to deposit funds therein. We also point out that Diana Khalatbari in a note to CTC called this account "JJ's London account", not "Diesel Power's account". There also was ample evidence that petitioner held himself out to GM as GM's representative, referring to CTC and Diesel Power employees as his "associates". We also emphasize that, by the specific terms of the agreement

between GM and CTC, petitioner's rights to commission fees were nonassignable. Even though some of the payments were made to Diesel Power, it is clear that GM viewed Diesel Power and petitioner as one and the same. As with the commission payments made directly to CTC, the record shows that petitioner did much of the work involved in earning these commissions and, to the extent that Diesel Power employees were also involved, the earning of these commissions was subject to petitioner's control. Although petitioner relinquished ownership of some of his Diesel Power stock in late 1974, the evidence shows that his control over the earning of commissions from GM did not change after that date. Accordingly, we hold that the GM commissions were all income to petitioner.

This is likewise true with regard to commissions from the Pakistani sales. Respondent contends that the 1975 payments in the amounts of $334,333.17 and $396,562.22 in connection with the Pakistani sales are income to petitioner based upon the GM-Caspian agreement. Amounts equivalent to the 1975 payments to Mr. Khilnani of 70 percent of the Pakistani commissions were included in income by petitioner in an amended return and thus are not at issue. The remaining 30 percent was split between CTC and Diesel Power on the CTC receipts journal. We agree with respondent that the portion of Pakistani commissions allocated to Diesel Power on the CTC receipts journal was petitioner's income.

Diesel Power appears to have had little or no involvement in the Pakistani sale and, therefore, did not earn the commissions in relation to it. Petitioner, on the other hand, earned all of the GM commissions attributed to Diesel Power on the CTC receipts journal. Petitioner appears to have negotiated the Pakistani locomotive sale and he was in control of the arrangement. A letter from petitioner to Mr. Khilnani indicates that petitioner was willing to pay for Mr. Khilnani's travel expenses, which he apparently was not required to do. Diesel Power does not appear to have had any involvement in these arrangements. There is also testimony that Diesel Power never sold anything that was not shipped to Iran. There is persuasive evidence that petitioner was responsible for and controlled the Pakistani arrangement. Therefore, we conclude that petitioner earned the commissions paid in connection therewith.

For the same reason, we conclude that respondent's allocation in the notice of deficiency for 1976 of "other" income in the amount of $34,377.70, which is equivalent to payments to Mr. Khilnani, also was correct. However, the payments made to Mr. Khilnani and the Amelia Corporation, to the extent proven, would also constitute deductible commission expenses. All payments to Amelia Corporation but one were sufficiently proven and constitute deductible expenses. With respect to this one payment, petitioner stated that $50,000 was paid in 1976 to

Amelia Corporation.  The record contains a 1976 memo to the file in which it is stated that there was a $50,000 payment to Amelia Corporation, which petitioner stated was for "expenses". However, the record does not reveal when this payment was made, if at all, or for what.  Therefore, the payment has not been proven to be a deductible expense.

### D.  SEDCO, IMICO, IMISS

Although the joint venture and dealership agreements at issue were between Diesel Power and Stewart & Stevenson, SEDCO, and IMICO, the record shows that there was virtually no involvement in these arrangements by Diesel Power; rather, they were agreements with Diesel Power in name only.  Petitioner and his CTC employees made all the arrangements to create and implement these ventures; Diesel Power was simply informed about them after the fact.  While petitioner's testimony attempts to convince us that CTC merely assisted with some of the paperwork involved, the contemporaneous documents indicate otherwise; i.e., they show that petitioner was actively involved in this venture and that Diesel Power was not.  Therefore, petitioner's income includes all commissions received from SEDCO, SEDIRAN, IMICO, and Stewart & Stevenson during 1973, 1974, 1975, and 1976 which are recorded on the CTC receipts journal as Diesel Power commissions.

With regard to the allegation in the 1973 notice of deficiency of $1,000 in unreported income from Stewart &

Stevenson, there is no evidence of this payment on the CTC receipts journal, and there is no other evidence presented by either party. Petitioner merely states in a proposed finding of fact pertaining to it that his accountant had reviewed all commissions received by CTC and petitioner for the pertinent years, and petitioner had reported all income. Respondent does not address this amount on brief. We assume that respondent has conceded this issue and hold for petitioner.

With regard to the alleged "unreported income" in the amount of $1,478.31 from Stewart & Stevenson in 1976, neither party presented any evidence. In a proposed finding of fact petitioner implies that it was paid directly to Diesel Power. Whether it was or not, we hold for respondent with respect to this amount. If it was paid to Diesel Power, it was petitioner's income for the reasons stated above; if it was not paid to Diesel Power, petitioner has failed to meet his burden of proof that it was not his income. Rule 142(a).

With regard to the allegation of income from IMICO, SEDIRAN, and SEDCO in 1978, the parties presented no evidence other than the 1978 receipts journal. We note that, while the 1978 CTC receipts journal lists numerous receipts from IMICO, SEDIRAN, and SEDCO in that year, the receipts are all recorded as either "Purchases" or commissions to CTC, the latter having been reported by petitioner as income. As to the amounts for 1978,

however, we can see no rationale under which they constitute income, and we therefore hold for petitioner.

### E.  Ingersoll-Rand

Petitioner argues that he is not liable for any unreported commission income from Ingersoll-Rand.  At trial he and his witnesses testified that neither he nor CTC sold any Ingersoll Rand products during the period at issue, that Diesel Power was the representative for Ingersoll Rand, and therefore, that none of the commissions from that company was earned by him.  Although respondent originally took the position that commissions from Ingersoll-Rand should have been included in petitioner's gross income, respondent on brief has partially conceded this issue, concluding that there was an agreement between Ingersoll-Rand and Diesel Power whereby Diesel Power was Ingersoll-Rand's representative in Iran.  The record supports this position.  Respondent contends now that petitioner is required to include in income all Ingersoll-Rand commissions that "he diverted from Diesel Power to his dominion and control."

With regard to 1973 and 1974, respondent concedes the amounts of $48,222.04 and $197,259.65, respectively.  However, in the ultimate proposed findings respondent asserts in a type of "dominion and control" argument that petitioner has income for these years to the extent of petitioner's withdrawals from the Diesel Power Bank of America account.  Respondent claims that the

withdrawals in the years 1973 through 1976 in excess of $3 million, which were not included in petitioner's income for those years, constituted income in the years of the withdrawals. We will discuss this issue later.

With regard to 1975, respondent on brief has conceded all previous determinations in the notice of deficiency and allegations in the amendment to answer and states that "It is now respondent's position that, in 1975, Zand failed to include $197,513.88 in income from Ingersoll-Rand that was deposited to Zand's FNCB account." The only support that respondent cites for this $197,513.88 deposit is a document that is stipulated to be a "Schedule of Commissions by Manufacturer showing where deposited" written by an unknown author. We are not willing to find that this deposit was in fact made based solely upon this document. We have serious hearsay concerns about a list of numbers that the Court knows nothing else about, including the author of those numbers, and no reason to believe that the document's contents are accurate. Accordingly, we do not rely upon it for the truth of its contents without any other evidence in support of this deposit.[27] There being no persuasive evidence of record that the

---

[27] Nor does petitioner admit that this payment was made. Petitioner in his proposed findings of fact merely states that "those payments did not constitute income to Petitioner." We are unwilling to interpret this as an admission that this payment was made.

deposit was made to petitioner's FNCB account, we hold for petitioner with respect to this alleged 1975 payment.

With regard to the stipulated 1976 payment from Ingersoll-Rand of £5,494.40 to the Zand FNCB London account, respondent asserts that the average monthly exchange rate for British pounds to dollars in March 1976 was £1.960 to $1. Respondent offers no support for this exchange rate. Accordingly, respondent's allegation that £5,494.40 was equivalent to $10,769.02 is unsubstantiated. Our research indicates that the correct exchange rate was £1.9454 to $1; accordingly, the £5,494.40 stipulated to have been deposited into the Zand FNCB account were equivalent to $10,688.05. Petitioner contends that this stipulated payment did not constitute income to him because it belonged to Diesel Power. To the contrary, respondent contends that these funds were transferred at the direction of petitioner's employee and thus, were income to him. We conclude that, although petitioner's employee may have directed the payment of these commissions, the record indicates that most of the effort involved in earning them was performed by Diesel Power. Accordingly, we hold for petitioner with respect to the $10,688.05.

Respondent also claims that there was an unreported $120,000 payment from IGOS to petitioner in 1976 for commissions from Ingersoll-Rand. In support thereof, respondent cites only to a

1981 sworn affidavit of one of the IGOS shareholders, Hossein Shirazi, indicating that there was such a payment in 1976. Mr. Shirazi was not a witness in this proceeding and thus was not subject to cross-examination for the statements made in his affidavit. Therefore, despite Mr. Shirazi's sworn statement that he believed the contents of his affidavit to be true, we are unwilling to rely solely upon this document as evidence that the $120,000 was actually paid. We hold for petitioner for this amount.

## F. Morgan

As a preliminary matter with regard to the stipulated 1976 receipts from Morgan of $525,786.48, petitioner correctly points out that respondent determined $449,333.24 in "other income" in the notice of deficiency but that respondent did not file an amended answer proposing to increase petitioner's 1976 income from the Morgan arrangement to a higher amount. See sec. 6214(a). Accordingly, we consider only the amount of $449,333.24 listed in the notice of deficiency as "other unreported" income.

With regard to the properly determined amount for 1976 and the full amount determined for 1977, the evidence does establish that Diesel Power employees and petitioner worked together to earn the Morgan income. Diesel Power employees assisted in earning the commissions by providing price quotes, negotiating orders, and keeping track of certain payments. Petitioner also

was involved in earning this income, both personally and through the actions of his CTC employees. At petitioner's instructions, some of the Morgan payments were issued directly to Diesel Power and some directly to CTC. Petitioner recorded the CTC payments as CTC commissions on the receipts journal, and petitioner did not report as income any of the checks issued to Diesel Power in 1976. This arrangement effectively resulted in the split of commissions for 1976. The 1977 payments were split on the CTC receipts journal. We conclude that the split of the commissions such as was made here reflected the understanding of petitioner and Diesel Power as to the work involved in earning the Morgan commissions. By the time these payments were made, petitioner had relinquished ownership of some of his Diesel Power stock. The actual division of commissions for 1976 and 1977 appears to have adequately reflected the evidence of division of effort on the part of Diesel Power and petitioner or CTC to implement the Morgan arrangement. Accordingly, we hold for petitioner on the Morgan amounts.

## G. Harnischfeger

There is no discussion in the parties' briefs concerning respondent's determination in the 1974 notice of deficiency for Harnischfeger. The amount of $525.41 is determined as income from Harnischfeger. However, there is no evidence in the record of income from that company, although it precisely matches an

amount that appears on the CTC receipts journal from Parker-Hannifin. In the absence of any explanation for this by respondent, we conclude that respondent has conceded this amount.

With respect to the years 1975 through 1977, we note that by this time petitioner had relinquished a portion of his Diesel Power stock. A contract existed directly between Diesel Power and Harnischfeger, and the record shows that the Harnischfeger commissions were earned by the efforts of Diesel Power and CTC. While petitioner or a CTC employee personally signed the distributor agreements, supervised the receipt of commissions thereunder, and directed the accounts to which they were payable, Diesel Power employees performed the work required in Iran to obtain orders for Harnischfeger equipment. The division of commissions on the CTC receipts journal between CTC and Diesel Power appears to adequately reflect the efforts of both companies and, therefore, will be respected. We hold for petitioner with respect to the Harnischfeger amounts for these years.

### H. Pioneer

Petitioner's only argument with respect to Pioneer in general is that there was a commission-splitting agreement between CTC and Diesel Power. Respondent contends that the distributor agreement was between Pioneer and CTC and that petitioner remained in control of the earning of commissions pursuant to that agreement. We agree with respondent. While the record shows that Pioneer issued a "To whom it may concern"

letter indicating that Diesel Power was its representative in Iran, there is no indication that the earlier agreement with CTC was terminated or that an agreement with Diesel Power was ever executed. There is also evidence that this letter was issued at the request of a CTC employee to facilitate obtaining business with the Iranian Government and was not intended to replace the Pioneer-CTC distributor agreement. Moreover, even if Diesel Power were Pioneer's distributor, petitioner clearly maintained control over the earning of Pioneer commissions. Petitioner and CTC employees corresponded with Pioneer on matters of importance. CTC gave Pioneer instructions on the payment of commissions. Petitioner and CTC created and continued the impression that Diesel Power and CTC were one and the same. Although petitioner relinquished ownership of some of his Diesel Power stock in late 1974, he does not appear to have relinquished his control over the earning of commissions. When Pioneer in 1974 expressed a willingness (at Mrs. Meier's suggestion) to amend the distributor agreement to Diesel Power's name, petitioner was asked whether this should be done, indicating that he had the power to prevent such a revision. Accordingly, we sustain respondent's determinations for the years 1973 through 1977.

With regard to 1978, the parties have made no stipulations and respondent has made no assertions apart from the notice of deficiency in connection therewith. We assume this to be an

oversight. The CTC receipts journal recorded receipt from Pioneer of $84,293.45. However, $33,717.38 of this amount was allocated on the receipts journal as commissions for CTC. We see no reason why respondent has asserted the full amount received as unreported income in this instance when in all other cases respondent has accepted the amounts listed on the CTC receipts journal as CTC commissions. Petitioner did report as income amounts listed as CTC commissions. Hence, those amounts did not constitute unreported income. Respondent has not explained this on brief. Therefore, we hold that the only amount at issue is the $50,576.07 allocated to Diesel Power on the 1978 CTC receipts journal. We hold for petitioner with respect to the $33,717.38 allocated as commissions to CTC, and which he reported as income.

We conclude that all of the remaining $50,576.07 allocated as commissions to Diesel Power constitutes petitioner's unreported income from Pioneer for 1978. Despite the fact that petitioner had sold his interest in Diesel Power prior to that year, the evidence shows that petitioner still was in control of the earning of commissions from Pioneer at that time. This is particularly evidenced by the correspondence between petitioner and Pioneer concerning the cancellation of Pioneer's agreement in 1978. That correspondence reveals that Pioneer had no intention to deal with Diesel Power apart from petitioner and that petitioner was planning to devise another means by which to do

business with Pioneer, because the Diesel Power he had created had "ceased to exist".  We conclude therefrom that petitioner earned the entire commission reflected on the CTC receipts journal as having been paid by Pioneer during 1978.

## I.  <u>Galion</u>

We note initially that, in the notice of deficiency, respondent determined unreported "Other" income from Galion in 1973 in the amount of $2,368.24.  Petitioner in his brief contends that this was a part of direct payments to Diesel Power that are not taxable to him.  Because respondent does not make any reference to this amount on brief, we conclude that respondent has conceded this determination, and we hold for petitioner with respect to this amount.

All other determinations pertaining to Galion involve the question of whether petitioner must include in income for the years 1973 through 1978 payments from Galion that were made to CTC at the instructions of petitioner or a CTC employee, some of which were attributed to Diesel Power on the CTC receipts journals.  We conclude that he must.  There were direct dealings between Diesel Power and Galion prior to the years at issue, as evidenced by the existence in 1969 of a sales relationship between the two companies and a negotiated settlement concerning overdue time drafts signed by Mr. Khalatbari.  However, the 1969 distributorship contract between Diesel Power and Galion, which

gave rise to the commissions at issue, was signed by petitioner on behalf of CTC and was in fact with CTC. The evidence shows that Galion did business with CTC and dealt with Diesel Power as CTC's Iranian affiliate. There is also evidence that Galion employees believed that Diesel Power, CTC, and petitioner were essentially the same. Petitioner and CTC employees controlled the timing and payment of commissions from Galion by issuing bills and directing payment. On a number of occasions there were payments made directly to Diesel Power without such instructions from CTC. Petitioner and CTC employees corrected this by advising Galion of the correct procedures to be used, which usually included direct payments to CTC. When other important problems arose, such as a changeover of power in an Iranian ministry, or the failure of Mr. Khalatbari to sign a contract in 1978, petitioner was expected to resolve them.

There is evidence that Diesel Power employees performed some of the legwork required to earn the commissions by obtaining price quotations and arranging for sales in Iran. However, unlike work performed for other companies, it appears that all of this work was performed at petitioner's direction and control, and that Diesel Power was considered to be an Iranian branch of CTC for Galion sales. Therefore, we conclude that petitioner earned all of the Galion commissions that were paid or attributed to Diesel Power and that petitioner should have reported them as

income. In addition to these amounts, respondent asserts an amount of $32,560.36 in 1978 which was listed as "Other" on the CTC receipts journal. Petitioner presented no evidence that this was not income; therefore, we conclude that it was.

In the notice of deficiency for 1978, 1979, and 1981 respondent determined that petitioner was entitled to additional offsets for cost of goods sold in the amounts of $148,706.31, $95,633.62, and $5,862, respectively. According to respondent's statement on brief, these additional amounts were a result of respondent's determination that additional Galion commissions were includable in income in those years. Having found that petitioner's taxable income for those years should be increased by the amounts received by Galion, it follows that respondent correctly increased petitioner's cost of goods sold for those years.

## J. Clark

We note initially some matters pertaining to evidence and pleading for certain years. In addition to the amounts that were stipulated by the parties, respondent asserts in the proposed findings of fact that there were deposits by Clark during 1973 to the Zand FNCB London account of amounts in excess of $16,545, and that there was unreported income in a similar (but not identical) amount. However, either the record materials cited by respondent in support thereof in appendix B relate to deposits in 1974 or

respondent cites an exhibit the accuracy of which we are unable to identify. Therefore, we cannot determine that the total amount of asserted deposits to the Zand FNCB London account of $16,547.29 in respondent's appendix B is correct. We therefore do not rely on appendix B for these asserted additional deposits during 1973.

Respondent also asserts in appendix B that an additional amount of $2,420.47 was deposited during 1976 to the Bank of Teheran. However, respondent did not provide any support for this amount. We also note that respondent has not filed a timely amendment to answer with respect to this additional amount. Respondent further asserts in appendix B that there was a 1977 payment in the amount of $3,221.00 to an unknown payee. However, respondent provides no record support therefor.

Thus, there is no evidence that certain payments asserted in the appendix B were made. Hence, we conclude that the stipulated amounts constitute the correct figures. In addition, we hold for petitioner with respect to respondent's assertions on brief that there was additional 1976 income from Clark in the amount of $681,783.24. Although this amount was stipulated to have been paid to Diesel Power in 1976, respondent first made assertions concerning these commissions on brief.

We now reach the issue of the Clark commission income for the years 1973 through 1977. As an initial observation, we think

the 1974 representation from Clark that Diesel Power was Clark's distributor in Iran is without significance. This representation is based on a letter obtained at Mrs. Khalatbari's request in order to facilitate the processing of transactions with Iran as a procedural matter. It was not intended to be an indication of who actually did the work or who controlled commissions earned in connection with Clark. Therefore, we give this document little weight.

With respect to the remainder of the evidence concerning Clark, the Clark distribution contracts were with Diesel Power, and thus the requirement that there be a contractual relationship between the wholly owned (for years prior to 1975) corporation and the payor is satisfied. Johnson v. Commissioner, 78 T.C. at 891. The issue of control, however, is more complex. Petitioner testified that I.J. Zand and Mr. Khalatbari did all of the work in connection with Clark, but there is other evidence that the Clark contracts were implemented by employees of both CTC and Diesel Power. Diesel Power employees provided local information, made price quotes to companies in Iran, and acted as the local representative. CTC employees performed all the billing and collecting tasks. However, petitioner still appears to have been ultimately responsible for the Clark contract. He negotiated a large forklift sale for Clark. There also was a perception by Clark employees that Diesel Power was petitioner's company.

When, in 1976, Iranian Air Force officials had been treated rudely by a Clark employee, it was petitioner, not a Diesel Power representative, who chastised Clark by letter. In the course of this letter petitioner emphasized that, without his services, Clark never would have even had a chance of receiving the large forklift order. Petitioner further emphasized that his CTC employees had spent considerable time working out the details of the letter of credit and payment of commissions. During the years 1973 through 1977 petitioner and his CTC employees did all of the billing, and the directing of funds. We conclude that throughout most of the relationship with Clark, at least through 1977, petitioner was in control of the commissions earned. Therefore, petitioner is taxable on the Diesel Power commissions properly alleged by respondent for all years through 1977.

The allegations pertaining to 1977 require special discussion. Respondent determined in the notice of deficiency that there was $22,545.46 in unreported income from Clark as reflected on the CTC receipts journal. The stipulations indicate that the CTC receipts journal records $14,013.71 as Diesel Power commissions, which is close to the figure requested by respondent in her proposed findings. For the reasons stated above, we conclude that $14,013.71 constitutes unreported income for 1977. Respondent also asserts on brief an additional amount of $37,359.91 that was not recorded on the CTC receipts journal for

deposits to "Diesel Power's FNCB Geneva account".  The
stipulations state that there were additional checks payable to
Diesel Power or to Diesel Power bank accounts in the total amount
of $38,569.34.  However, respondent failed to either determine in
the notice of deficiency or to assert in the amendment to answer
an amount in excess of $22,545.46.  In addition, that figure
represents alleged amounts that were reflected on the CTC
receipts journal and does not include funds that were not
recorded there.  Respondent may not assert for the first time on
brief that these payments to Diesel Power or Diesel Power bank
accounts were income.

While the notice of deficiency determined additional income
from Clark in 1978 of $36,796.41, the CTC receipts journal shows
commissions allocated to Diesel Power of only $15,191.10.  We
note that respondent makes no assertions on brief concerning
Clark commissions in 1978 other than the latter amount.  Thus,
there is no record support for the remaining $21,605.31.  We hold
for petitioner with respect to $21,605.31.  With respect to the
balance of the $36,796.41 determined in the notice of deficiency,
or $15,191.10, there is sufficient evidence to hold for
petitioner as well.  Petitioner no longer owned Diesel Power
stock in 1978 because he transferred it to the Khalatbaris in
December 1977.  Nor by that point did petitioner control Diesel
Power in any meaningful sense.  In 1977 a dispute had arisen

between CTC and Diesel Power over Clark commissions when Mr. Khalatbari began to be assertive about commissions. The sense of the 1977 letter from Mrs. Conway and Mrs. Meier to petitioner about the dispute concerning Clark commissions is that petitioner's former control was being challenged. The evidence shows that this question was resolved when Mr. Khalatbari paid approximately $325,000 to CTC in June of that year. Thus, by the end of 1977, and particularly after the transfer of petitioner's last 40 percent of Diesel Power stock to the Khalatbaris, petitioner had lost his control over Diesel Power. We conclude that the $15,191.10 of commissions allocated to Diesel Power on the 1978 CTC receipts journal were not taxable to petitioner.

### K. Miscellaneous Companies/Goodyear

Petitioner's only argument with respect to the relatively small commissions received from various companies was that a commission-splitting agreement existed between CTC and Diesel Power, and that the allocation of commissions on the CTC receipts journal was in accordance with that agreement. As we have discussed, petitioner's alleged agreement, even if it existed, is irrelevant to the question before us of who actually earned the commissions at issue. Although there is little record evidence of the dealings with these particular companies, the record as a

whole shows that until 1978 petitioner for the most part was in control of Diesel Power and is taxable on most payments made or attributed to Diesel Power.  Where the evidence is lacking as to which employees performed work for these companies, petitioner has failed to meet his burden of proof.  We therefore hold that with the exception of the 1976 Exxon allegation, petitioner has failed to meet his burden of proof for these miscellaneous commissions.  With respect to Exxon, respondent asserted an amount for 1976 greater than the stipulated amounts attributed to Diesel Power on the CTC receipts journal.  We hold that the stipulated amount of $12,082.61 constitutes the amount of unreported 1976 income received from Exxon.

### L.  Petitioner's Withdrawals from Bank Accounts

Respondent makes a further argument that petitioner's income includes amounts withdrawn from a Diesel Power account and from the WHIP account at the times the withdrawals were made.  Thus, respondent contends that in the event that we do not hold that petitioner had unreported commission income in the form of funds received from Lockheed, Goodyear, Clark, Galion, and Morgan that were deposited in the Diesel Power Bank of America account, as well as Lockheed funds that were deposited in the WHIP Barclays Bahamas account, petitioner had unreported income to the extent

of his withdrawals from those accounts.  Respondent further
contends that because of respondent's concessions in connection
with Ingersoll-Rand payments deposited to the Diesel Power Bank
of America account, petitioner's withdrawals from that account
constitute unreported income in any event.

Respondent asserts first on brief that petitioner withdrew
the following amounts from the Diesel Power Bank of America
account:

| Year | Amount |
|------|--------|
| 1973 | $655,500.00 |
| 1974 | 531,633.48 |
| 1975 | 1,345,766.60 |
| 1976 | 665,000.00 |

In our findings of fact, we found that the evidence supported
withdrawals by petitioner from that account in amounts somewhat
smaller than respondent's assertion, namely:

| Year | Amount |
|------|--------|
| 1973 | $655,500.00 |
| 1974 | 531,633.48 |
| 1975 | 601,652.03 |
| 1976 | 265,000.00 |

Subsequently, on brief respondent asserts that the amounts to be
considered income to petitioner because they were converted to
his personal use were as follows:

| Year | Amount |
|------|--------|
| 1973 | $605,500.00 |
| 1974 | 387,876.45 |
| 1975 | 575,000.00 |
| 1976 | 265,000.00 |

We assume that respondent has conceded both higher sets of figures and now argues for only those sums that were converted to petitioner's personal use.  These are the figures that are the basis for our holding.

Petitioner argues that these withdrawals were not income because they constituted loans to him allegedly with the "full knowledge and agreement of Mr. Khalatbari".  However, there is no documentary evidence in the record to support such an argument.  Furthermore, Diesel Power financial statements do not reflect any loans made to shareholders.  Petitioner testified that the amount that was owed became a part of the litigation with Diesel Power and was part of the claim of right which he subsequently reported as income.  As we stated in Gilbert v. Commissioner, 74 T.C. 60, 65 (1980), the critical question in resolving the issue of whether there is a loan "is whether there was a genuine intention to create a debt, which, in turn, depends upon weighing such objective factors as reasonable expectation of repayment and the economic reality of the claimed debtor-creditor relationship."  Petitioner has not presented any evidence other than his testimony or that of his employees to convince us that these withdrawals were loans.  There is no loan agreement or promissory

note; there is no stated interest; there is no fixed maturity date; there is no payment schedule; there is no collateral; and there is no evidence that such loans were repaid. While petitioner testified that these withdrawals were part of the claim of right later asserted by him and which he included in income, petitioner has not provided any documentary evidence to support his self-serving testimony. Some sort of objective factors demonstrating economic reality are required. See Wilkof v. Commissioner, 636 F.2d 1139 (6th Cir. 1981), affg. T.C. Memo. 1978-496. There are no such factors present here. Accordingly, we hold that, to the extent that commissions received from Lockheed, Goodyear, Clark, Galion, Morgan, or Ingersoll-Rand did not constitute income to petitioner in the years they were paid, the withdrawals from the Diesel Power Bank of America account which were converted to petitioner's personal use constituted either constructive dividends or converted funds. In either case, those withdrawals constituted income to petitioner in the years of withdrawal.

III. Issues 4 and 5--Interest Income on Foreign Bank Accounts

In the years 1974 and 1975 petitioner had a bank account with First National City Bank in London (FNCB), account number 1612131. The account earned interest for those years in the amounts of $38,055.71 and $43,641,69, respectively. Petitioner owned the account; he was the sole signatory to the account; he

had unfettered access to the account; his name was on the account; and he directed the activities of the account. Similarly, in 1976 petitioner's FNCB account number 245925 earned interest in the amount of £27,466.39, the equivalent of $44,127.50. He owned the account, he was a signatory, and he had unfettered access to the account. Petitioner did not show that his accounts had any restriction or were in any way controlled by any person other than himself. He asserted through his testimony and the testimony of other witnesses that he considered the London accounts in his name to be those of Diesel Power. However, in 1974 and 1975 Diesel Power also had an FNCB account in London as well as FNCB accounts in Geneva, Switzerland. According to the testimony, all Diesel Power officers were signatories to the Diesel Power accounts. Petitioner's accounts were separate. We hold, pursuant to section 61, that the interest income on such accounts is taxable to petitioner. See Marcus v. Commissioner, T.C. Memo. 1992-234.

In 1974, 1975, and 1976 the bank account or time deposits in the name of WHIP at the Barclays Bank Bahamas also earned interest in the respective amounts of $25,025, $29,338.94, and $16,998.06. As set forth in our findings of fact, WHIP was simply a repository for the receipt of commissions earned from Lockheed for petitioner's performance of services. Petitioner was the sole shareholder of WHIP and exercised full control over

the funds in the Bahamian bank account.  Respondent contends that the separate corporate status of WHIP, whose sole business activity was the bank account, should be ignored.  We agree. Although generally a corporation can only act through its shareholders or officers and the distinction between the corporation and its sole shareholder must be respected, this particular situation is different.  Petitioner, WHIP's sole shareholder, testified that WHIP had no operations.  Instead, WHIP was merely a paper corporation whose only purpose was to hold funds in a tax haven jurisdiction so that the funds would escape scrutiny for tax and other purposes.  Since WHIP was a mere skeleton, its existence is disregarded.  See Noonan v. Commissioner, 52 T.C. 907, 909-910 (1969), affd. per curiam 451 F.2d 992 (9th Cir. 1971); Aldon Homes, Inc. v. Commissioner, 33 T.C. 582, 597 (1959).  Therefore, we hold that the interest earned on the WHIP account is includable in petitioner's gross income for the years in question.

IV.  Issue 7--Amount and Character of Gain on Sale of Diesel Power Stock

On his 1977 Federal income tax return petitioner reported a long-term capital gain of $4,805,864 from the sale of Diesel Power stock that he had held since 1958.  Respondent determined, pursuant to section 1248, that petitioner was required to treat gain from the sale of his Diesel Power stock as ordinary dividend income rather than long-term capital gain.  Respondent also

determined that his gain from the stock sale was $3,925,000 rather than $4,805,864.

Section 1248 was intended to tax foreign accumulated income at ordinary, as opposed to capital gain, rates. Teller v. Commissioner, T.C. Memo. 1992-402. Section 1248(a) provides that gain from the sale of stock in a foreign corporation is to be treated as a dividend (to the extent of earnings and profits attributable to such stock which were accumulated while the corporation was a "controlled foreign corporation") if the stock is sold by a United States person who owned 10 percent or more of all classes of stock entitled to vote during the 5-year period ending on the date of the sale or exchange when the foreign corporation was a controlled foreign corporation.

Although petitioner contends otherwise, we think the requirements necessary to invoke section 1248 are present here. For purposes of section 1248 the term "United States person" includes a U.S. citizen, section 1.1248-1(a), Income Tax Regs.; section 7701(a)(30), which petitioner has been since 1953. A "controlled foreign corporation" is any foreign corporation in which more than 50 percent of the total voting stock is owned or considered owned by a U.S. shareholder on any day during the foreign corporation's taxable year. Sec. 957(a).

Diesel Power was an Iranian corporation. Petitioner acquired 100 percent of Diesel Power's stock for nothing in 1958

and owned 100 percent of Diesel Power's stock until at least November 1974. Thus, Diesel Power was a controlled foreign corporation until at least Diesel Power's fiscal (or Iranian calendar) year, which ended March 20, 1975. Moreover, it is agreed that petitioner owned at least 40 percent of Diesel Power's voting stock until December 1977. Thus, the requirements of section 1248(a) are met; i.e., the stock was sold by a United States person who owned at least 10 percent of the foreign corporation's voting stock, and he owned that stock at a time when the foreign corporation was a controlled foreign corporation and which fell within the 5-year period ending on the date of the sale.

The only remaining question is the extent of Diesel Power's accumulated earning and profits for purposes of section 1248 through Diesel Power's March 20, 1975, fiscal year. As reflected on Diesel Power's financial statement, as of March 20, 1975, the amount of retained earnings and the amount due shareholders totaled $2,483,188.73. The March 20, 1975, fiscal year is the appropriate date because during that year Diesel Power was a controlled foreign corporation at least 1 day, as is required for section 1248 to apply. Sec. 957(a). However, Diesel Power's financial statements do not reflect foreign assets or amounts in foreign bank accounts. In 1972, commission payments in excess of $550,000 were deposited into the Bank of America account in

Diesel Power's name in New York City. At least $2,470,000 was placed in Diesel Power's foreign accounts in 1973 and 1974.

Other commission payments were deposited to Diesel Power's FNCB accounts and to the Banque de Paris accounts in Geneva, Switzerland. With respect to the Swiss accounts, the evidence shows that there were substantial sums deposited. While the burden of proof is on petitioner to show the lack of accumulated earnings and profits in his controlled foreign corporation under section 1248(h), the evidence shows that Diesel Power's earnings and profits were far in excess of the $2,483,188 shown on its financial statements as of the close of its fiscal year ended March 20, 1975. Many of the funds deposited to the Bank of America account disappeared into the secrecy of Swiss bank accounts, leaving no trace as to whether they were ever transferred into Teheran and possibly included on the financial statements as earnings and profits of Diesel Power. However, since Diesel Power did not want to have funds deposited to Teheran banks, it is likely that such amounts did not end up in Teheran or on Diesel Power's financial statements.

We conclude that Diesel Power's earnings and profits through 1974 included not only the $2,483,188 reflected on its financial statements, but also the funds deposited to the Swiss bank accounts and the Bank of America account. Adding the commissions deposited to bank accounts in the name of Diesel Power outside

Iran to the reported retained earnings per the financial statements approximates $5 million in earnings and profits.

Because Diesel Power's earnings and profits through 1974 were in excess of $5 million, the $3,925,000 amount determined by respondent to be petitioner's gain from the sale of his Diesel Power stock is deemed to be ordinary dividend income, rather than long-term capital gain, pursuant to section 1248.

We note that petitioner does not contend that Diesel Power lacked sufficient earnings and profits. It is not mentioned in his brief. Instead, petitioner claims that section 1248 is inapplicable because he sold 60 percent of his Diesel Power stock in 1971; therefore, Diesel Power was not a controlled foreign corporation within 5 years of petitioner's 1977 stock sale. This in incorrect. The parties stipulated that petitioner owned 100 percent of Diesel Power's stock until at least Novemer 1974; petitioner filed Forms 2952 to that effect; and petitioner testified that he owned 100 percent of Diesel Power until at least June 1974.

Accordingly, we hold that petitioner had a gain of $3,925,000 on the sale of his Diesel Power stock in 1977 and that such gain is taxable as ordinary income.

V. Issues 8 and 9--Claimed Reduction in 1979 Reported Income Under a Claim of Right and Section 1341 Tax Computation for 1981

Although petitioner does not argue on brief in support of his position that 1979 reported income should be reduced by $348,350 attributable to a "claim of right" adjustment or that his 1981 income tax calculation should be based upon section 1341, he requests the Court to so find in his proposed findings of fact. An analysis clearly shows that petitioner is not entitled to a reduction in 1979 nor to tax computation relief in 1981.

The parties agree that on petitioner's 1979 tax return he included in income approximately $1.6 million that he had in his possession representing commission income he received from manufacturers in prior years. On the return he reported that this amount was includable in income because he had determined that he would not transmit the funds to Mr. Khalatbari or Diesel Power because of their disputes. In an amended return petitioner claims the income previously reported should be reduced by $348,350, with the explanation that he did not receive as much as he thought he would in the sale of Diesel Power stock. The fact that there was a dispute over the sale price for the Diesel Power stock has nothing to do with the claim of right petitioner exercised over commissions that he earned and held in his possession during 1979 and prior years. They are two separate items. Petitioner still retained the commission funds; the stock sale dispute was over the price for disposition of his capital

asset; i.e., his stock in the company.  Furthermore, in the notice of deficiency respondent reduced petitioner's reported gain from the sale of the Diesel Power stock to reflect what respondent then understood petitioner had received.

Similarly, for 1981 petitioner claimed on his return that his tax was zero, also due to his claim of right theory, even though taxable income shown on the filed return was $315,928. There is no evidence in the record of what amount petitioner paid to Mr. Khalatbari in settlement of the litigation or to what items the repayment was attributable.  The only evidence is the return and some vague statements by the return preparer that he determined an amount had been paid that could give rise to a section 1341 calculation.  There is no evidence of record of how the amount was calculated because the Court did not admit Joint Exhibit 556-UJ into evidence.  Accordingly, we hold that petitioner is not entitled to reduce 1979 reported income by $348,350.

VI.  Issue 10--Claimed Schedule C Business Expense Deductions

In the notices of deficiency covering the years 1973 through 1981 respondent disallowed substantial business expense deductions on three grounds, namely:  (1) That they had not been substantiated; (2) that they were not shown to be ordinary and necessary; or (3) that they were not shown to be petitioner's expenses, but were those of another taxpayer.  Petitioner

contends that the evidence presented with respect to the business expense deductions was virtually unchallenged by respondent. It is our view that, for the most part, there was no need for respondent to challenge the evidence offered by petitioner on the deduction issues because the evidence presented failed to show that the majority of the business expenses claimed were petitioner's ordinary and necessary business expenses or that he was otherwise entitled to the various amounts claimed. He also contends that respondent's reasons for disallowing various deductions were not clear in every instance. To the contrary, the notices of deficiency specifically set forth which deductions were allowed and disallowed, and provide a narrative explanation for the disallowance.

We have made detailed and specific findings of fact with respect to the claimed business expense deductions. We think no useful purpose would be served by reiterating each and every fact in this opinion. However, we will discuss the major disputed items.

Section 162(a) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". The regulations promulgated under section 162 clarify that only those ordinary and necessary business expenses

"directly connected with or pertaining to the taxpayer's trade or business" may be deducted.  Sec. 1.162-1(a), Income Tax Regs.

Whether an expenditure is ordinary and necessary is generally a question of fact.  Commissioner v. Heininger, 320 U.S. 467, 475 (1943).  To be "necessary" within the meaning of section 162, an expense need only be "appropriate and helpful" to the taxpayer's business.  Welch v. Helvering, 290 U.S. at 113. For an expense to be "ordinary", "the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved."  Deputy v. du Pont, 308 U.S. 488, 495 (1940) (citing Welch v. Helvering, supra at 114).

Section 6001 and the regulations promulgated thereunder require taxpayers to maintain records sufficient to permit verification of income and expenses.  As a general rule, if the trial record provides sufficient evidence that the taxpayer has incurred a deductible expense, but the taxpayer is unable to adequately substantiate the amount of the deduction to which he or she is otherwise entitled, the Court may estimate the amount of such expense and allow the deduction to that extent.  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).  However, in order for the Court to estimate the amount of an expense, we must have some basis upon which an estimate may be made.  Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).  Without such a basis, any

allowance would amount to unguided largesse.  <u>Williams v. United States</u>, 245 F.2d 559, 560 (5th Cir. 1957).

Expenditures for items that are capital in nature are not deductible by the taxpayer.  Sec. 263.  However, the cost of capital expenditures may be recoverable through depreciation or amortization.  Business expenses, like other deductions claimed on a tax return, must be substantiated by the taxpayer, who bears the burden of proof.  Rule 142(a).  In order to be deductible, business expenses must be those incurred by the taxpayer in his trade or business, and not expenses of another individual or entity.  <u>Bistrup v. Commissioner</u>, T.C. Memo. 1980-402.

The underlying issues involving the cost of goods sold and business expense deductions claimed by petitioner fall within one or more of the three areas mentioned above.

A.  <u>Cost of Goods Sold</u>

As reflected in our findings of fact, we conclude that petitioner overstated cost of goods sold by $33,242.12 for 1973.  His taxable income should be increased by that amount.  Petitioner has conceded the adjustment of $32,704.82 in cost of goods sold for 1974, and $57,154.81 of $68,815.64 claimed for 1977.  We sustain respondent's determination with respect to the remaining amount ($11,660.83) for 1977.

In the notice of deficiency for the taxable years 1978, 1979, and 1981 respondent increased petitioner's cost of goods sold in the amounts of $145,706, $95,633.60, and $5,862, respectively. These amounts are related to additional income from Galion that was included in the notice of deficiency for these taxable years. Having decided that petitioner's taxable income should be increased by the amounts from Galion, it follows that respondent correctly increased petitioner's cost of goods sold for those years.

B. Commission Expenses

For some of the commission expenses claimed as deductions for the years 1973 through 1978 petitioner failed to substantiate the business purpose and that the expenditures were his ordinary and necessary business expenses. Other than the unidentified amounts of $170 in 1973 and $16,000 in 1975, respondent concedes that the claimed amounts were paid.

As to the amounts petitioner paid to Hillary Wood during the years 1973 through 1977, petitioner raises on brief the possibility that respondent would argue that the payments to Hillary Wood were illegal payments to Iranian Government officials or employees. Respondent has not taken that position. The reason for disallowing the payments to Hillary Wood in the notice of deficiency and in respondent's brief is that such

payments were not ordinary and necessary business expenses. Petitioner, however, attempts to show that the payments to Ms. Wood were ordinary and necessary business expenses. Over a period of 4 years and 1 month petitioner paid Hillary Wood about $73,500. Ms. Wood resided in Paris, while petitioner resided in Columbus, Ohio, and carried on most of his business activities in Iran. Petitioner was able to point to only one Iranian Government official to whom he received an introduction through Ms. Wood. Further, he was already well connected with several high ranking officials in the Iranian Government. Therefore, it is unlikely that petitioner needed someone from France to assist him in meeting Iranian Government officials. We think it is clear that very few, if any, of the services Hillary Wood provided to petitioner qualify as ordinary and necessary business expenses for payments of $1,500 per month for 49 consecutive months. Therefore, we sustain respondent's determination.

Petitioner claimed that the amounts of $16,100 in 1973, $25,000 in 1974, and $2,130 in 1978, paid to his brother, I.J. Zand, are deductible. As reflected in our findings of fact, we hold that the amounts paid as commissions are petitioner's ordinary and necessary business expenses. The same thing is true with respect to $15,000 in commissions paid to petitioner's

brother, Monty Zand, in 1973. However, the amounts paid to Mr. Sabety in 1973, 1974, and 1978 are not allowable.

The claimed "commission expense transfer payments" of $23,686 in 1973 and $30,000 in 1974 to the Bank of Minora are petitioner's ordinary and necessary business expenses and therefore deductible.

Respondent has conceded a commission expense payment of $10,000 to A.K. Said in 1973. Petitioner has conceded a payment of $75,000 to Stewart & Stevenson in 1975.

The July 7, 1973, payment to an illegible payee in the amount of $35,000 has not been proven to be an ordinary and necessary expense of petitioner. Thus, it is disallowed. Similarly, the $170 payment in 1973, and the $16,000 payment in 1975 were unidentified. Both deductions are disallowed.

For the year 1974 petitioner claimed a commission expense in the amount of $75,000 paid to Hossein Zanganeh. Petitioner reimbursed himself from Diesel Power's Bank of America account for this amount. Mr. Zanganeh earned this commission for assisting petitioner in selling Lockheed aircraft in Iran. Respondent agrees that Mr. Zanganeh was paid for assisting petitioner in the sale of the Lockheed aircraft and spare parts to the Iranian Government. However, petitioner is not entitled

to any deduction for 1974 because he was reimbursed from Diesel Power's Bank of America account for that payment.

No business purpose was shown for either the $2,000 payment to Sadek Massey in 1974, or the $4,756 payment to Ladham Alam in 1974. (We note that petitioner claimed a deduction of $5,250 for the $4,756 payment to Ms. Alam.) Thus, both deductions are disallowed.

Having found that all the commissions paid by General Motors with respect to the sale of locomotives to Pakistan constitute income to petitioner, we conclude, and respondent agrees, that commission expenses paid to Amelia Corporation of $234,033.42 in 1975 and $362,003.36 in 1976 are deductible by petitioner.

Petitioner failed to show a business purpose to substantiate the lodging expenses, car rental, and medical expenses for Mr. Emelian's son. Petitioner failed to itemize the $4,443 cash payment to Mr. Emelian. Hence, the total deduction of $7,028.33 is disallowed.

Petitioner failed to prove that the $1,000 payment to Mr. Bolanhemat in 1975 was his ordinary and necessary business expense. Thus, this deduction is disallowed.

For the year 1976, petitioner deducted a commission expense of $10,000 paid to Alfred Borsharpour, who assisted Diesel Power in attempting to market Lockheed's earth resources program in

Iran. This program was not successful. Since earth resources was a Diesel Power program, the amounts paid by petitioner to Mr. Borsharpour were not his ordinary and necessary business expenses.

The 1976 payment of $1,500 to Don Kahler in settlement of a disputed bill was an ordinary and necessary business expense of CTC, petitionner's sole proprietorship. Therefore, this deduction is allowed.

There was no business purpose shown for either the 1978 $500 payment to Celia Longenbaker or the 1978 payment in the amount of $736.54 to TWA for Mr. Rayhanni's Chicago travel expenses. Hence, both deductions are disallowed.

C. <u>Consulting Fees</u>

For the years 1977, 1978, and 1979 petitioner made payments of $18,266.10, $14,377.13, and $12,445.39, respectively, to Larry Castoe. Included in the payments made on behalf of Mr. Castoe are payments to CDC, stock exchanges fees, expenses for financial publications and services, and expenses for items for which the business purpose is not readily apparent.

Mr. Castoe was a stockbroker in Columbus, Ohio, who made his services available to CTC, Diesel Power, petitioner and other Iranians to make investments in stock on their behalf. Mr. Khalatbari also purchased stock through Mr. Castoe. Petitioner

purchased stock through Mr. Castoe on one or two occasions.
Petitioner has failed to show how the payments made to or on
behalf of Mr. Castoe constitute his ordinary and necessary
business expense.  He has not shown how Mr. Castoe's activities
relate to his trade or business of representing U.S.
manufacturers selling machinery or developing real estate.
Commissions paid to a stockbroker are taken into account in
computing the gain or loss on the sale of stock.  Such amounts
are not ordinary and necessary business expenses because the
expenses of an investor are not trade or business expenses.
Higgins v. Commissioner, 312 U.S. 212 (1941).  In addition,
petitioner has not established a relationship between the
payments made to or on behalf of Mr. Castoe and any investments
he may have made through Mr. Castoe.  For these reasons, we
sustain respondent's determination.

For the years 1978 and 1979 petitioner deducted fees paid to
his brother, I.J. Zand, in the amounts of $100,000 and $50,000,
respectively.  Petitioner maintains that these payments are
deductible due to a fee splitting arrangement he had with his
brother concerning an agreement petitioner had with Harris
Corporation.  Petitioner substantiated the payment to I.J. Zand
in the amount of $100,000 for the year 1978, and respondent
concedes that amount.  However, petitioner has failed to

establish when the $50,000 claimed for the year 1979 was paid. CTC's 1979 disbursements journal reflects an account payable to I.J. Zand on June 15, 1979, of $50,000. However, petitioner's books and other evidence fail to show when or whether this account payable to I.J. Zand was paid. Since petitioner is a cash basis taxpayer, he may not claim a deduction for an account payable. Sec. 461; sec. 1.461-1(a)(1), Income Tax Regs. Because he has not shown that the $50,000 was paid in 1979, he is not entitled to the deduction claimed.

D. Management Fees

For the years 1977, 1978, and 1979 respondent disallowed management fees in the amounts of $96,396, $72,609, and $67,943, respectively. For the year 1980 respondent disallowed the amount of $106,601, which consists of payments for investment counsel totaling $4,500 and payments for consulting and salaries totaling $102,101.

The majority of the amounts at issue consist of alleged payments to CDC for management fees. CDC was incorporated on September 27, 1976. Petitioner held a controlling interest in CDC.

For the year 1977 petitioner presented no evidence as to how the amount of the management fee paid was determined or what services were rendered by CDC to him in exchange for the fee.

Instead, to support this deduction, petitioner relies on a June 22, 1977, entry in CTC's cash disbursements journal of $100,000 paid to CDC. His accountant, Mr. Dutton, could not confirm that this payment was for a management fee or any other specific services, nor was Mr. Dutton able to describe how the amount of the payment was determined. Petitioner also offers no explanation for the difference between the $100,000 payment made June 22, 1977, and the claimed deduction of $96,369. Accordingly, we hold that petitioner has not established that the claimed management fee was paid or was an ordinary and necessary business expense. Thus, he is not entitled to the deduction claimed.

For the years 1978 and 1979 petitioner offered time allocation reports and summary workpapers prepared by his employees in support of the management fees claimed.

For 1978 the first page of Exh. 3138 lists the items which make up the expense claimed. These items are wages allocable to CDC, payroll taxes for such wages, a management fee equal to 10 percent of the wage expense, rents received, and rent credit. No justification was given for either the purpose or the percentage of the management fee. Furthermore, the time allocation reports indicate that petitioner's employees merely wore different hats

at different times in various businesses.  This is not sufficient justification for deducting a management fee.

In 1979 the alleged management fee was increased to 15 percent.  A similar method of keeping track of the services rendered by the employees was utilized.  Additionally, in computing the deduction claimed for 1979 petitioner failed to offset the management fee claimed by the rent credit, a total amount of $16,269.  Petitioner also failed to report the rental income on his 1979 income tax return.

As substantiation for payment of the management fee claimed, petitioner again offered workpapers.  Although the first page of these workpapers lists two accounts payable to CDC in the amounts of $44,475.29 and $7,198.69, petitioner failed to prove that the alleged management fees claimed in 1978 and 1979 in the amounts of $72,609 and $67,943 were actually paid.  His cash disbursements journal for 1978 does reflect a number of payments to CDC.  However, the purpose of most of these payments is not identified, and none of the payments match the amounts reflected in the summary workpapers.  Furthermore, no checks were issued by petitioner to CDC for management fees.  Certain other payments recorded in petitioner's 1978 disbursements journal are listed under a column identified as rent.  These payments pertain to the deduction of $31,842 claimed on petitioner's Schedule C for 1978

as rent.  Other payments identified in the cash disbursements journal as made to CDC were paid on behalf of Mr. Castoe.

On brief petitioner does not point to any specific amounts in the record that would substantiate the payments to CDC for management fees in 1978 and 1979.  Instead, he claims that the payments may have been made by offsetting amounts due him from CDC.  However, petitioner has provided no reconciliations or other workpapers documenting when and in what amounts any such offsets were made.  Accordingly, the management fees for 1978 and 1979 are disallowed.

For the year 1980 petitioner provided little documentation in support of expenses claimed for investment counseling in the amount of $4,500 and consulting and salaries in the amount of $102,101.  He presented only invoices to CTC from CDC dated February 29, 1980, in the amount of $6,487.83 and April 9, 1980, in the amount of $461.73.  Petitioner's cash disbursements journal for 1980 does not reflect payment of the amounts claimed. Therefore, we hold that he has failed to substantiate these amounts, and they are not deductible.

E.  Legal and Professional Fees

Petitioner claimed a deduction for the amount of $2,097.34
on his 1975 Federal income tax return.  The deduction claimed was
for a payment to DuBois Jansson for Mr. Jansson's services in
connection with products to be sold to Iranian State Railways.
Because we have previously held that petitioner is taxable on the
income from the sales to Iranian State Railways, he is entitled
to deduct the $2,097.34 paid to Mr. Jansson

Respondent disallowed legal fees paid to George, Greek,
King, McMahon & McConnaughey, a Columbus, Ohio, law firm in the
amounts of $57,921.08 in 1976, $57,419.26 in 1977, and $25,059.21
in 1978.  Petitioner offered a variety of bills from the law firm
in support of the business purpose of these fees.  However, the
bills do not itemize the particular services rendered, the time
spent for particular services, and the corresponding charge.
Instead, they list the general nature of the matter for which
services were rendered.  Included in the services rendered are
acquisition of real estate, conferences concerning Harris
Corporation, work on the Clark arbitration matter, drafting
leases, a dispute involving property purchased, services
concerning joint ventures, a corporate liquidation, conferences
with representatives of insurance companies on insurance and
pension matters, and tax issues.  The legal fees petitioner

incurred with respect to the purchases and sales of real estate, the joint ventures, the fees concerning Harris Corporation if they dealt with a long-term contract for services, and the corporate liquidation are capital expenditures rather than ordinary and necessary business expenses. See Collins v. Commissioner, 54 T.C. 1656 (1970); Bilar Tool & Die Corp. v. Commissioner, 530 F.2d 708 (6th Cir. 1976). Furthermore, the legal fees petitioner incurred with respect to insurance and pension matters are his personal expenses rather than ordinary and necessary business expenses. In contrast, respondent agrees that any fees incurred for tax matters and landlord-tenant problems are petitioner's ordinary and necessary business expenses. Finally, as will be discussed in more detail below, the fees paid in the arbitration between Clark Equipment and Diesel Power are the expenses of Diesel Power, and not those of petitioner. The payments to George, Greek pertaining to the Clark arbitration involving Diesel Power were specifically set forth as $20,607.58, $17,950.59, and $6,315.68 for the years 1976, 1977, and 1978, respectively.

Thus, petitioner's legal expenses include both deductible and nondeductible items. Problematically, petitioner's supporting documentation, the law firm bills, lacks the requisite specificity to demonstrate what amount of the fees is reallocable

to deductible items versus nondeductible items. Consequently, petitioner has failed to meet his burden of proof as to the amount of such fees that is deductible for Federal income tax purposes. Merians v. Commissioner, 60 T.C. 187 (1973). In addition to these fees, we note that other expenses for 1976 and 1977 also relate to the same arbitration. When Clark Equipment Company canceled its distributorship with Diesel Power, Diesel Power was left with Clark Equipment inventory on hand that it could not sell. The distributorship agreement provided for arbitration to resolve such disputes. Diesel Power was represented in this matter by George, Greek. The other fees paid to Walder, Wyss, & Maier, Coudert Freres, and A. Sarisin & Cie represented deposits and arbitrator fees that Diesel Power was required to pay. Since the dispute concerned a distributorship agreement and inventory of Diesel Power rather than petitioner, the legal fees and other arbitration expenses are those of Diesel Power and not those of petitioner.

Petitioner claimed a deduction in the amount of $9,312.49 on his 1976 income tax return for payment to Larry Castoe for professional services. Because petitioner has not shown that Mr. Castoe's fee was petitioner's ordinary and necessary business expense, this deduction is disallowed.

For the year 1976 petitioner claimed a deduction for legal and professional fees in the amount of $19,799.12 paid to architect J. Foley. This amount comprises $4,779.12 paid with respect to a housing project for General Dynamics and $15,000 paid with respect to the purchase and construction of the building on Riverside Drive which housed CTC's operations. The amount paid pertaining to the housing project for General Dynamics employees is not an ordinary and necessary business expense of petitioner. For the years at issue, he reported no income from General Dynamics. Thus, any fees paid for services rendered by Mr. Foley to General Dynamics would be a business expense of General Dynamics, not petitioner. Furthermore, these fees are capital in nature. The fees paid for the services rendered with respect to the purchase and construction of CTC's office building are clearly capital expenditures and not current deductions. Sec. 263(a).

Petitioner deducted $2,425.20 as a professional fee paid to Price Waterhouse for its services rendered as resident agent of WHIP, a Bahamian corporation. Because WHIP was a shell corporation, this payment was petitioner's ordinary and necessary business expense. Hence, the deduction is allowed.

On his 1978 income tax return, petitioner deducted payments totaling $5,000 made to Sandra Rossi and Celia Longenbaker.

However, these payments were recorded in CTC's journal as made to Mr. Shamloo, an Iranian lawyer. No business purpose for the payments was shown. No explanation was given for why the payments were made to Sandra Rossi and Celia Longenbaker instead of Mr. Shamloo. Hence, the $5,000 deduction is disallowed.

For the year 1979 respondent disallowed legal and professional fees in the amount of $10,082 claimed by petitioner. Of this amount, $3,710 was paid to the New York law firm of White & Case. Respondent concedes that $850 of the amount paid is deductible by petitioner. However, the remaining amounts paid to White & Case represent fees paid in connection with the purchase of a cooperative apartment in New York City for petitioner's daughter. That amount is petitioner's personal expense and is, therefore, not deductible as a business expense.

Petitioner deducted $910 on his 1979 income tax return for legal fees paid to Chester, Saxbe, Hoffman & Wilcox. Because the business purpose of this payment was not shown, the $910 deduction is disallowed.

F. Salaries and Wages

There remain in dispute for 1974 and 1976 payments to petitioner's brother, I.J. Zand, in the amounts of $9,000 and $5,000, respectively, claimed as salaries and wages. Unlike the commission expenses, the payments to I.J. Zand claimed as

salaries and wages in 1974 and 1976 are not deductible by petitioner. I.J. Zand was a Diesel Power employee. Consequently, the salaries and wages paid to him are not deductible by petitioner because he has not established his business purpose for the amounts paid to his brother or that the expenses were not those of Diesel Power.

G. Office Expenses

Respondent disallowed various office expenses claimed for the years 1973 through 1978. The issues are factual and many of the amounts are small. Our findings are dispositive of the items involved. We will comment only on the larger items; i.e., office furniture and equipment, an Ohio Bell telephone expense, and condominium rent.

The expense claimed in 1973 for office furniture in the amount of $1,498.49 is a duplication of business assets depreciated by petitioner. The depreciation schedule attached to his 1973 tax return shows the acquisition in 1973 of furniture in the amount of $296.25 and a desk in the amount of $1,202.24. These two items total $1,498.49, the same amount petitioner tried to expense as office furniture. The deduction is disallowed.

For the year 1974 respondent capitalized office furniture purchases which totaled $4,020.41. The individual items are set forth in the depreciation schedule attached to the notice of

deficiency.  The items are a Morgan desk ($592.28), Lazarus office machine ($258.76), a Morgan desk ($954.97), an IBM typewriter ($696), and telephone equipment ($1,518.40).  Each of these items clearly has a useful life of more than 1 year, and, consequently, for Federal income tax purposes, their cost must be recovered through depreciation rather than as an expense.

The deductions claimed for office furniture and equipment for the years 1975 and 1976 are in the amounts of $16,873.59 and $4,407.96.  There is no evidence in the record to show the items for which these expenditures were incurred.  The depreciation schedule attached to the notice of deficiency sets forth items of furniture and equipment that respondent determined were capital expenses rather than ordinary expenses, and which petitioner substantiated.  Thus, because there is no evidence to show that the items claimed constitute ordinary expenses, we sustain respondent's determination.

For the year 1975 respondent disallowed a payment to Ohio Bell in the amount of $7,359.75.  This payment is for a CTC telephone bill dated November 14, 1975, which consists of a one-time charge in the amount of $6,626.30 and other charges for services totaling $661.16.  Respondent concedes that petitioner is entitled to deduct the other charges in the amount of $661.16.  However, petitioner has failed to verify the type of equipment or

service provided, or the business purpose of the one-time charge of $6,262.30. Thus, since petitioner has not established the business purpose for this expense or that it is an ordinary rather than a capital expense, no deduction is allowed.

For the year 1978, petitioner deducted $9,000 for condominium rent paid to his son-in-law, Joseph Dinunzio. The rent was prepaid in 1978 for the year 1979, and was based on the estimated fair rental value of the condominium plus the cost of furnishing it. Mr. Dinunzio acquired the condominium in the fall of 1978 from the Riviera Condominium Company of Naples, financing the purchase with a 100-percent mortgage from Dollar Savings of Ohio. Petitioner was a shareholder in the Riviera Condominium Company of Naples.

The amount paid to Mr. Dinunzio for the use of this condominium does not constitute an ordinary and necessary business expense of petitioner. Rather, the evidence shows that petitioner was merely continuing to help his daughter and her new husband get established. Petitioner had already provided his son-in-law with employment immediately after Mr. Dinunzio graduated from college. Furthermore, shortly thereafter, Mr. Dinunzio's duties were expanded to include the vice presidency at no less than four business entities controlled by petitioner; i.e., CDC, Caspian Machinery, Caspian Electric, and Caspian

Florida.  Petitioner also purchased a home in Columbus, Ohio, for his daughter and Mr. Dinunzio and bought him a Cadillac.

Accordingly, we hold that the $9,000 paid by petitioner to Mr. Dinunzio did not constitute an ordinary and necessary business expense, and, therefore, the deduction is disallowed. Additionally, petitioner's 1980 rent expense deduction in the amount of $6,451.86 is disallowed.  The expense was personal; i.e., rent paid for a New York City condominium for petitioner's daughter.

H.  <u>Interest Expense</u>

For the years 1973 through 1980 respondent disallowed deductions claimed by petitioner for interest expenses of $3,250, $3,000, $142,500.17, $27,579.67, $3,093.12, $20,034, and $74,879, respectively.

With respect to the amounts claimed as interest expense to Mr. Sabety, petitioner substantiated payments in the amounts of $3,000 for 1973, $3,000 for 1974, $2,950.96 for 1975, $3,000 for 1976 and $1,000 for 1977.  However, petitioner presented no evidence to show a debtor-creditor relationship between himself and Mr. Sabety.  In 1967, Mr. Sabety invested $20,000 through petitioner in an entity known as Caspian International Jordan. Petitioner did not incur personal liability to Mr. Sabety for the amount invested, nor did he sign a note.  From this investment

Mr. Sabety was to receive a monthly payment of at least $250.
There is no further evidence in the record of this investment.
Since petitioner has failed to establish that the payments to Mr.
Sabety constitute his interest expense, the deduction is
disallowed.

For the year 1975 petitioner claimed interest expense paid
to Diesel Power in the amount of $137,500.17.  Petitioner filed
an amended income tax return for 1975 reducing the interest
expense paid to Diesel Power by $41,245.39.  Thus, the remaining
amount in dispute is $96,254.78.

Petitioner paid Diesel Power $125,000 on December 30, 1975.
In CTC's cash disbursements journal this amount is listed under
the transfer column and is noted "interest on loan drawn by Zand
since 1973."  In 1978, when petitioner was attempting to
determine where he stood financially with Diesel Power, the
$125,000 payment was treated no differently than other CTC
transfers to Diesel Power.  In addition, by filing the amended
return petitioner admitted that the claimed interest expense was
no more than $96,254.78.  Moreover, he has presented no notes or
other loan documents evidencing a debtor-creditor relationship
between himself and Diesel Power.

Testimony was presented that petitioner borrowed moneys from
Diesel Power.  However, this testimony was not specific with

respect to amounts of such loans, dates of such loans, interest rates, or payment schedules. Since petitioner has failed to establish that $96,254.78 or any portion of the $125,000 paid to Diesel Power on December 30, 1975, is interest expense, the deduction is not allowed.

For the years 1975 and 1977, petitioner deducted interest expenses in the amounts of $2,049.04 and $688.32, respectively. Neither payment can be identified. Therefore, petitioner has failed to meet his burden of proof with respect to these amounts, and the deductions are disallowed.

For the year 1976 petitioner deducted $24,400.87 paid to W.P. Glass on June 1, 1976, as interest expense. This amount was recorded in CTC's cash disbursements journal as an interest payment for a ranch. However, the entry in this journal is not accurate. In fact, the payment of $24,400.87 to Mr. Glass was for the acquisition of real estate, a ranch purchased as an asset of the A-Z Ranch Partnership. Petitioner admits that the payment to Mr. Glass was a portion of the purchase price of real property that was an asset of the partnership. Thus, this amount does not constitute interest expense. Sec. 163.

For the years 1979, 1980, and 1981 petitioner claimed interest expenses paid to the Mirhosseini family in the amounts of $15,000, $44,879, and $36,000, respectively. On or about September 10, 1979, three members of the Mirhosseini family each

lent petitioner $80,000. He agreed to invest the total sum of $240,000 in his operating companies and to provide the Mirhosseini family with a 25-percent-per-year return on the principal, payable quarterly, in advance. At approximately the same period of time, petitioner borrowed other funds at interest rates of 8 percent and 12 1/2 percent.

The parties stipulated that CTC's or petitioner's 1979 and 1980 journals reflected payments to the Mirhosseini family. This stipulation was in error and is in conflict with the documentary evidence of record. The disbursements journals do not reflect the claimed interest payments to the Mirhosseini family for the years 1979, 1980, and 1981. Stipulations contrary to the actual facts disclosed by the record may be disregarded. Mead's Bakery, Inc. v. Commissioner, 364 F.2d 101, 106 (5th Cir. 1966), revg. T.C. Memo. 1964-104. Furthermore, the workpapers recapping 1980 interest expense are not sufficient documentation that payment was made or that the amounts shown are interest. Thus, petitioner has not substantiated any payments to the Mirhosseinis. Moreover, he has not shown in which of his operating companies the funds were invested. Therefore, we hold that the amounts paid to the Mirhosseini family are not deductible as interest expense.

The $30,000 and $45,000 of interest expenses claimed in 1980 and 1981 for payments to the J.J. Zand Trust are attributable to

loans made by trusts established for the benefit of petitioner's three daughters. In 1977 petitioner established these six trusts, two for each of his three daughters. The two trusts for each daughter were in the amounts of $25,000 and $75,000. Each of the trusts was for a term of 10 years and 1 day. The three trustees were Priscilla Meier, petitioner's longtime employee, and George Hairston and David Johnston, attorneys in the law firm of George, Greek. The terms of the trust agreements placed investment discretion solely in the hands of the three trustees acting in unison and not separately.

In 1977 the trust funds were lent to CDC, a corporation in which petitioner held a controlling interest. The loans were repaid to the trusts. On February 5, 1980, the corpus of each trust was lent to petitioner personally with a rate of return of 12 percent per annum. As security for the loans, petitioner gave mortgages on his residence and condominium. He claimed interest paid to the trusts in the amounts of $30,000 and $45,000 for the years 1980 and 1981, respectively. At the end of the years 1980 and 1981, the loans had not been repaid. The funds in the trusts were paid to petitioner personally or were invested in entities that he controlled.

Respondent contends that the claimed interest deductions of $30,000 for 1980 and $45,000 for 1981 should be disallowed because petitioner should be treated as the "owner" of the

trusts' assets.  It is asserted that petitioner has failed to comply with the safe harbor provisions of section 675(3).  To the contrary, petitioner contends that the provisions of section 675(3) are met and that he is entitled to the claimed interest deductions.  We agree with petitioner.

Section 675(3) provides that the grantor shall be treated as the owner of any portion of a trust in respect of which the grantor has directly or indirectly borrowed the corpus or income and has not completely repaid the loan, including the interest, before the beginning of the taxable year.  However, the section also provides that this requirement does not apply to a loan which provides for adequate interest and security and if the loan is made by a trustee other than the grantor and other than a related or subordinate trustee subservient to the grantor.  Here these three conditions are met:  (1) The loans bore adequate interest; (2) the loans were adequately secured; and (3) the majority of the trustees (the two attorneys) were not related, subordinate, or subservient to the grantor.  Lawyers are not proscribed by section 672(c) and thus may qualify as independent. See Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 80.1.4, at 18-19 (2d ed. 1991); 452-2nd T.M. Grantor Trusts: Sections 671-679, A-14.  See also Estate of Goodwyn v. Commissioner, T.C. Memo. 1976-238.  Moreover, even if section 675(3) did apply, its effect by its terms is to tax all or a

portion of the trust income to petitioner.  It does not provide for the disallowance of the interest expenses claimed by him. Indeed, the net result to the grantor may be no increase in tax because the trusts' interest income taxed to the grantor may be offset by a deduction for interest on the loans.  See Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 80.7 at 64.

Respondent relies on Benson v. Commissioner, 76 T.C. 1040 (1981); Bixby v. Commissioner, 58 T.C. 757 (1972); and Bennett v. Commissioner, 79 T.C. 470 (1982).  Such reliance is misplaced. Those cases are distinguishable.  In Benson the loan was unsecured, and the grantor's spouse was the sole trustee.  In Bixby the settlors were held not to be the true grantors for purposes of the grantor trust rules.  Rather, the subsequent transferors were the actual grantors.  There was no discussion of section 675(3) in the Bixby case.  In Bennett the grantors were the trustees, and the loan was unsecured.

Accordingly, as reflected in our findings of fact, we hold that the interest deductions claimed by petitioner in 1980 and 1981 as paid to the trusts on the secured loans are deductible.

I.   Expenses for Insurance and Dues and Publications

Our findings of fact are dispositive of the expenses disallowed by respondent for insurance and dues and publications. It is not necessary to repeat them here.

J.   Depreciation

For the years 1973 through 1980 respondent disallowed depreciation expenses in the amounts of $560.90, $6,820.14, $6,154.42, $10,902.44, $5,913, $13,652, $7,461, and $7,806.36, respectively.

For the year 1981 respondent allowed depreciation in an amount that is $2,494 greater than the amount claimed by petitioner on his income tax return.  Respondent's adjustments to depreciation take into account items that petitioner expensed on his income tax returns but that respondent determined were capital expenditures subject to depreciation.

For the years 1973 and 1976 petitioner offered no evidence to refute respondent's adjustments to the depreciation claimed. Therefore, respondent's adjustments are sustained.

For the years 1974 and 1975 respondent disallowed depreciation claimed on petitioner's apartment in Kitzbuhel, Austria.  Petitioner contends that the apartment was purchased as a place to stay while in Europe in lieu of hotels.  He transacted business from the apartment, including meeting business associates and making business-related telephone calls.  He, his

family, and his friends also used the Kitzbuhel apartment for personal vacations. Petitioner engaged in skiing in Kitzbuhel and received skiing lessons there. All of his daughters, his son-in-law, and his wife used the Kitzbuhel apartment for personal vacations. Petitioner was known to spend Christmas vacation in Kitzbuhel skiing. He allowed many of his friends to use the Kitzbuhel apartment for personal vacations.

Although petitioner may have conducted some business while in Kitzbuhel, there is evidence that his apartment was used extensively for personal vacations by him, his family, and his friends. Furthermore, he failed to keep a record of the number of days of business use as compared to the number of days of personal use of the Kitzbuhel apartment. Moreover, he failed to show that any business activities carried on while in Kitzbuhel were not incidental to personal vacations. Petitioner has failed to establish that he is entitled to the claimed depreciation with respect to the Kitzbuhel apartment.

For the years 1974, 1975, 1977, 1978, 1979, and 1980 respondent disallowed the depreciation expenses claimed by petitioner on various automobiles. The automobiles consisted of cars driven by him and those provided to employees of CTC or CDC. Neither petitioner nor the employees maintained any records to differentiate between business and personal use of the automobiles. He and the employees admitted that the cars were

used for personal purposes, and they made only general comments that the cars were used mostly for business.

Additionally, in 1976 petitioner formed CDC. His son-in-law, Mr. Dinunzio, was employed by CDC and its various subsidiaries. Mr. Dinunzio also worked on McZand Corporation projects. He used the automobile provided by petitioner in his employment for McZand Corporation and CDC and its subsidiaries. Mr. Dutton was also provided with a car by petitioner, as were Clem and Priscilla Meier. Each of these individuals used the cars provided by petitioner in their employment with CDC, subsidiaries of CDC, or partnerships in which CDC was a partner.

We conclude that petitioner failed to present sufficient evidence to prove that he is entitled to depreciation on the automobiles he purchased for his use and the use of others. No records were maintained to show the business use of the automobiles. There is also little evidence of petitioner's business activities in and around the Columbus, Ohio, area. His clients and customers were spread throughout the United States. He claimed and was allowed significant amounts for travel expenses in meeting with those clients. In addition, for the years 1977 through 1980 the use of the automobiles by Mr. Dinunzio, Mr. Dutton, and the Meiers was related to the activities of McZand Corporation or CDC. Thus, any automobile use on behalf of those entities would not constitute an ordinary

and necessary business expense of petitioner. Accordingly, we sustain respondent's determination on this issue.

### K. Rental Loss and London Rent Expense

Again, our findings of fact are dispositive of respondent's decreased rental loss of $35,228.13 claimed by petitioner for 1975, and the disallowance of $10,000 in 1976 for the rental of the Khalatbaris' apartment in London. We sustain respondent's determinations.

### L. Loan Origination Fee

For the year 1978 respondent disallowed a deduction in the amount of $7,000 paid as a loan origination fee. On May 25, 1978, petitioner paid W. Lyman Case and Company $7,000 as a loan origination fee for the purchase of the Madison County Farm. The Madison County Farm was not petitioner's personal residence. Instead, it was a farm owned by CDC. Section 461(g) generally requires that loan origination fees be charged to the capital account and recovered over the period to which they are so allocable. However, a loan origination fee is currently deductible only if the loan is for the purchase of the taxpayer's principal residence. Sec. 461(g)(2). Because the farm was owned by CDC, rather than by petitioner, the deduction of the loan origination fee is disallowed.

M.  Moving Expense and Investment Tax Credits

As to these two issues, our findings of fact are dispositive.  The claimed moving expense deduction for 1979 was for Mr. Dutton, an employee of CDC.  It was not petitioner's ordinary and necessary business expense.  The investment tax credits for 1976, 1978, and 1979 were disallowed by respondent, and petitioner presented no evidence with respect to them.  Therefore, respondent's determinations are sustained.

N.  Travel and Entertainment Expenses

A major area of deductions for which payment is disputed is travel and entertainment.  Petitioner claimed enormous and inflated expenses for travel and entertainment, as shown in our findings of fact, for the years 1973 through 1981.  Respondent allowed sizable amounts for the years 1973 through 1976, and also disallowed substantial amounts for those years.  All amounts claimed for the years 1977 through 1981 were disallowed by respondent.

For the travel and entertainment expenses, not only is the fact of actual payment in question, but also whether claimed expenses were ordinary and necessary, whether they were incurred by petitioner as a sole proprietor, or whether they were the expenses of Diesel Power or, for later years in issue, a myriad of other corporate entities with which petitioner was involved.  Also at issue is whether the substantiation requirements of

section 274 have been met.  Some of the disputed expenses involve estimated cash expenditures, expenses relating to apartments in the ski village of Kitzbuhel, Austria, and in London, England, and reimbursements made to Diesel Power.

Section 162(a) permits a taxpayer to deduct "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," including travel and entertainment expenses.  However, even "ordinary and necessary" expenses must have been incurred on behalf of the taxpayer's business, not on behalf of another taxpayer's business.  Deputy v. DuPont, 308 U.S. 488 (1940).

Thus, petitioner must first show that his claimed travel and entertainment expenses were ordinary and necessary and, if so, petitioner must also show that the expenses were incurred in furtherance of CTC's business rather than the business of another taxpayer.  Dietrick v. Commissioner, 881 F.2d 336, 339 (6th Cir. 1989), affg. T.C. Memo. 1988-180.

From 1972 through 1977 petitioner owned and operated CTC as a sole proprietorship.  He was also a shareholder (100 percent until late 1974) as well as a director and chairman of Diesel Power.  During all or part of the earlier years, he was also involved in various other entities, including WHIP, All Patents, and IGOS.

Beginning in 1975, and for the remaining years, the characterization of expenses becomes even more difficult.  By 1975 Diesel Power and CTC's business relationship was winding

down; the distributor agreements with the various U.S. manufacturers were terminated; and in December 1977 petitioner divested himself of any interest in Diesel Power.

Between 1976 and 1981, however, he became involved in various closely held corporations and partnerships for real estate development and farming operations. He formed CDC, which filed corporate tax returns with its consolidated subsidiaries including Caspian Electric Company, Caspian Farm Systems, Caspian Machinery Company, and Charleston, Inc. CDC was generally in the business of real estate and real estate development and management. CDC owned 70 percent of Green Prairie, a partnership consisting of an Alabama farming operation; a second partnership, Franklin Green, owned a house on the Alabama farm; a third partnership, the Bowling Green partnership, owned the farm-land. Petitioner, directly or indirectly (in conjunction with CDC), owned over 50 percent of these three partnerships. Petitioner was also a shareholder in the following additional entities: McZand Corporation, a subchapter S corporation, which held real estate in the Columbus, Ohio, area; and Homestead Development and Southern Florida Real Estate, both of which were involved in real estate development and investment in Florida. By 1978 CTC employees had become employees of CDC, and although CTC continued as a Schedule C business, it is unclear on this record exactly what business CTC engaged in after 1977.

No attempt has been made to show that claimed travel and entertainment expenses in any amounts greater than those allowed by respondent were ordinary and necessary or were expended in furtherance of CTC's business, rather than in furtherance of Diesel Power's business or the business of other entities in which petitioner was involved. Instead, petitioner ignores the existence of any other entities on whose behalf he conducted business and merely concludes that an expense was CTC related if it was treated that way on CTC's books or by his tax return preparers. None of petitioner's bookkeepers or return preparers testified that they were present when any expense was incurred; rather, petitioner simply directed how an expense was to be treated on CTC's books. Accordingly, their testimony does nothing to substantiate the business nature of travel and entertainment amounts reflected on either CTC's books or petitioner's tax returns. See Anderson v. Commissioner, T.C. Memo. 1976-28 (testimony of bookkeeper who was not present when expenses were incurred could not substantiate nature of claimed travel and entertainment expenses).

In addition to the requirements that expenses be ordinary and necessary as well as in furtherance of taxpayer's business, section 274(d) imposes stringent substantiation criteria. Section 274(d) prohibits a deduction for travel and entertainment expenses unless the taxpayer substantiates by adequate records or

by sufficient evidence, corroborating the taxpayer's own statement:  (1) The amount of the expense; (2) the time and place of the travel or entertainment; (3) the business purpose of the expense; and (4) the business relationship of the taxpayer to the persons entertained.  These four elements must be established for each separate expenditure.  Sec. 1.274-5(c)(1), Income Tax Regs.; Dowell v. United States, 522 F.2d 708, 714 (5th Cir. 1975).

A taxpayer satisfies the substantiation requirements of section 274(d) by meeting the adequate records test or through substantiation by other sufficient evidence.  Sec. 1.274-5(c)(1), Income Tax Regs.  Proof by "adequate records" requires the taxpayer to maintain a contemporaneous account book, diary, statement of expense, or similar record and documentary evidence which, in combination, "are sufficient to establish each element of an expenditure".  Sec. 1.274-5(c)(2), Income Tax Regs.  In addition to an account book or diary, substantiation by adequate records requires additional documentary evidence for expenditures of $25 or more, except for transportation charges, if documentation for such charges is not readily available.  Sec. 1.274-5(c)(2)(iii)(b), Income Tax Regs.  Acceptable documentary evidence includes receipts, paid bills, or other similar evidence which establish the amount, date, place, and essential character of the expenditure.  Sec. 1.274-5(c)(2)(iii), Income Tax Regs. Failure to produce adequate documentary evidence results in

disallowance of travel and entertainment deductions.  Sanford v.
Commissioner, 50 T.C. 823, 828 (1968), affd. per curiam 412 F.2d
201 (2d Cir. 1969).

In our view petitioner's travel diaries do not meet the
substantiation requirements necessary for purposes of section
274.  The diaries do not reflect the business purpose of the
meeting, entertainment or expense, the location where the
entertainment took place, or the business relationship of the
person entertained.  Instead, the diaries contain a hodgepodge of
cities, names of persons and, in some instances, an amount
allegedly paid for hotel bills, dinners and entertainment,
transportation, and miscellaneous expenses.

Some meetings, entertainment, and expenses reflected in the
diaries are clearly personal.  For example, the diaries include
expenditures for luggage and clothes and reflect meetings and
entertainment in Rome, Beirut, London, and Paris with Murat Seker
of Ingersoll-Rand in January, February, and April 1973, April and
August 1975, March and May 1976, and April 1977.  Both petitioner
and Mr. Seker testified that they had no business relationship in
the 1970's.  Moreover, the diaries reflect expenses for dinners
and entertainment of entire families or unnamed associates.  In
many instances the individuals whose names appear in the diaries
were involved not only with CTC, but also with Diesel Power,
WHIP, All Patents, IGOS in the earlier years, and McZand

Corporation, CDC, and various Florida real estate projects involving other corporate entities in the later years. The more frequently named individuals who fall into this category include Mr. and Mrs. Khalatbari, Dr. Fallah, Olin Atkins, Hossein Zanganeh, and Bill McCabe, as well as representatives of various U.S. manufacturers who dealt with both Diesel Power and CTC.

Petitioner acknowledged that the diaries only generally reflect his travel and entertainment expenses. The diaries do not reflect sundry travel expenses or minimal amounts. Most of the expenditures reflected in the diaries are for amounts in excess of $25; many of the expenses shown for hotel bills, dinners, and entertaining are for hundreds of dollars, with no supporting documentation as to either the amount or the business purpose.

Alternatively, the substantiation requirements of section 274(d) can be satisfied by a taxpayer's oral or written statement supported by "other corroborative evidence". Other corroborative evidence can take two forms: (1) Oral or written testimony of third persons with actual knowledge of the expenditures or (2) documentary evidence subject to the same requirements imposed under the "adequate records" test. Sec. 1.274-5(c)(3), Income Tax Regs. In our opinion petitioner has not complied with this alternative substantiation method. Several persons named in his diaries did testify at trial, but none corroborated any meeting

or expenditure claimed in the diaries.  In fact, the testimony of Murat Seker and petitioner himself directly contradicts entries in his diaries.

The unsupported testimony of a taxpayer at trial is not sufficient to meet the stringent substantiation requirements of section 274(d).  To adequately substantiate the deductibility of travel and entertainment expenses, specificity is imperative. Dowell v. United States, supra at 714; Hatch v. Commissioner, T.C. Memo. 1980-110; Gras v. Commissioner, T.C. Memo. 1974-230.

Petitioner attempts to surmount this specificity requirement by contending in his brief that this case does not involve a shoebox full of receipts, and that the sheer number of exhibits, the length of trial, the mass of petitioner's brief, and petitioner's selective testimony prove his entitlement to the claimed travel and entertainment expenses.  We reject his contention.  This same argument was rejected in Dowell v. United States, 522 F.2d at 708, where the Court of Appeals for the Fifth Circuit reversed the District Court's finding that the "blizzard" of bills and chits established the amounts, dates, and places of expenditures necessary to substantiate the taxpayer's claimed travel and entertainment expenses.  As recognized by the Court of Appeals in Dowell, such an approach is contrary to the stringent substantiation requirements imposed by section 274(d).  Id. at 714.

The only years for which petitioner specifically testified as to receipts, invoices, or underlying documents relating to claimed expenses were 1977, 1978, and 1979.  However, for the years 1978 and 1979, as well as 1980 and 1981, his exhibits containing checks, receipts, or other underlying documents were not received in evidence.  Furthermore, his testimony with respect to his travel in those years can best be described as vague with respect to both business purpose and the business relationship of the persons with whom he allegedly met.  It appears that his testimony confirms that the majority of his travel in those years related to the business of Diesel Power, IGOS, CDC and its various subsidiaries and partnerships, real estate development projects in Florida (Homestead Development and Southern Florida Real Estate), the exploration of new business opportunities, startup expenses related to new ventures, and the sale and subsequent arbitration and litigation with Mr. Khalatbari regarding his Diesel Power stock.  Moreover, while receipts, invoices and other documents for 1977 are in evidence, they establish no more than the fact of payment; these documents do not establish the elements necessary to corroborate petitioner's testimony for purposes of substantiating his entitlement to the deductions under section 274.

As part of his travel and entertainment expenses, petitioner claimed cash expenses that are not reflected as part of travel

and entertainment on CTC's disbursements journals.
Significantly, the cash expenses claimed on the returns cannot be reconciled with the diaries and are in substantially greater amounts than the expenses recorded in the diaries. For the years 1973 through 1976 the amounts of the cash expenses claimed were estimates that the return preparer, Mr. Giffin, derived from the number of checks that petitioner wrote to cash and the number of days that he was out of the country, based on his diaries. No evidence was presented concerning any specific cash expenditures from 1973 through 1976. Moreover, estimated expenses for travel and entertainment expenses are not allowable because section 274 expressly overrides the Cohan rule, Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930); see Sanford v. Commissioner, 50 T.C. at 827.

For the years 1977 through 1981 it is unclear how the cash expenses were determined. Aside from testimony that the return preparers reviewed the cash expenses claimed on the returns, there is no evidence of business purpose or that any cash expenses claimed in 1977 through 1981 were incurred for CTC's business. Nor, as noted previously, is any check, receipt or document underlying the cash expenses claimed in 1978 through 1981 in evidence.[28] For 1977 the workpapers show only a list of

---

[28] In this regard, the Court in its order dated Oct. 9, 1992, specifically stated that Exhs. 3195 through 3215, which include documentation for claimed travel and entertainment expenses in 1978 through 1981, would not be received in evidence.

amounts that add up to the $17,380 in cash expenses claimed on the 1977 tax return. It appears that alleged cash expenses included on the 1978 through 1981 returns include payments to petitioner's housekeeper, payments for cablevision, payments to a CDC employee, American Express and VISA payments, payments to Ohio State University, payments to the Port Royal Club and the Columbus Country Club, a number of payments for flowers and gifts, at least $12,500 in checks to "cash" or "J.J. Zand" and a $5,000 wire transfer to Austria near the Christmas holidays. However, no cash expenses claimed for 1978 through 1981 have been reconciled with petitioner's tax returns for those years, and no business purpose for any claimed cash expenditures in those years has been disclosed on the record.

In 1974, 1975, and 1976 petitioner claimed, either separately or as part of his travel and entertainment, various expenses attributable to his apartment in Kitzbuhel, Austria. He and his family used Kitzbuhel personally for Christmas skiing vacations, and CTC employees considered Kitzbuhel as petitioner's personal rather than business location.

In 1975 and 1976 petitioner included $10,000 and $5,000 in expenses for Kitzbuhel as part of his claimed travel and entertainment expenses. Neither the fact of payment nor the business purpose for any expense attributable to Kitzbuhel has been proven. All of the expenses claimed for Kitzbuhel were

included on the returns without the benefit of supporting records or documentation.  Rather, in support of the Kitzbuhel expenses, petitioner relies on telephone calls and meetings ascribed to Kitzbuhel in his diaries.  While the diaries reflect telephone calls and meetings at Kitzbuhel, they also reflect visits by family members and the fact that petitioner went to Kitzbuhel to rest.  His 1974 diary shows that petitioner was in Kitzbuhel for 55 days, 9 of which were for rest, and that his daughters, housekeeper, and girlfriend were in Kitzbuhel for 42 days.

In 1975 petitioner also claimed travel and entertainment expenses for a London apartment in the amount of $15,000.  The return preparer did not question petitioner or see any underlying documentation regarding this claim.  He simply took petitioner's word for the $15,000 expense.  The workpapers for 1975 show that $5,000 of the total expenses claimed for the London apartment was for a car and chauffeur.  However, no documentation underlying the $15,000 in expenses claimed for the London apartment has been provided.  Furthermore, the amount claimed is contrary to petitioner's testimony that he paid Mr. Khalatbari a flat sum of $10,000 for the use of his London apartment, including the maid, car and chauffeur.

Finally, petitioner claims that part of the total travel and entertainment expenses claimed in 1974 is a $27,618.39 payment to Diesel Power that was allegedly paid to reimburse it for payment

of petitioner's hotel expenses in that year.  The only evidence to support the business purpose for this payment is petitioner's testimony that Diesel Power paid his hotel expenses in all but 1 year, and notations on CTC's 1974 disbursements journal and workpapers.  Moreover, there is no breakdown of this total amount by date or place, nor is there evidence establishing that any portion of the payment was incurred for a business purpose of CTC, rather than of Diesel Power.  In these circumstances, we hold that the $27,618.39 payment is not a deductible expense.

In his brief petitioner makes no legitimate argument in support of his claimed travel and entertainment expenses.  He merely asserts that the respondent's disallowance of the expenses was arbitrary because respondent allowed the amounts set forth on CTC's journals in 1974 and 1976, but subsequently took a "shotgun" approach, disallowing one-half of the amounts on CTC's journals in 1975 and completely disallowing the amounts reflected on the journals for the years 1977 through 1981.  Contrary to petitioner's claim, CTC's 1975 disbursements journal shows travel and entertainment expenses of $108,446.48.  However, on his 1975 return petitioner claimed a deduction in the total amount of $157,946.48.  For 1975 respondent allowed him $80,631.47 or approximately 75 percent of the amount reflected on CTC's journals.  For the years 1977 through 1981 petitioner was involved in a myriad of other entities in addition to CTC, his

sole proprietorship.  Although he continued to utilize CTC for bookkeeping purposes, petitioner has not shown that any expenses reflected in CTC's books bear any relationship to CTC's business. Indeed, it is unclear in what, if any, business CTC engaged during the years from 1978 through 1981.

It is established law that deductions are a matter of legislative grace and the taxpayer must meet the specific statutory requirements for any deduction claimed.  Welch v. Helvering, 290 U.S. at 115; New Colonial Ice Co. v. Helvering, 292 U.S. at 440.  It was petitioner's burden to prove his entitlement to the deductions at issue.  Based on this record, we hold that petitioner failed to prove that he is entitled to any travel and entertainment expense deductions for the years in issue other than those allowed by respondent.

VII.  Issue 11--Dependency Exemption and Charitable Contribution Deductions

A.  Dependency Exemption

Respondent disallowed dependency exemption deductions for Tara Daneshvari claimed by petitioner for 1973 and 1974.  Tara was the daughter of petitioner's Iranian friends who lived in Columbus, Ohio.  The issue is whether Tara qualified as petitioner's dependent during those years.

Section 151(a) and (c) allows a taxpayer, subject to certain requirements, a deduction for personal exemptions for each of his dependents as defined in section 152.  Pursuant to section

152(b)(3), an individual, other than a child of the taxpayer, who is not a citizen or national of the United States is excluded from the definition of the term "dependent" unless the person is a resident of the United States or of a country contiguous to the United States.

Section 1.871-2(b), Income Tax Regs., contains guidelines for determining the residence of alien individuals and provides that an alien whose stay in the United States is limited to a definite period by immigration laws normally is not considered a resident. Section 1.871-4, Income Tax Regs., further contains a presumption that aliens are nonresidents unless they have filed declarations of their intention to become citizens, have filed a Form 1078 or its equivalent, or have taken certain actions to acquire residency. There is no evidence in the record as to whether Tara was a resident of the United States within the meaning of section 152(b)(3). The only evidence is that she was an adopted daughter of Dr. and Mrs. Daneshvari.

There was apparently some concern by her legally adoptive parents that Tara would be sent back to Iran, thus indicating that she was not a U.S. citizen or had not taken any other actions required to establish residency. See Camilo v. Commissioner, T.C. Memo. 1993-249. We note that petitioner does not claim that Tara is a U.S. citizen, but instead relies upon the fact that she lived in the United States as the basis for

allowing the exemption.  That is insufficient absent proof that she was a resident of the United States (or of a contiguous country).  Accordingly, the dependency exemption deductions claimed for both years are not allowed.

B.  <u>Deduction for Charitable Contribution to City of Columbus</u>

On Schedule A of his 1976 income tax return, petitioner claimed a deduction for a charitable contribution of $51,662.62 to the City of Columbus for a house that had been situated on the lot he purchased in 1975 at 3404 Riverside Drive, Columbus, Ohio, adjacent to CTC's office building.  The house had been rented, but petitioner decided to give it to the city by moving it across the road on the other side of the river where it would be used as a public place.  He also gave the city $13,000 for the expense of moving the house to the park.  On December 20, 1976, the City of Columbus passed an ordinance accepting petitioner's donation of the single-family stucco house located at 3404 Riverside Drive and the $13,000 paid to the city as a donation for moving the house.

The claimed charitable deduction was disallowed by respondent on the ground that the house was acquired with the intention to remove or demolish it when it was acquired, and, consequently, the cost should be considered land acquisition cost, with the house having no fair market value at the time of the transfer.  Where property is purchased with the intent of

demolishing an existing building, either immediately or subsequently, the entire basis of the property is allocated to the land, increased by the net cost of demolition, and no loss is allowed for the demolition of the building. Sec. 1.165-3(a)(1), Income Tax Regs.; Estate of Wilson v. Commissioner, T.C. Memo. 1990-514, and cases cited therein. The rationale for this is that if a taxpayer buys property with the intention of demolishing a building, the building can have no value to the taxpayer and its demolition causes the taxpayer no loss. Ivey v. Commissioner, 423 F.2d 862, 864 (2d Cir. 1970), affg. 52 T.C. 76 (1969).

Section 170(c) permits a deduction for a charitable contribution to a State or political subdivision thereof, provided the gift is made for exclusively public purposes. Osborne v. Commissioner, 87 T.C. 575 (1986). However, the measure of a charitable contribution of property is the fair market value of such property. Withers v. Commissioner, 69 T.C. 900, 902 (1978).

We reject respondent's contention that petitioner intended to demolish the house when he purchased it some 14 months before he gave it to the City of Columbus, Department of Recreation and Parks. The provisions of section 1.165-3, Income Tax Regs., are inapplicable in these circumstances for two reasons. First, the regulation applies only if the purchaser has the intent to

demolish the building at the time it is purchased. The record shows that petitioner had no such intention. An intent formed after the acquisition does not suffice. Panhandle State Bank v. Commissioner, 39 T.C. 813, 816 (1963). The second reason is that the house was not demolished, but was removed to a park and apparently is still being used.

Respondent also contends that petitioner, having claimed the book value ($38,662.62) of the house on his return, did not establish its fair market value when he donated it to the city. We disagree. We have found in these circumstances that the house had a fair market value of $27,333.41, which represents the cost allocated by petitioner to the house for depreciation purposes in 1975. We regard this amount as being equivalent to its fair market value. Consequently, we hold that petitioner is entitled to a charitable contribution deduction of $40,333.41 ($27,333.41 plus $13,000) in 1976.

C. Deduction for Charitable Contribution to Kenyon College

On the 1979 income tax return petitioner claimed a charitable contribution deduction of $657,000 that pertained to real estate given by him to Kenyon College in honor of his friend Bill McCabe, who was dying of cancer. The claimed deduction was reduced to zero by respondent in the notice of deficiency on the ground that petitioner realized ordinary income from the transaction.

Section 170(e)(1)(A) provides that deductions for claimed charitable contributions are required to be reduced by the ordinary income or short-term capital gain that would have been realized if the property had been sold at its fair market value on the date of contribution. Simply stated, a taxpayer's allowable deduction is limited by his basis in such property. As set forth in our findings of fact, the transaction at issue is the December 1979 donation of real estate to Kenyon College with a net value, after encumbrances, of $657,000. Petitioner owned the properties donated to Kenyon College in 1979 for, at most, one day, because the properties were transferred to him by deeds from McZand, his wholly owned corporation, immediately before he transferred the properties to Kenyon College. The narrow dispute between the parties on this issue is whether these properties, had they been sold by petitioner at fair market value, would have produced any short-term capital gain or ordinary income, which would have reduced petitioner's allowable amount for the charitable contribution deduction.

Petitioner's main contention is that the property was given to him in satisfaction of loans he purportedly made to the McZand Corporation. He argues that he had a basis in the donated realty equal to the loan notes of approximately $669,000 which exceeded the net fair market value ($657,000) of the property after taking into account the debt on the property. Thus, petitioner contends

that there was no ordinary income or short-term gain to be recognized upon his contribution to Kenyon College because his basis exceeded fair market value.

To the contrary, respondent takes the position that the purported loans by petitioner to McZand Corporation were actually contributions by petitioner to McZand's capital. Thus, it is argued, because the claimed debt was capital and petitioner owned 100 percent of McZand stock both before and after the contribution, there was no consideration paid by petitioner for receipt of the donated property. As set forth in Segel v. Commissioner, 89 T.C. 816 (1987), when determining whether shareholder advances are debt or equity, cases have generally relied on various factors which include the common identity between the shareholders and the putative creditors, the extensive participation in management by such creditors, the corporate ability to borrow from a commercial or nonrelated source at similar rates, terms and other conditions, the thinness of the capital structure of the corporation, and the relative position of the putative creditors to other creditors. See Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972).

Here there was a 100-percent identity between shareholders and putative creditors. Prior to October 1979 McZand stock was owned 50 percent by the Zand family and 50 percent by the McCabe

family.  During this same period the claimed "debt" owed to each family also remained exactly even.  Petitioner and McCabe also participated extensively in McZand management.  They both had positions as officers and/or directors of McZand, and CTC kept the books and records for McZand.

In addition, the shareholder advances were under very different terms than commercial lending.  While there were "notes" executed for at least some of the claimed debt, such notes bore a stated interest rate of 6 percent and were not secured.  During the same period of time, commercial institutions were lending funds to McZand Corporation at a rate in excess of 8 percent with such obligations secured by mortgages on the underlying real estate.  Also, interest on the claimed Zand/McCabe "debt" was not paid but was allowed to accrue over several years.

Finally, McZand Corporation was thinly capitalized with only $500 in stock and little retained earnings.  As of the close of the tax year 1977, after taking into account the purported debt from McCabe to petitioner, the debt-equity ratio was approximately 25 to 1 with debts exceeding $725,000 and equity at approximately $30,000.  At the close of McZand's 1978 tax year, the ratio had increased to 35 to 1 with debt in excess of $3 million and potential equity at approximately $85,000.  This very thin capitalization is further reflected by the fact that

petitioner's accountant, Mr. Dutton, recognized in a memorandum to the file in September 1977 that the advances by McCabe and petitioner were contributions to capital and that further contributions would be needed.

All of the objective indications are that the advances by petitioner and McCabe were made under terms and conditions that a commercial lender would not grant, were subordinated to such commercial debt, and were in exact ratio to stockholdings. We think such advances are properly characterized as contributions to capital and not debt. When petitioner fleetingly received the title to the properties before signing them over to Kenyon College, he did not include the properties in his income as a dividend or otherwise treat his receipt of the properties as an occasion for recognizing gain. Therefore, he had no basis in such properties. Having a zero basis in the realty, petitioner would have had at least $657,000 of short-term gain if the realty had been sold. Thus, his $657,000 contribution is reduced to zero.

Accordingly, we conclude that the charitable contribution limitations of section 170(e)(1) apply to reduce petitioner's allowable charitable deduction to Kenyon College to zero.

VIII. Issue 12--Losses From Trusts, Partnerships, Subchapter S Corporation, and Farming Operations

For the years 1979 and 1980 petitioner claimed losses on his tax returns attributable to the Bowling Green partnership of

$12,768 and $19,073, and for the Franklin Green partnership of $3,596 and $4,140. In an amended return, he claimed an additional 1979 partnership loss of $23,709. The only evidence relied upon to support the Bowling Green and Franklin Green claimed losses are the partnership agreements, testimony that petitioner was a partner, testimony that he made unidentified amounts of capital contributions, the partnership tax returns, and tax trial balance workpapers. Reliance on partnership returns to establish basis in a partnership or to establish a loss generally is insufficient to prove the claimed losses. Patterson v. Commissioner, T.C. Memo. 1984-58.

In addition, the claimed losses were disallowed in the notice of deficiency on the ground that petitioner had not met the at-risk rules of section 465. The 1979 Bowling Green partnership return reflects over $448,000 of debt as nonrecourse. No contrary showing has been made by petitioner.

Finally, the only evidence for the additional 1979 loss claimed on the amended return is the return itself and the return preparer's vague statement, which petitioner mischaracterizes. Contrary to petitioner's assertion that Mr. Dutton calculated basis and other items, Mr. Dutton had no recollection as to what the loss was attributable to. The tax returns are insufficient to prove the underlying claimed loss. The disallowance of the

partnership losses, including the one claimed on the amended 1979 return, is sustained.

In addition to claimed partnership losses, petitioner claimed losses in 1979 and 1980 for McZand, a subchapter S corporation, of $11,997 and $39,147, respectively. Respondent disallowed these losses. Also disallowed were claimed 1979 losses for Southern Florida Real Estate Sales ($3,228), Admiralty Point Trust ($2,933), Homestead Development Corporation ($1,889), and Danny's Hideaway ($5,771). For each of these entities, other than McZand, the only evidence in the record consists of tax returns for some of the entities and the general testimonial statements that losses were incurred. No primary records establishing actual loss were presented. Therefore, petitioner has failed to meet his burden of proof.

Further, with respect to McZand and Danny's Hideaway, there is affirmative evidence that the reported tax treatment was incorrect. In 1979 McZand purported to sell real estate to petitioner at a gain; however, McZand failed to include that gain in income. For Danny's Hideaway, petitioner claimed a loss from the disposition of all his stock in 1979; yet petitioner claimed an unexplained additional loss in 1980 when he was no longer a shareholder. In view of the lack of evidence to support the claimed losses and the affirmative indications that these losses

were incorrectly calculated, such partnership, trust, and subchapter S losses are not allowable.

The only evidence in the record to support the deductions claimed for the farm losses or expenses are petitioner's 1979 and 1980 returns and the general statements by Mr. Dutton, the return preparer, that the farm showed a loss. We regard such evidence as insufficient to sustain petitioner's burden of proof. Moreover, one of petitioner's employees testified that the records for the farm were included in the corporate records of CDC through its subsidiary Caspian Farms. This is an indication that the farm expenses were paid by CDC, and not by petitioner. Because petitioner has failed to meet his burden of proving the amounts of expenses or losses incurred or that they were his expenses or losses, we hold that he is not entitled to the 1979 farm loss of $128,458 and the 1980 farm expenses of $249,204.

IX. Issue 13--Section 6653(b) Additions to Tax for Fraud

In the notice of deficiency covering the years 1972 through 1976 respondent determined additions to tax for fraud pursuant to the provisions of section 6653(b) with respect to petitioner. In an amendment to the answer filed herein, respondent asserted increased additions to tax under section 6653(b) for the years 1973 through 1976. Section 6653(b), applicable for the years in issue, provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be

added to the tax on amount equal to 50 percent of the underpayment.  Thus, for the years 1972 through 1976, respondent need only prove, by clear and convincing evidence, that <u>some</u> part of each year's underpayment is due to fraud.  If that burden is met, then the addition to tax is calculated on the entire underpayment for each year.

Petitioner relies upon, and we are well aware of, comments that were made by Judge Whitaker at the conclusion of the trial when the method and schedule for filing briefs were addressed. Judge Whitaker stated that it was his "recollection of the testimony, and this is not a decision on my part" that petitioners' counsel "made a very strong case".  With reference to the fraud issue, the following colloquy occurred:

> MS. HERBERT:  Your Honor, you know we do still have the affirmative allegation of fraud for a number of the years.

> THE COURT:  I understand that.  And if I were you, I wouldn't waste a whole lot of time on that argument. I don't think this is a fraud case, frankly.

> *  *  *  *  *  *  *

> THE COURT:  You're perfectly -- obviously, you can argue it.  You should argue it.  But point out those parts of the record which you think support fraud, because I have some trouble with it.  I don't think this ought to have been a fraud case to start with.

This tentative and qualified reaction by the trial Judge was made before a review of all the testimony and massive documentary evidence and before any briefs were filed.[29]

We are not bound by the comments made by the trial Judge about the fraud issue. They were of a preliminary or tentative nature, and were not embodied in a ruling. In our view the totality of the clear and convincing evidence contained in this record establishes that petitioner's underpayment of tax for each of the years 1972 through 1976 was due to fraud with intent to evade tax. In the trial Judge's qualified reaction there was no analysis of the indicia of fraud present in this record. By contrast, our conclusion regarding the section 6653(b) additions to tax is based on consideration of the indicia of fraud discussed below.

The addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). The Commissioner bears the burden of proof with respect to the additions to tax for fraud, and that burden must be carried by

---

[29] Compare North American Rayon Corp. v. Commissioner, 12 F.3d 583, 586 & n. 4 (6th Cir. 1993), affg. T.C. Memo. 1992-610, where the trial Judge wrote a letter to counsel indicating that the Court was inclined to rule in favor of the taxpayer, but in a subsequent opinion decided against the taxpayer. The Court of Appeals affirmed the decision. See also Milbrew, Inc. v. Commissioner, 710 F.2d 1302, 1308 (7th Cir. 1983), affg. T.C. Memo. 1981-610.

clear and convincing evidence.  Sec. 7454(a); Rule 142(b); <u>Rowlee v. Commissioner</u>, 80 T.C. 1111, 1123 (1983).  This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes.  <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  <u>Gajewski v. Commissioner</u>, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud is not presumed or imputed; it must be established by independent evidence that establishes a fraudulent intent on the taxpayer's part.  <u>Otsuki v. Commissioner</u>, 53 T.C. 96, 106 (1969).  Because direct proof of a taxpayer's intent is rarely available, fraud may be proved by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts.  <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943); <u>Stephenson v. Commissioner</u>, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).  For example, an intent to conceal or mislead may be inferred from a pattern of conduct, <u>Spies v. United States</u>, <u>supra</u> at 499, or from a taxpayer's entire course of conduct, <u>Stone v. Commissioner</u>, 56 T.C. 213, 223-224 (1971).  Likewise, a pattern showing a consistent underreporting of income, when accompanied by circumstances evidencing an intent

to conceal, may justify a strong inference of fraud. Parks v. Commissioner, 94 T.C. 654, 664 (1990).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. These "badges of fraud" include: (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, (6) failing to cooperate with tax authorities, (7) attempting to conceal illegal activities, (8) failing to make estimated tax payments, and (9) filing false documents. See Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Several of these indicia of fraud are present herein.

1. Petitioner's Sophistication and Experience

The sophistication and experience of a taxpayer are relevant in determining whether fraud exists. Stephenson v. Commissioner, supra at 1006. Petitioner was a highly intelligent, astute, and successful businessman. He was a consummate salesman. He dealt frequently with executives of major corporations and prominent Iranian officials. He was a strong negotiator. He was thoroughly familiar with his vast business operations, and he controlled them. Consequently, it is unlikely that he would not have realized that his Federal income tax liabilities were

consistently and substantially underreported for each of the years 1972 through 1976.

2. Consistent and Substantial Understatements of Income

Consistent and substantial understatement of income may be strong evidence of fraud. Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Moreover, a pattern of consistent underreporting of income, when accompanied by other circumstances indicating an intent to conceal income, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137 (1954).

Although petitioner carefully kept track of the income he generated, he did not disclose to Mr. Giffin, his accountant and return preparer, substantial amounts that were not recorded in the books and records of his sole proprietorship, CTC. For 1972, 1973, 1974, 1975, and 1976 business receipts directed to accounts other than petitioner's or CTC's CNB accounts and not recorded in CTC's books exceeded approximately $1,000,000, $750,000, $2,500,000, $1,850,000 and $1,375,000, respectively. These omitted amounts greatly exceeded the reported Schedule C gross profit in every year except 1976; in that year the omitted amount was 80 percent of the reported gross profit. Mr. Giffin did not know about these deposits because he knew only what was recorded in CTC's cash receipts journal. Furthermore, Mr. Giffin never

saw or knew the terms of the underlying agreements with Lockheed and Ashland.

Petitioner was the sole representative of Lockheed and Ashland with respect to the business these companies transacted with the Government of Iran. These two companies paid commissions in excess of $5 million for the services rendered by petitioner. As a part of his scheme to evade the payment of taxes, petitioner directed the majority of the commissions to bank accounts in the names of other entities. He directed Lockheed to make commission payments he earned in the amounts of $594,972, $466,147, $995,542, and $331,862 to Diesel Power's Bank of America account during the years 1972 through 1975, respectively. He also directed Lockheed to deposit commission payments he earned to the WHIP bank account at Barclays Bank Bahamas in the amounts of $418,111 in 1972 and $191,588 in 1973. The amounts he directed to the Diesel Power and WHIP bank accounts were not recorded in CTC's books, nor were Lockheed, WHIP, or Sunvaco listed as customers of Diesel Power in the latter's financial statements for the periods ending March 20, 1974 and March 20, 1975.

Petitioner had complete control over the Diesel Power and WHIP bank accounts. He made significant withdrawals and transfers from the accounts during the years 1972 through 1976 which he converted to his personal use. From the WHIP bank

account, he paid Hossein Zanganeh $80,000 in 1972 for his assistance in the Lockheed transactions. He transferred $880,000 from the WHIP account to a Swiss account at the Banque de Paris. From the Diesel Power account at Bank of America, petitioner withdrew $655,500 in 1973, $531,633 in 1974, $1,345,766.60 in 1975, and $665,000 in 1976.

With respect to Ashland, petitioner was paid commissions for his consulting services in the amounts of $117,900 in 1973, $1,472,776 in 1974, and $452,328 in 1975. In 1976, he was paid $265,000 for the termination of the various consulting agreements that existed with respect to Ashland's business in Iran. Yet he reported only $66,250 of these amounts on his tax returns for those years.

The payments by Ashland, like those by Lockheed, were made to shell entities, primarily All Patents Corporation, through 1975. Some of the amounts made payable to All Patents were deposited to Swiss accounts at the Banque de Paris for petitioner's benefit. He alone performed the services for which those commission payments were made. He transferred the funds deposited to All Patents' Banque de Paris account to Diesel Power's account. He also had some of the commissions made payable to All Patents deposited directly to Diesel Power's account. Diesel Power provided no consulting services to Ashland, and it was not in a line of business that would have

been of use to Ashland.  These payments were not recorded in CTC's books for 1973 through 1975, and Ashland and All Patents were not listed as customers of Diesel Power in its financial statements for the periods ending March 20, 1974, and March 20, 1975.  The evidence is clear that Diesel Power did not earn the commissions paid by Ashland during these periods, nor those paid by Lockheed.  The consultant agreements entered into by Lockheed and Ashland for the sale of their products in Iran were terminated once petitioner stopped traveling to Iran in 1975. The termination payments were recorded in CTC's books only after petitioner had to sign statements alleging compliance with the consultant agreements.  That occurred only after the Government's probe into foreign business transactions.

In addition, petitioner understated substantial interest income he received from foreign bank accounts in 1974, 1975, and 1976.  During those 3 years petitioner earned interest on the bank accounts or time deposits in the name of WHIP at the Barclays Bank Bahamas in the amounts of $25,025, $29,338, and $16,998, respectively.  He admitted that WHIP was merely a shell corporation that conducted no business of its own.  Petitioner directed all activities of WHIP and invested the funds of WHIP for his personal benefit in time deposits at the Barclays Bank. He closed WHIP's bank accounts in 1978 when he withdrew the

remaining balance of $610,000 and deposited it in his personal bank account in Columbus, Ohio.

Petitioner also omitted interest income earned on his own accounts at the First National City Bank in London.  In 1974 and 1975 he earned interest of $38,055 and $43,641, respectively.  In 1976 he earned interest of $44,127.50.  Although petitioner testified that the account in his name at the FNCB London was an account of Diesel Power, the documentary evidence shows otherwise.  First, Diesel Power had a separate bank account, FNCB London.  No plausible reason was shown for it to have an account in petitioner's name at that bank.  Second, petitioner had complete access to and control of the accounts in his own name. He directed payments to the accounts and invested sums on deposit in the accounts.  He was the signatory on the accounts and the accounts had no restrictions.

3.  Overstatements of Business Expenses and Itemized Deductions

It is well settled that a fraudulent understatement of income can be accomplished by overstatements of business expenses and deductions.  See Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986), and cases cited therein; Pettit v. Commissioner, T.C. Memo. 1984-460, affd. without published opinion 792 F.2d 1122 (9th Cir. 1986); Gano v. Commissioner, 19 B.T.A. 518, 533 (1930).

Here petitioner consistently followed a pattern of claiming excessive business expenses and deductions for all the years in

issue, particularly during the years for which respondent determined fraud. For example, travel and entertainment expenses were overstated by $19,913.37 in 1973, $75,284.40 in 1974, $77,315.01 in 1975, and $20,000 in 1976. In addition, for some of the years there were overstatements of some commission expenses, consulting fees, legal and professional fees, salaries and wages, interest expenses, depreciation, and rental expenses.

4. Failure to Maintain Adequate Books and Records

Failure to maintain adequate books and records of income generally and failure to keep records of income diverted and unreported are both indicative of fraud. Truesdell v. Commissioner, 89 T.C. 1280, 1302 (1987); Gajewski v. Commissioner, 67 T.C. at 200.

The record contains evidence showing that petitioner's books and records with respect to income and expenses were inadequate, incomplete, and sometimes misleading. Substantial income was unreported and claimed expenses were overstated or not substantiated.

5. Concealment of Income or Assets

The concealment of income or assets is an indicium of fraud. Bradford v. Commissioner, 796 F.2d at 307-308.

Petitioner handled the transactions involving Lockheed and Ashland to conceal from respondent the large sums of money paid

by these companies to him. Petitioner had access to the funds through his signatory powers over the accounts. He withdrew moneys from the WHIP and Bank of America accounts to which the Lockheed sums were paid. Such withdrawals exceeded $2.9 million. He had access to the deposits made to All Patents' account at the Banque de Paris, and he transferred funds from that account to the Diesel Power account. He also had payments made in the name of All Patents deposited directly to Diesel Power's account at the Banque de Paris. He had signatory authority over the accounts. Diesel Power provided no services to Lockheed and Ashland from 1972 through 1976.

As a part of his effort to conceal the commissions earned from Lockheed and Ashland and the interest income earned on the accounts at Barclays Bank Bahamas and FNCB London, petitioner concealed this information from Mr. Giffin, his accountant and return preparer. This is evidence of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63. Mr. Giffin had instructed CTC's employees to include all income and disbursements of CTC and petitioner, whether business or personal, on CTC's cash receipts and cash disbursements journals. Mr. Giffin relied on the journals in preparing petitioner's Federal income tax returns. If items did not appear on the journals, Mr. Giffin was not aware of them. No commission payments that petitioner directed to the foreign bank

accounts or to Diesel Power's Bank of America account were recorded in the journals. Mr. Giffin did not know about such payments.

At the time he prepared petitioner's tax returns, Mr. Giffin was unaware that petitioner had any ownership interest in Diesel Power. He was similarly unaware that petitioner had an interest in or affiliation with WHIP or All Patents. He also did not know that petitioner had signatory authority on any foreign bank accounts.

Because this information was concealed from Mr. Giffin, petitioner's 1974 and 1975 income tax returns made several false statements. Not only did the returns fail to include in income the interest earned on petitioner's FNCB London and WHIP accounts, but the returns were not accompanied by a Form 4683 disclosing petitioner's signatory authority over the foreign bank accounts. Such a form was required to be attached to returns for years after 1975. When Mr. Dutton, petitioner's subsequent accountant, filed an amended 1975 return in 1978, still no disclosure was made of the foreign bank accounts.

On his 1976 income tax return petitioner disclosed the existence of one FNCB London account on Form 4683, but failed to disclose the WHIP account. The 1976 foreign bank accounts disclosure form is also false because it improperly stated that petitioner's interests in foreign bank accounts was less than

$50,000. The interest income alone earned on or deposited to the foreign bank accounts in 1976 exceeded that amount.

After Mr. Giffin prepared petitioner's income tax returns, Mr. Giffin, petitioner, and others would review the returns, including the individual items that made up the total numbers shown on the returns. If petitioner believed something on a return was not correct, he would personally have it corrected. Thus, petitioner signed the returns with knowledge of the substantial omissions of income from Lockheed, Ashland, and foreign bank accounts.

By not informing his accountant and return preparer about interest income earned on bank accounts outside the United States, by diverting the income he earned from Lockheed and Ashland to accounts in the names of All Patents, WHIP, and Diesel Power, and by not recording all fees earned from Lockheed and Ashland, petitioner clearly evaded the payment of substantial portions of his income tax liabilities for the years 1972 through 1976. Keeping this information from Mr. Giffin was an act of concealment by petitioner. Reliance upon an accountant to prepare accurate returns negates fraudulent intent only if the accountant has been supplied with all the information necessary to prepare the returns. Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976). Here petitioner was responsible for the

substantial underreporting of his income tax liabilities for the years in question.

6. Failure To Cooperate With Respondent in Determining Liabilities

Failure to cooperate in the examination and investigation of tax liabilities is an indicium of fraud. Powell v. Granquist, 252 F.2d 56, 59-60 (9th Cir. 1958); Gajewski v. Commissioner, supra at 200. Although petitioner asserts that he was cooperative, he was cooperative only to a limited extent. His cooperation was a defensive measure and incomplete. When respondent's investigation began, petitioner defended his prior actions by appearing to cooperate. He provided some of his books and records to respondent's agents and advised his employees to work with them. However, the books and records provided did not include the millions of dollars in omitted income from Lockheed and Ashland. Respondent's agents had to go to Lockheed and Ashland to complete records of payments to petitioner. Thus, he concealed the same information from respondent that he had concealed from Mr. Giffin.

Petitioner also did not disclose to respondent's agents complete information about the foreign bank accounts in which he had an interest or his interest in WHIP. In fact, he withheld information, even in responding to formal discovery, with respect to the British bank accounts, Banque de Paris accounts in the name of Diesel Power, and ownership information in WHIP, until

after respondent filed a motion to impose sanctions. Respondent had to resort to this method to obtain the necessary facts, due to petitioner's efforts to conceal these facts. He did not volunteer complete and truthful information.

In 1979, after petitioner had Mr. Dutton withdraw the $610,000 from WHIP's bank account in Barclays Bank Bahamas, Mr. Dutton informed respondent's agent, who was investigating potential criminal liability, that the $610,000 would be reported on petitioner's 1978 income tax return. However, there is no attachment to the tax return disclosing the withdrawal, and the income was not reported on petitioner's return. All in all, it is our view that petitioner did not truly cooperate with respondent's agents. We think he only did what he thought was necessary to keep respondent's agents from discovering the true sources of his fraud.

Accordingly, after considering all the facts and circumstances present in this record, we have found, and hold, that petitioner is liable for the additions to tax for fraud under section 6653(b) on the amounts of the underpayments for the years 1972, 1973, 1974, 1975, and 1976.

X.  Issue 14--Statute of Limitations for 1972

Petitioner has affirmatively pleaded and contends that the assessment of additional taxes for the year 1972 is barred by the 3-year statute of limitations. Sec. 6501(a). However, as

provided in section 6501(c)(1), the tax may be assessed at any time in the case of a false or fraudulent return with intent to evade tax. Because we have found that petitioner's 1972 Federal income tax return was fraudulent, it follows that the assessment of additional taxes for that year is not barred by the statute of limitations.

XI. Issues 15 and 16--Section 6653(a) Additions to Tax for Negligence

In the notices of deficiency for the years 1977 through 1981 respondent determined additions to tax for negligence. Section 6653(a), in effect for the years 1977 through 1980, provides that if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. For the year 1981 the negligence addition to tax includes two components: (1) 5 percent of the underpayment (section 6653(a)(1)) and (2) 50 percent of the interest payable under section 6601 on the portion of the underpayment attributable to negligence (section 6653(a)(2)).

Negligence, as used in section 6653(a), is defined as the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d at 506). Respondent's determination is prima facie correct, and the burden is upon petitioners to prove

that these additions to tax are erroneous.  Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264; Enoch v. Commissioner, 57 T.C. 781, 802 (1972).

Petitioners contend that they are not liable for the negligence additions to tax because they relied upon "tax experts" to properly prepare their returns for the years in issue.  As a general rule, the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer.  Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987); Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974).  In some circumstances, however, good faith reliance on expert advisers negates applicability of the addition to tax for negligence.  Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991).  To avoid liability, a taxpayer must establish the following:  (1) That the taxpayer provided the return preparer with complete and accurate information from which the tax return could be properly prepared; (2) that an incorrect return was the result of the preparer's mistakes; and (3) that the taxpayer in good faith relied on the advice of a competent return preparer.  Jackson v. Commissioner, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989); Daugherty v. Commissioner, 78 T.C. 623, 641 (1982).  In addition, taxpayers must show that they at least read

or made a cursory review of the prepared returns. Metra Chem Corp. v. Commissioner, supra at 662. Here petitioners have failed to establish that the information provided to their accountants and return preparers was complete or accurate.

Petitioners failed to maintain adequate books and records, and substantially overstated expenses and deductions for a number of items on their tax returns. These expenses and deductions include travel and entertainment expenses, depreciation, office expenses, legal fees, consulting fees, management fees, farm losses, partnership losses, subchapter S corporation losses, interest expense, rent expense, and omitted income. Their failure to keep adequate records, coupled with the omission of income and overstatement of expenses, shows negligence or intentional disregard of rules or regulations.

Petitioner substantially overstated his deductions for travel and entertainment expenses for each of the years 1977 through 1981. He estimated amounts for such expenditures and claimed high cash expenses that are not reflected in CTC's books and records. For each of the years 1977 through 1981 the deductions claimed for travel and entertainment expenses substantially exceed the amounts recorded in CTC's cash disbursements journals and the cash expenditures recorded in his diaries. Petitioner has been unable to substantiate the expenses. The failure to adequately document expenses for travel

and entertainment in light of the rules and regulations under section 274 demonstrates negligence.

Several adjustments were made by respondent with respect to depreciation, legal expenses, office expenses, consulting fees and rent expense for the years 1977 through 1980. Such adjustments were due to petitioner's failure to verify amounts claimed or to establish that such amounts were ordinary and necessary business expenses. He did not maintain records to verify the adjusted bases of automobiles or the business use of the automobiles for which depreciation was claimed. He claimed deductions for legal expenses incurred by Diesel Power in excess of $40,000 for which no substantiation was presented and for which the business purpose was not shown. Business expenses were claimed as consulting fees for payments to or on behalf of a stockbroker who had no relationship to petitioner's trade or business and who provided services to others. A business expense in the amount of $50,000 claimed for a fee to petitioner's brother was not paid. Rent expense was deducted for $6,451 paid by petitioner for his daughter's apartment; $2,053 was deducted that could not be identified; and over $13,000 was deducted for his son-in-law and daughter's condominium. The failure to maintain adequate records to verify business expenses or to show that claimed amounts were paid is indicative of negligence.

For the years 1977 through 1980 petitioner claimed management fees to CDC, a corporation in which he held a majority interest, in the amounts of $96,396, $72,609, $67,943, and $102,101, respectively. He offered no evidence that these amounts were paid and, in fact, stipulated that the 1979 amount was not paid. He also was unable to show a legitimate business purpose for a portion of the expenses claimed in each year. He was negligent in failing to substantiate that the management fees paid to his corporation were ordinary and necessary business expenses.

For the years 1979 and 1980 petitioner claimed losses for farming activities on Schedule F in the amounts of $128,458 and $249,204, respectively. There is no evidence in the record to support these large amounts. However, there is affirmative evidence that CDC or its subsidiary, Caspian Farm Systems, paid the expenses or amounts incurred. Petitioner's failure to provide any documentation in support of these large losses was due to negligence.

For the years 1979 and 1980 petitioner claimed partnership and small business corporation losses in amounts in excess of $55,000 and $69,000, respectively. Included in these amounts was a loss claimed in 1980 of $5,771 for Danny's Hideaway, when in fact petitioner had disposed of his entire interest in that business in 1979. Petitioner presented virtually no evidence in

support of numerous other losses claimed.  The failure to document such large losses constitutes negligence.

For the years 1979, 1980, and 1981 petitioner claimed amounts of interest paid to the Mirhosseini family.  He was unable to show that a significant portion of the interest expense claimed was actually paid to the Mirhosseini family or that debtor/creditor relationships existed between him and the Mirhosseini family.

For 1977 and 1978 petitioner had substantial amounts of unreported income.  Although he claimed the income belonged to Diesel Power, it was under his dominion and control.  It was deposited to his bank account pursuant to directions he gave the payors, and he performed the services for which the income was paid.  Furthermore, the manner in which the income was treated on CTC's books and records was erroneous because it reflected the unreported amounts as being the income of Diesel Power.  His return preparers relied on the books in preparing his tax returns.  The information relied upon by the return preparers was not accurate, which is a further indication that petitioner was negligent.

Accordingly, we sustain respondent's determinations with respect to the additions to tax for negligence for each of the years 1977 through 1981.

XII. <u>Conclusion</u>

We think we have resolved all the disputed issues raised by the parties.  However, if there are any unresolved issues, they will be treated as conceded or abandoned or as issues with respect to which there has been a failure of proof.

To reflect concessions of the parties and our conclusions on the disputed issues,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.